# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## No.     19-1652

### UNITED STATES OF AMERICA,
#### Respondent/Appellee,

#### v.

### JUAN JARMON,
#### Petitioner/Appellant.

**On Appeal from the Judgement of Conviction and Sentencing Order in the United States District Court for the Eastern District of Pennsylvania, Entered November 27, 2019, No.2:17-CR-00072**

### BRIEF FOR APPELLANT
### AND APPENDIX VOLUME I

**MAUREEN COGGINS**
**Attorney for Appellant Juan Jarmon**
**463 West Linden Street**
**Allentown, PA 18101**
**(610) 400-3015**

# **TABLE OF CONTENTS**

TABLE OF CITATIONS ……………………………………………… i-iv

STATEMENT OF SUBJECT MATTER AND  APPELLATE
        JURISDICTION …………………………………………… v

STATEMENT OF THE ISSUES ……………………………………… vi-vii

RELATED CASES AND PROCEEDINGS ………………………… vii

STANDARD OF REVIEW …………………………………………… vii-viii

CONCISE STATEMENT OF THE CASE

        A.   Relevant Facts ……………………………………… 1-20

        B.  Procedural History …………………………………… 20-22

        C.  Rulings Presented for Review …………………………… 22

SUMMARY OF ARGUMENT ……………………………………… 23

ARGUMENT ………………………………………………………… 25-61

CONCLUSION ……………………………………………………… 61

COMBINED CERTIFICATIONS……………………………………….. 62

CERTIFICATE OF SERVICE ……………………………………… 63

# **TABLE OF CITATIONS**

**Federal Cases**

Bansal v. Pavlock, 352 Fed. Appx. 611 (3d Cir. 2009)                    55

Blumenthal v. United States, 332 U.S. 539 (1947)                    27

Carpenter v. United States, 138 S. Ct. 2206 (2018)                    24, 25, 50, 51,
                                                                    52, 53, 54, 57

Chao v. Community Trust Co. 474 F.3d 75 ( 3rd Cir. 2007)                    55

Gall v. United States, 552 U.S. 38 (2007)                    37

Jones v. United States, 565 U.S. 400 (2012)                    51, 52

Kotteakos v. United States, 328 U.S. 750, 66 S. Ct. 1239,
        90 L.Ed. 1557 (US 1946)                    27

Melendez-Diaz v. Massachusetts, 557 U.S. ___, 129 S.Ct. 2527,
        174 L.Ed. 2nd 314 (2009)                    35

Riley v. California, 134 S.Ct. 2473 (2014)                    52

SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735 (1984)                    54

SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118 (3rd Cir. 1981)( en banc)    55, 56

Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 1619, 48 L.Ed. 2d 71 (1976)    51

Tinsley v. United States, 43 F.2d 890 (8th Cir. 1930)                    29

United States . v. Amirnazmi, 645 F.3d 564 (3rd Cir. 2011)                    55

United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936)    59

United States v. Bell, 947 F. 3d 49 (3d Cir. 2020)                    10, 37

United States v. Bostic, 791 F.3d 127 (D.C. Cir. 2015)                    29

United States v. Brown, 587 F.3d 1082 (11th Cir. 2009)                    27

United States v. Calderon, 578 F.3d 78 (1st Cir. 2009)                         29

United States v. Castro, 776 F.2d 1118, 1124 n.4 (3d Cir. 1985),
    *cert*. *denied* 475 U.S. 1029, 89 L. Ed. 2d 342, 106 S. Ct. 1233 (1986)    27

United States v. Clark, 425 F.2d 827 (3d Cir. 1970)                           35

United States v. Collado, 975 F.2d 985  (3d Cir. 1992)                 10, 34, 42, 43

United States v. Coyle, 63 F.3d 1239 (3d Cir. 1995)                           44

United States v. DeLarosa, 450 F.2d 1057 (3d Cir. 1971)                       35

United States v. Dragon, 471 F.3d 501, 505 (3d Cir. 2006)                 10, 58

United States v. Ewell, 2016 W.L. 463784 (W.D. Pa., February 8, 2016)      55, 56

United States v. Falcone, 311 U.S. 205 (1940)                                 29

United States v. Goldstein, 914 F.3d 200 (3rd Cir. 2019)                  51, 53

United States v. Grier, 475 F.3d 556 (3d Cir. 2007)                       10, 37

United States v. Harris, 44 F.3d 1206 (3d Cir. 1995)                          37

United States v. Hodge, 85 F. Appx. 278 (3rd Cir. 2003)                       53

United States v. Jones, 132 S.Ct. 945 (2012)                              51, 52

United States v. Katz,  389 U. S., at 351-352, 88 S. Ct. 507, 19 L. Ed. 2d 576    51

United States v. King, 454 F.3d 187 (3d Cir. 2006)                            38

United States v. King, 21 F. 2d 1302 (3d Cir. 1994)                           38

United States v. Katora, 981 F.2d 1398 (3d Cir 1992)                          38

United States v. Lapier, 796 F.3d 1100 ( 9th Cir. 2015)                       27

United States v. Lott, 584 F.2d 827 (3d Cir. 1970)                            35

United States v. Mastrangelo, 172 F.3d 288, 292 (3d Cir. 1999)                26

United States v. McFadden, 2018 U.S. Dist. LEXIS 185120                       40

United States v. McNeill, 887 F.2d 448 (3rd Cir. 1989)                    26

United States v. Miele, 989 F.2d 659 (3d Cir. 1993)                    34, 37

United States v. Miller, 425 U. S. 435, 443, 96 S. Ct. 1619,
    48 L. Ed. 2d 71 (1976)                    51

United States v. Miller, 527 F.3d 54 (3rd Cir. 2008)                    26

United States v. Nixon, 418 U.S. 683 (1974)                    55

United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed 2d 508 (1993)    58, 59

United States v. Palk, 917 F.2d 879 (5th Cir. 1990)                    40

United States v. Peoni, 100 F.2d 401(2nd Cir. 1938)                    29

United States v. Perez, 280 F.3d 318, 344 (3d Cir. 2002)                    27

United States v. Pressler, 256 F.3d 144 (3rd Cir. 2001)                    28, 29

United States v. Price, 13 F. 3d 711 (3rd Cir. 1994)                    10, 26, 34

United States v. Nixon, 418 U.S. 683 (1974)                    55

United States v. Rawlins, 606 F.3d 73 (3d Cir. 2010)                    35

United States v. Rivera, 800 F.3d 1 (1st Cir. 2015)                    28

United States v. Smith, 294 F.3d 473 (3d Cir. 2002)                    9, 25, 26, 34, 51

United States v Theodoropoulos, 866 F.2d 587, 594 (3d Cir. 1989)                    26

United States v. Tracey, 597 F.3d 140 (3rd Cir. 2010)                    50

United States v. Tinidad-Acosta, 773 F.3d 298 (1st Cir. 2014)                    42

United States v. Westinghouse Elec. Corp., 638 F.2d 570 ( 3rd Cir. 1980)    55

United States v. Whitted, 502 Fed. Appx. 143 (3d Cir. 2020)                    34

United States v. Wolfe, 245 F.3d 257 (3d Cir. 2001)                    9, 25, 34

United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed. 2nd 1 (1985)    58

**Federal Statutes**

5 U.S.C. § 52(b)                                              58

18 U.S.C.S. § 2703(d)                                         53, 54

18 U.S.C.S.  § 2703(b)(1)(B)                                  54

18 U.S.C.S. § 3231                                            7

18 U.S.C.S. § 3553(a)                                         58

21 U.S.C. § 841(a)(1)                                         21

21 U.S.C.  § 841(b)(1)(A)                                     21

21 U.S.C.  § 841(b)(1)(B)                                     21

21 U.S.C. § 841(b)(1)(C)                                      21

21 U.S.C. § 846                                              21

28 U.S.C § 1291                                              7

28 U.S.C. § 3742(a)                                          7

U.S.S.G. § 2D1.1(b)(1)                                       39

U.S.S.G. § 3B1.1                                             38

U.S.S.G . § 3B1.3                                            34, 43

U.S.S.G §3D1.2                                               59

U.S.S.G §3D1.3(b)                                            59

**Federal Rules**

Federal Rule of Appellate Procedure 4(b)                     7

Federal Rule of Procedure Rule 29                            25, 26

## STATEMENT OF SUBJECT MATTER
## <u>AND APPELLATE JURISDICTION</u>

The United States District Court for the Eastern District of Pennsylvania, had subject matter jurisdiction over this case pursuant to 18 U.S.C. § 3231 wherein '[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States based on the violation of federal criminal statutes.' As this is an appeal from a final judgement of conviction and sentence entered by the United States District Court for the Eastern District of Pennsylvania, appellate jurisdiction lies under 28 U.S.C § 1291 and U.S.C. § 3742(a).

On November 21, 2019, Appellant was sentenced to 360 months imprisonment with six (6) years supervised release. The judgement of conviction and sentence, from which this appeal is taken, was entered on the docket on November 27, 2019.  Juan Jarmon filed his notice of appeal on December 2, 2019, therefore, his appeal is timely under Federal Rule of Appellate Procedure 4(b).

## <u>STATEMENT OF THE ISSUES</u>

1. **WHETHER THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT APPELLANT OF ONE OVERARCHING  CONSPIRACY AS SET FORTH IN COUNT ONE OF THE SUPERSEDING INDICTMENT?**

2. **WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT APPELLANT CONSPIRED TO SELL 280 GRAMS OF CRACK COCAINE AS PART OF ONE OVERARCHING CONSPIRACY?**

3. **WHETHER DISTRICT COURT ERRED IN SENTENCING APPELLANT BASED ON THREE ENHANCEMENTS AND AN AMOUNT OF 280 GRAMS OR MORE THAT WERE NOT PROVEN BY PREPONDERANCE OF THE EVIDENCE?**

    D. **WHETHER THE DISTRICT COURT ERRED IN APPLYING A FOUR LEVEL ENHANCEMENT WHEN GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT APPELLANT WAS A LEADER IN THE CONSPIRACY?**

    E. **WHETHER THE DISTRICT COURT ERRED IN APPLYING A TWO LEVEL ENHANCEMENT WHEN THE GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT APPELLANT POSSESSED A DANGEROUS WEAPON?**

    F. **WHETHER THE DISTRICT COURT ERRED IN APPLYING A TWO LEVEL ENHANCEMENT WHEN THE GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT APPELLANT USED VIOLENCE, MADE A CREDIBLE THREAT TO USE VIOLENCE, OR DIRECTED THE USE OF VIOLENCE?**

    G. **WHETHER THE DISTRICT COURT ERRED IN ATTRIBUTING AT LEAST 280 GRAMS OF CRACK COCAINE TO APPELLANT DUE TO APPELLANT'S PARTICIPATION IN ONE OVERARCHING CONSPIRACY?**

4. **WHETHER THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT APPELLANT OF KNOWINGLY AND INTENTIONALLY DISTRIBUTING CRACK COCAINE AS SET FORTH IN COUNTS 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 AND 18, AND ADDITIONALLY AIDING AND ABETTING IN COUNTS 24, 25, 26, 27, 28,  29 , 30 , 31, 32 AND 33, OF THE SUPERSEDING INDICTMENT?**

5. **WHETHER DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS APPELLANTS TAPE RECORDED CONVERSATION FROM AN INCARCERATED CO-DEFENDANT BASED ON CARPENTER V. UNITED STATES?**

6. **WHETHER DISTRICT COURT COMMITTED PLAIN ERROR IN SENTENCING APPELLANT TO 360 MONTHS ON EACH OF COUNTS 8, 12, 14, 16, 18, 25, 26, 27, 29, 31 AND 33AND 240 MONTHS ON COUNT 9?**

## RELATED CASES AND PROCEEDINGS

Several co-defendants and others were charged in a related case under United States v. Edward Stinson Docket Number 17-00071.  That case is currently on appeal in case 20-1315.

## STATEMENT OF THE STANDARD OF REVIEW

Questions 1, 2 and 4 involve claims of insufficiency of the evidence.  The standard of review for a claim of insufficiency is that the court must view the record in a light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. United States v. Smith, 294 F.3d 473 (3rd Cir. 2002); United States v. Wolfe, 245 F.3d 257 (3rd Cir. 2001).

Question 3  involves claims of court error for applying enhancements and attributing a certain weight of drugs to establish a base level in sentencing Appellant.  This Honorable Court reviews factual findings relevant to the guidelines for clear error, however exercises plenary review over a district court's interpretation of the Guidelines. United States v. Collado, 975 F.2d 985, 990 (3d Cir. 1992);  United States v. Price, 13 F.3d 711, 732 (3d Cir. 1994)

Question 5 involves the denial of Appellant's suppression motion of recorded prison phone calls.  This Court reviews findings of fact for clear error but exercises plenary review over a district court's interpretation of the Guidelines.  United States v. Grier, 475 F.3d 556 (3rd Cir. 2007)(en banc);  United States v. Bell, 947 F.3d 49 (3rd Cir. 2020).

Question 6 involves the reasonableness of Appellant's sentencing.  The standard of review for this claim is for plain error.  United States v. Dragon, 471 F.3d 501, 505 (3d Cir. 2006).

## STATEMENT OF THE CASE

### A.  Relevant Facts

This case was investigated by the Federal Bureau of Investigation (FBI) and Drug

Enforcement Administration (DEA).  During the course of the investigation, the FBI and DEA

conducted wire intercepts of phone calls between several people in the indictment, which led to

hundreds of phone call recordings.  Law enforcement also made controlled purchases of crack

cocaine from persons listed in the indictment, using cooperating witnesses and confidential

sources, during which the members were surveilled, audiotaped and/or videotaped by the FBI

and DEA.  Many of these recording were captured in and around the Norman Blumberg

Apartment Complex.

The Norman Blumberg Apartment Complex, hereinafter referred to as "Blumberg," was a

public housing facility in North Philadelphia owned and operated by the Philadelphia

Housing Authority and designed to provide affordable housing to low income residents.

Blumberg's geographic territory was bordered by North 22nd Street to the East, North 24th

Street to the West, Jefferson Street to the South, and Oxford Street to the North. Blumberg

contained a children's playground located within 1,000 feet of each of its two high-rise

towers.

Blumberg's two high-rise towers each contained eighteen floors with nine apartments on

each floor, and a series of connected row home units, or "low-rises." One of the high-rise

towers was located at 1516 Judson Way, hereinafter referred to as the "Judson Building."

The other high-rise tower was located at 1515 Hemberger Way, hereinafter referred to as

the "Hemberger Building."

1

The government's theory of this case is that Juan Jarmon was the leader of a large scale drug conspiracy that operated within the Blumberg complex from 2012 until mid-2014. The government set out to prove this claim through the testimony of three government agents, two lab technicians, a law enforcement 'drug language expert' and two cooperating co-defendants.

The first witness called by the government was FBI Special Agent Cardone. Through this witness, the government presented intercepted telephone calls between several different people and the defendant. Agent Cardone's testimony included several phone calls mostly consisting of calls to/from Rasheed Chandler (a government cooperating witness, paid confidential source and co-defendant). The phone calls with Rasheen Chandler discussed drug sales in the NBA regarding many different people including Anthony Staggers, an 'unidentified male,' Raheen Butler, Mike Ferrell, Dwayne Fountain, Damon Edwards, Crystal Calonne, 'Auntie,' Taft Harris, Ms. Pat, Stephen Dawkins, Derek Fernandez and Sharita Bailey. A120-208. Eight of the seventeen people speaking in these phone calls were not even listed in Appellant's conspiracy indictment. In fact, Edward Stinson, Jamilla Bellamy and Stephen Dawkins were all charged in a separate drug conspiracy covering the time period beginning in 2010 through September 2015.

The first phone call testified to by Agent Cardona was dated October 3, 2012. In this phone call Jamila Bellamy placed a call to Edward Stinson[1], her boyfriend. Eleven minutes into the call, Bellamy handed her phone to Appellant. Stinson told Appellant that Appellant was allowed to sell drugs on the 18th floor. Stinson also says, regarding what Appellant argues is Rasheen Chandler, 'He'll f ** with the late night for you, right, you just got to tell him make sure it's from me or whatever. Like he can't put nothing else in pink, in pink or nothing.' Government

---

[1] The government dismissed all charges in Appellant's indictment against Edward Stinson prior to Appellant's trial. Stinson was charged in a separate indictment for conspiracy to distribute crack cocaine on the 18th floor of the NBA from 2010 through 2105. Stinson's indictment covered the same geographic location, time frame and several of the same people as Appellant's indictment. 17-cr-71, Eastern District of Pennsylvania.

exhibit 1A.  Moreover, Rasheen Chandler testified that he sold drugs for Edward Stinson in 2012.  **A352**  Rasheen Chandler told Agent Trainor that the bundles the he sold for Appellant were always red.  **A654-655**

The phone call recordings and transcripts presented by the government did not established one overarching conspiracy, but instead, multiple conspiracies between various people at different times to sell drugs in the Norman Blumberg Apartments (NBA).  These calls showed a number of different people who worked for several different people, sometimes at different times, often at the same time.  Appellant's frustration was apparent in these calls as he struggled to find people to work for him.  There were people who did not show up when they were supposed to, who moved out of the sate, who slept instead of working, etc.  Rasheen Chandler who also sold for Edward Stinson used most of the people referenced in these cals.  The evidence from the October 2012 call shows that Rasheen Chandler continued to sell crack cocaine in pink packets for Edward Stinson during the time frame of Appellant's indictment.  This and the other calls show that there were many different people involved in selling drugs in the NBA in many different roles working for multiple people all at the same time.  The only common factor in these separate conspiracies was Appellant's effort to sell drugs inside the Norman Blumberg Apartments.

Agent Cardona and Agent Trainor testified to several videos recording that they testified showed hand to hand drug sales from Appellant to confidential source JF.  Agent Trainor testified that, prior to dropping JF off in the vicinity of the NBA, Agent Trainor he would search the JF by patting him down over his clothing, outfit JF with several concealed recording devices and provided him with recorded cash.  **A508, A592**

3

Agent Trainor testified that JF bought crack cocaine on May 3, 2013,  May 17, 2013, June 11, 2013 and September 5, 2013 from Apellant at various locations outside of the MBA buildings.  Agent Trainor testified that they stopped using JF to buy drugs from Appellant because Appellant 'accused the source of being a cop' and this presented a safety issue.  **A563** On cross examination, however, Agent Trainor admitted that they had attempted another buy **after** this date and that the transcript of the recording shows that appellant was forcefully denying that [Appellant] believed 'that the CI was a cop.' **A619-620**

Agent Trainor testified, regarding the May 3rd transaction,  that he was unaware of how much money the agents gave to JF, was unaware how much money JF allegedly gave to Appellant and where the black bag and leftover money that was handed to JF by Sean Jarmon as seen on the video went, despite not recovering any money in the search after JF returned. **A593-596**  Agent Trainor admitted that the black bag seen being handed to the CS was missing from evidence: 'Q: So where is the black bag?  A: I don't — I don't know.' **A597, A600-601**  In fact, the black bag was never found.  The amount recorded by the agents as seized from May 3rd was 36.6 grams, the amount submitted was 36.8 grams, the amount received by the lab was 37.9 grams and the net weight was 2.1 grams. **A601; A832-834** Agent Trainor also agreed that there was no video evidence of Appellant handing anything to JF. **A605**

Agent Trainor testified that the video cameras for the May 17th transaction were not working but that JF met with Appellant and returned with crack cocaine.  Agent Trainor testified that the seized weight was 12 grams and the submitted weight was 23 grams. **A608** The lab report showed that the gross weight was 50.7 grams and the net weight was 22.7 grams. **A832-834**

Agent Trainor testified that on July 12, 2013, JF was sent out with $1700 to make a controlled purchase. He returned with a substance that the DEA listed as a seized amount of 39.7 grams and a submitted weight of 69.9 grams. Agent Cardona field tested the substance and reported a positive result for cocaine. **A612-613** The lab, however found that the substance did not contain any cocaine. **A473** The powder had a net weight of 34.5 grams of a non-controlled substance. **A832-834** This transaction was not testified to on direct, but only introduced by Appellant through cross examination. **A612**

Agent Trainor then testified that on August 2, 2013, JF was given $450, went to a mini mart and returned with a substance that the agents recorded as 37.5 grams seized, 37.5 grams submitted. **A615** The lab received 49.3 gram package with a net drug weight of 16.1 grams. **A832-834** Agent Trainor testified that Appellant did not appear anywhere on either video inside of the minimart or engaged in any transaction at all. **A616**

Agent Cardone also testified regarding August 2, 2013, but said that JF was given $900, met with Appellant in the doorway of the minimart, completed a drug transaction and returned with crack that weighed 37.5 grams. **A677 , A696** The video played for the jury did not show Appellant inside the store and did not show any transaction in the door way of the mini mart. **A697-698** After seeing the video on cross examination, Agent Cardona testified 'the source **told** us that the transaction happened there.' (emphasis added). **A697**

Agent Trainor testified that on August 14, 2013, JF is given $450 and returns with a substance that the DEA records as a seized weight of 24.5 grams, submitted weight of 24.5 grams and the lab receives a package weighing 40.7 grams with a drugs weight of 6.1 grams. **A832-834** Agent Trainor testified that Appellant did not appear anywhere on the video of the transaction. **A616-617**

5

Agent Trainor testified that September 5, 2013, JF was given $2,400 and sent off to try to buy drugs from Appellant.  JF returns with three knotted bags of white powder with a seized weight of 66.1 grams and a submitted weight of 96.7 grams.  **A618** The lab recorded a gross weight of 94.3 grams and a net weight of 58.9 grams.  **A832-834** Three quarters of the powder submitted was not a controlled substance.  Agent Trainor also stated, after listening to the transcript, that Appellant was forcefully denying that he believed JF was a cop.  **A620**

On September 30, 2013, agents gave JF $1300 to attempt to purchase an ounce of crack from Appellant.  JF came back without any money but handed over a white powdery substance that later tested to a fake substance.  **A563-564** Agent Trainor testified that Appellant did not appear at all on the video of the transaction. **A638**

The Confidential source used in all of these sales was identified as JF.  Agent Cardona was questioned regarding the number of false names JF had used in eight separate prior arrests, Jf's use of several different dates of birth and social security numbers, all of which appeared in his NCIC 'rap sheet.'  Cardona did not answer the questions and told the court when asked, that she did not run the NCIC check.  **A233**  Agent Trainor, however, testified that Agent Cardona had, in fact, requested JF's complete NCIC rap sheet from the Pennsylvania State Police and that the State Police had sent the NCIC rap sheet back to Agent Cardona:

> Q And there was some questions about this the other day.  Correct me if I'm wrong, but someone has to -- from law enforcement has to request a criminal history from the Pennsylvania State Police is that correct?
> A Or the FBI, and NCIC report, correct?
> Q Okay. And then once they compile this report, they send it back to the person who requested it; is that fair to say?
> A I'm --
> Q They send it back attention to the law enforcement agent who requested the rap sheet in the first place?
> A Oh, yes, correct.
> Q And in that document that's in front of you, D4 -- I'm sorry, if you want to look at the first page of D-5, actually. I apologize. That was requested on what date?
> A July 13th, 2018.

6

Q And who was that requested by?
A Sarah Cardone.
Q And that's the agent seated here at the table?

A Yes, that's correct.
Q So she's the one who requested and received that rap sheet?
A Yes, that's correct.

**A587-588**


The government then relied on two co-defendants turned government cooperators to try

to show that Appellant was leader of this alleged overarching conspiracy, however, their

testimony contradicted the government's theory. The first cooperator was Rasheen Chandler.

Chandler, at the time of his cooperation with the government, was facing a possession

with intent to deliver for pink packets of crack that were found through a search warrant by the

agents in this case, in his 18th floor apartment. Under oath in Appellant's trial Chandler testified

that he stored drugs in his apartment for Appellant. However, Chandler pled guilty to possessing

those drugs with the intent to sell them in his Philadelphia County case. **A333**  Chandler also

testified that he sold drugs for Edward Stinson in the NBA. **A258**

Chandler testified that he stored crack cocaine in Sharita Bailey's apartment on the 18th

floor. **A260** Sharita Bailey is not listed on Appellant's indictment and therefore, not charged by

the government as having conspired with Appellant to store any of **his** drugs in her apartment.

(emphasis added).

On cross examination, Chandler contradicted himself on many occasions regarding

people that the government alleged worked for Appellant. For example, in the government's

case, Chandler testified that the only people that sold drugs for Appellant were Mike Ferrell,[2]

Anthony Staggers, Raheen Butler and Dottie Goode:[3]

> Q There's nobody else [other than Raheen Butler, Mike Farrell, Dottie Good and himself]
> that sold for my client, according to your direct testimony, is that correct?
> A Correct.  **A349**

This, however, was directly contradicted to his prior statements to Agent Trainor wherein he stated

that, as of February 18, 2014, only he and another male (not named) sell drugs on the 18th floor.

**A647**  Agent Trainor also testified that Chandler told him that Mike Ferrell was not involved in drug

trafficking[4] and that Anthony Staggers worked for him as a lookout for one month and now sells

marijuana around the NBA.[5]  Moreover, Chandler testified on cross:

> THE COURT: Mr. Chandler, do you recall ever telling the Government that someone
> called Riddles [Raheen Butler] sold for Juan Jarmon? Yes or no?
> THE WITNESS: No.
> **NT day 3, page 162, lines 19-22**

 The government then asked questions of Chandler regarding 'lookouts' to try to show

that Appellant was employing people to warn his sellers of police presence. On direct Rasheen

Chandler testified that Reds, Paintjob, Diamond and Ant served as lookouts for Chandler.  **A273**

After Chandler testified that he could not remember any other people, the government provided

the names 'Jamie' to which Chandler testified that person also served as a lookout.  **A304**

'Paintjob' and Jamie are not listed on Appellant's indictment, however, 'Paint Job' is charged in a

separate indictment for a drug conspiracy run by Edward Stinson.

---

[2]  Agent Baver testified that, after he showed Dottie Good a photograph of Mike Farrell, she told him 'to her knowledge, however, Ferrell was not involved in distributing narcotics.'  **A673**

[3]  Dottie Good told Agent Baver that 'to her knowledge, Chandler was not involved in distributing narcotics.'  **NT A673**

[4] **A649**

[5] **A653**

On cross examination, Agent Trainor testified that Chandler told him: '[Rasheen Chandler] used males known only to him as Mitch, Larry and Reds. **A648**

Further, on cross-examination, Chandler testified:

> Q Now, with regard to these lookouts, you testified to various lookouts. Is it fair to say, sir, that the lookouts were kind of free agents; do you know what I mean by that?
> A Of course.
> Q So they would be out there and then they would work for this group or they would work for that group or they would work for two groups --
> A Of course.
> Q -- at the same time?
> A Various at that time.
> Q They could even work for two different buildings at the same time, correct?
> A Of course.

**A349-350**

The government also called Dottie Good to show that she sold drugs for Appellant and used his 'lookouts' during her shifts. Dottie Good testified that she sold drugs for Appellant starting in April of 2013[6] and stopped on May 31st, but then went back to selling for one week in August of 2013.[7] On direct examination Dottie Good testified that she sold for Appellant in the

---

[6] **A405**

[7] **A406**

> Q Now, after the assault -- so you stopped that day, whatever the date of the assault was, you stopped selling crack cocaine?
> A Correct.
> …
> Q. And then do you remember telling the agents that you sold, after that, for one week in August of 2013?
> A Correct.

And

**A412**

> Q Okay. Well, you said you were working with my client, the dates that you said you were working with my client were?
> A 2013.
> Q April of 2013, when you started and you ended on May 31st of 2013, correct?

hallway of the18th floor.  **A375**  However, on cross, she testified that she sold on the 15th floor

because Appellant did not want her to sell on the 18th floor:

> Q Do you recall what apartments on the 15th floor you went back and forth between?
> A It was the girl who actually lived on the 13, but he [Appellant] had them come into the
> 15 so it wouldn't make the 18 floor like hot.
> **A405-406**

Agent Baver testified that Good also told him that she sold drugs on the 15th floor.  **A668**

Moreover, the DEA Form 7 stated that Dottie Good sold crack on the 15th floor.  **A** Cooperator

Chandler testified that the only place people could buy crack cocaine was the 18th floor.  **A357**

Dottie Good testified that she sold drugs for several people other than Appellant:

> And then do you remember telling the agents that you sold,  after that, for one week in
> August of 2013?
> A Correct.
> Q And then after that, you went on to sell for someone named Will?
> A Correct.
> **A406**
> …
>
> Q Is it fair to say that during the course of your drug dealing, in Norman Blumberg
> Apartments, you dealt with a lot of people? Fair to say?
> A No, just three.
> Q And who were those three?
> A It was Juan, Will, and Raheen.
> Q Raheen, who's that?
> A I don't know his last name.
> Q You sold for Raheen?
> A Yeah, but that was only like for maybe a week.
> Q When was that?
> A I'm not sure. Like it wasn't like nothing major.
> Q And you worked with other sellers; is that fair to say?
> A Yeah, but not nothing major like from when I first started.
> **A414**

Dottie Good also testified regarding lookouts.  On direct she testified that the lookouts that she used during her drug selling were 'Paint Job' and 'Diamond.'[8]  However, on cross examination, Dottie Good testified:

> Q You worked with a lot of different lookouts; is that fair to say?
> A Mainly like Paint Job or Diamond, sometimes Wanda.
> Q Wanda is Paint Job's wife?
> A Correct.
> Q Okay. And these lookouts, do you recall when you sat down and met with the agents, that you said you didn't know anything about lookouts? Do you remember maybe having a conversation in January that you were not aware of the presence or identity of any lookouts because Mr. --
> A And what year was this?
> Q 2014.
> A Okay. Because probably at that time, I wasn't too aware of them.[9]
> **A415**

Agent Baver testified that on January 6, 2014, Dottie Good told him that she was not aware of the presence or identities of any lookouts:

> Q "Dottie Good told you that she would be notified by only Jarmon if she was instructed to cease drug sales because of law enforcement presence near the public housing units." Is that correct?
> A Yes.
> Q She also told you: "As a result, she, Dottie Good, was not aware of the presence or identities of any lookouts."
> A That's correct.
> **A669**

The government also used the cooperating codefendants to try to establish an amount of drugs sold by the alleged conspiracy.  Rasheen Chandler testified on direct that he sold drugs for Appellant for $350 per week and negotiated for more because he was storing it in his apartment.

---

[8] The government listed 'aka Diamond' on it's indictment under the name Stephen Dawkins, however, the name 'Paint Job' is not associated with anyone listed on the indictment.  Stephen Dawkins is also charged in a separate conspiracy indictment at 17-cr-71.

[9] 'Wanda' is not charged in this conspiracy or any conspiracy that Appellant is aware of.

**A260**  He also said that he would typically sell two bundles in his 4pm-8am shift, but not less.

**A263-264**  He testified that he sold drugs for Appellant for eight to nine months.  **A264**

On cross examination Chandler stated he worked for Appellant for six to eight months and told Agent Trainor is was six months.  **A337** Chandler also stated that he would, in fact, sell less than two bundles and did not even know the least amount he would sell:

> Q Sir, do you remember saying, on a prior occasion, that you sold less than one bundle
>
> per day?
>
> A I told Pat it varies. It was not in stone that I sold one a day. It was -- it varies from time to time. It's slow, it's 1 fast, different times. I don't know what he took for me to say one. No. Different times it varies.
> Q Okay. But when you said to the jury before that the least you ever sold was two bundles, you've said different things in he past, is that correct?
> A It fluctuates. Meaning like sales fluctuate. Fluctuate all the time. So, it's not that I'm not making different changes of the amounts, it was just that sometimes it fluctuates. I don't know what they took of it.
> Q So then the least amount of crack that you ever sold, you don't even know?
> A Yes.
> **A343-344**

Chandler told Agent Trainor that he had started selling at some amount for Appellant and then **increased his sales** to 9 bundles every ten days, which equates to less than a bundle per day (emphasis added):

> Q You stated -- I'm sorry, he stated to you that he began selling for Juan Jarmon, and it was to earn money to pay his rent. Adding that their drug trafficking activities increased to where Jarmon and Edwards supplied Chandler with nine bundles of crack every ten days; is that correct?
> A Yes, I see it.
> Q So he's telling you it had increased to the point where it 15 was nine bundles per every ten days?
> A Correct.
> Q And he also stated that he made a profit of approximately $550 every ten days; is that correct?
> A Yes, that's correct.
> **A647**

Dottie Good testified on direct that she sold for Appellant from 12am through 8am but without any specific start date other than 2013. **A374**  She testified that she would sell three, maybe four bundles at the busiest and one at the least.  **A377-378**  Good also testified that she worked for several different sellers at different times.  **A398; A414; A416**  She also was arrested several times during the dates of the conspiracy selling her own drugs and several times outside of the conspiracy dates.

The government next called DEA Agent Patrick Trainor.  Agent Trainor introduced photographic evidence and testified to controlled buys on the 18th floor of the NBA from Rasheen Chandler, (4) Michael Farrell (1) and Taft Harris (1) only (exclusive of the controlled buys alleged to have been from Appellant to confidential source JF outside of the building).  **A564-566** All of these controlled buys were conducted using a confidential source known as DA. **A566**

Make Ferrell ('Diamond') made a sale of four red packets to DA on September 20, 2013 and was never seen again. **A566-570, A898**  On October 31, 2013, Taft Harris (Taz) sold six pink packets to DA.  **A899; A625**  Finally,  Agent Trainor testified to four hand to hand transaction by Rasheen Chandler to DA in which he sold solely pink packets (although the DEA 6 reflected that the four packets sold on February 11, 2014 were red).  **A628-630; A633; A813**  Agents served a search warrant on Rasheen Chandler's apartment on February 18th and found in 43 pink packets of crack.

Agent Trainor testified that Rasheen Chadler told him that the drugs that he (chandler) sold for Appellant were always in red colored packets:

> Q Now, he then told you during this interview Chandler advised that these bundles were
> usually 250 bundles, which consisted of  55 bags of crack cocaine, worth $250, correct?
> A Yes.

Q And then immediately after that: "Chandler stated these $5 bags were always red." Is that correct?
A Yes, that's correct.
Q And he was referring to the bags that were sold for Jarmon; is that correct?
A Yes, that's correct. **A654-655**

Agent Baver testified to two sales that were made on April 18 and April 25th of 2013 by Dottie Good on the 18th Floor to a CS known as VB. Agent Trainor testified that the fourteen packets that were sold by Dottie Good to VB on both dates were blue. **A634; A662-663; A896, A897** Government exhibit 401A also recorded that the April 18th sale occurred on the 15th floor. **A896**

**A**gent Trainor also testified that there were 'about 90 controlled buys in this case' even though only a handful were turned over in discovery. **A632** Appellant does not know who made the remaining 75 controlled buys, where the buys were made, what product was sold, what the packaging was or the weights of the sales.

The confidential sources used in the aforementioned sales all had prior convictions, pending cases, drug habits and were even on probation or parole at the time of their buys. The CS used in the hand to hand transactions with Appellant, JF, had several prior convictions under several fake names for felony offenses including possession with intent to deliver. He had used many social security numbers and fake dates of birth in the past. He was also paid $11,800 to cooperate with the government.

The confidential source (CS) used in all of the transactions with Chandler, Ferrell and Harris was identified as DS. Agent Trainor testified that DS had a number of arrests prior to her use, was arrested using eight (8) different names and three (3) different dates of birth, several

14

convictions for felony drugs and other crimes.  **A639-640**  In fact, DA was on probation at the time of her cooperation for a felony possession with intent to deliver case.  **A640**  When agent Cardona received the requested rap sheet back from the Pennsylvania State Police, she was informed that DA was wanted on an outstanding warrant for failure to appear on an assault case.  **A641**  DS was paid $11,400 for her assistance to the government.

The CS used in the drug sales with Dottie Good not only had a very long rap sheet, but was also 'purchasing drugs without authorization from the FBI or the DEA' and was subsequently 'terminated as a source for the FBI and DEA.'  **A662**  Appellant was not informed by the government that the CS was terminated. In fact, Appellant found out only through it's own investigation that both the CS and the co-operating co-defendant Dottie Good had been arrested together for buying and selling drugs to each other, while cooperating with the government, in the lobby of the NBA during

the time of the conspiracy.[10]  Both were charged in that incident and those cases remained open during the investigation and most of Dottie Good's cooperation.[11]

To prove the amount of drugs, the government called two witnesses from the DEA Northeast Laboratory where the drugs from the CS sales were sent.  Ms. Vitale testified that she could not say when any of the drugs were received at the lab for testing but that it would be on the DEA 7.  **A467** Ms. Vitale testified, 'Well I know when I received it from the evidence vault, but I — as far as when it comes to me in the lab, that should be reflected on — it should be on the evidence label.  Not necessarily.  That could be when they sealed it.  It would be on the DEA 7.'  **A475**  She also testified that the evidence was often times opened, resealed, opened again to put something in and then resealed again:

> Q Okay. And then in this case, correct me if I'm wrong, but it looks like you sealed it once, you opened it back up. You must have put something in it because the weight changed. Is that fair to say?
> A Yeah. I would expect the second weight to be a little bit heavier because -- well, there's other labels that I put. Yeah. And it looks like I put something in there. I'm just speculating.

---

[10]   The testimony from **A408** from Dottie Good's cross examination:
> Q And then after that, you're arrested on December 26th of 2014, again, for selling drugs, correct?
> A Correct.
> Q Now, at that point, in that case, you sold drugs to someone named Bike Lady; is that correct?
> A Yes.
> Q And you know Bike Lady because you've sold to Bike Lady in the past; is that correct?
> A Correct.

Agent Trainor testified:
> Q And you learned that subsequent to her working with you, and  making [the two Dottie Good purchases in April 2013] purchase, she was arrested about maybe a year --  well, December 26 of 2014, for buying drugs off of Dottie Good,  off the book -- yeah, off the books; do you recall that?
> A This is the --
> Q Her initials are V.B.?
> A Oh, yes. Yes, of course.
> Q You recall that she was arrested along with Dottie Good, for dealing drugs in the, I believe it was the lobby of the Hemberger building?
> A Yes. Yes. Oh, yeah.
> **A447**

[11]   On March 16, 2015, Good received a four (4) year probation for a 'negotiated guilty plea' to Possession with Intent to Deliver. Docket Number: CP-51-CR-0000465-2015

> It's possible I opened it because I didn't put all the packaging in there, and that's why the
> weight is different. But yes, I did reopen it to put something in it.
> Q But you don't know what that was?
> A I don't remember. I'd have to see my notes. **A469**

She testified that the gross weight and net weights on each lab report varied because:

> Well, the gross weight is all the packaging and the contents. The net weight is just the rock
> like substance or powder, whatever the sample is. So, the net weight is just the sample, and
> the gross weight is the whole package. **A470**

The Court admitted defense counsel's exhibits that included the DEA6, DEA7 and
DEA7As for each of the controlled purchases. These exhibits showed that none of the blocks
pertaining to the chain of custody of the evidence had been filled in. These exhibits also showed
that sometimes the 'seized weights' were vastly different from the 'submitted weights' which
were vastly different from the 'net weights' testified to by Ms. Vitale. The exhibits also showed
that on some occasions, the 'seized weights' were exactly the same as the 'submitted weights.'

Agent Trainor testified:

> **Q** Can you explain when it says seized, what does that mean?
> A That's the weight of the bag, as it's mailed to the -- as it's mailed to the laboratory.
> Q Okay. So, when you see the bag, do you -- I'm not talking about submitted, I'm talking
> about seized. When you describe seized, is that the weight of the whatever it is that the CI
> brought back to you?
> A Correct. That should be the weight of the drug exhibit in chief, correct.
> Q So, that would be the drugs and whatever is contained inside. Whether it's packets or
> plastic, not a bag, correct?
> A Yes, that's correct. Packaging material.
> Q Submitted then would be what you submit to the lab, including the sealed envelope?
> A Correct.
> Q On these exhibits for 28 and 29, the seized weight is exactly the same as the submitted
> weight; is that correct?
> A Yes, it is.
> Q So, obviously, the packaging that you're sending away to the laboratory has to weigh
> something, correct?
> A Oh, yes, correct.
> Q So, how can the seized and the submitted be exactly the same for both exhibits?

A It would appear that the officer who prepared the report may not have included the weight of the evidence bag in the weight of the exhibit.  **A601-602**

Appellant compiled and provided to the jury a chart that contained all of the discrepancies in weight regarding the seized and submitted drugs.  **A820; A768**  The chart consisted of all drugs seized pursuant to CS buys provided in discovery.[12]  **A832-834**

Agent Trainor testified that none of the forms for any of the drugs purchased in this case that were sent to the laboratory for weighing and testing were filled out with regard to the chain of custody information, even though there are boxes on each form to record such information:

> Q So, as I understand it then, the custodian, the person who's taking the drugs from the DEA field office in Philadelphia, fills out the first part of that box; is that correct?
> A No, no that's signed by the staff at Lab New York City when the exhibit is received by them.
> Q Okay. So, then it says received from, and then name  received by; is that correct?
> A Yes, correct.
> Q And then for laboratory evidence receipt, received from and received by, correct?
> A Yes, correct.
> Q It's not filled in.
> A No, it is not.
> Q And it's actually not filled in on any of these forms, is it?
> A I don't see it on either of these forms, correct?
> Q On any of these forms. Is that fair to say? On any DEA 7 that we've talked about today, correct?
> A Correct.
> Q So, as -- if the laboratory receives this and they don't know what date they received it or who they received it from, this form isn't going to help them, correct?
> A That's correct. 1
> Q But the rest of the form is filled out by a DEA agent?
> A Yes, that's correct.  **A604-605**

The government tried to establish that Appellant used acts of violence and intimidation in the NBA as part of is drug sales.  To do this, the government elicited testimony from Dottie Good

---

[12]   One example is from the May 17 hand to hand sale.  The amount seized was recorded as 12 grams, the amount submitted as 23 grams, the net amount as 8.9 grams and the gross as 40.6.  Another example is the April 25th hand to hand with Dottie Good where the amount seized was recorded as 1.9 grams, the amount submitted as 1.9 grams, the net amount as .61 and the gross as 32.5.

that she put money that she felt Appellant owed her in her pocket. She testified that Appellant tried to get the money out of her pocket and, during a tussle for the money, Appellant 'pushed' her into a table causing a cut over her eye. **A383** She testified that this happened in a room on the 18th floor and that she lied to the medical staff because Appellant threatened her not to go to the hospital. **A384** Also on direct, Ms. Good described the fight differently:

> We got into an argument, which led to like a fight, and he dug his hand in my pocket to retrieve the money that was supposed to be mines, and we like was tussling for a while and like the pants pocket of my pants was ripped off, and then like I hit my head on the corner of the table in Sharita house, and I had to go to the hospital.
> **A379**

Agent Baver testified that Good, on January 6, 2014, told him a very different story:

> Q "Sometime in late June of 2013, at approximately 4:00 a.m., during her shift Good then confronted Jarmon on the 15th floor of Hemberger Way, about not being paid what she had been promised." That was on the 15th floor?
> A Correct.
> She then told you, Jarmon took her into an apartment on the 15th floor, in order to speak with her; that's what Dottie Good told you, correct?
> A Yes.
> …
> Q There's nothing in that paragraph about Juan Jarmon trying to reach for her pocket; is that correct?
> A I see nothing in there that indicates that.
> Q There's nothing in there to describe my client trying to grab any money from her pocket, correct?
> A Correct.
> Q There's nothing in there that says that my client threatened
> her, not to go the hospital, correct?
> A Correct.
> **A669-671**

The medical records that were admitted for the altercation by the government showed that Good told the admitting nurse that her drunk cousin slammed her around and she hit the corner of a table. Good told the doctor that that her cousin was drunk and was being too rough while playing with her, grabbed her headband she accidentally fell against a table. **A886-893**

At the conclusion of the government's case, Appellant moved for a judgement of acquittal pursuant to Fed.R.Crim.P. 29 on all charges. **A709, A760** The district court denied the Rule 29 motion **A760.** The court issued a Memorandum Opinion of tAppellant's Rule 29 denial on May 7, 2019. **A13-28** Defendant was found guilty on March 13, 2019 to most of the counts including the count 1 conspiracy. **A38-39**

A final PSI was delivered via email to Appellant's counsel on June 12, 2019. On October 21, 2019, Appellant filed timely objections to the PSR. **A835-839** The sentencing hearing was held on November 21, 2019. At the sentencing hearing, the court overruled Appellant's objection to the October 12, 2014 recorded prison call,[13] used Dottie Good's testimony regarding her assault to warrant a two level enhancement for the use of violence enhancement,[14] found 'abundant evidence' to apply a two level enhancement for aggravated role[15] and applied a two level enhancement for possession of a firearm based upon a September 12, 2013 recorded phone call played by the government.[16]

The court found the amount of drugs attributable to Appellant to be 723.33 grams using a calculation that he handed to counsel in court.[17] The court, based off of a phone recording played by the government at the hearing found that appellant possessed a dangerous weapon.[18] Moreover, the district court determined that appellant used violence, made a credible threat to

---

[13] **A845**

[14] **A847**

[15] **A847-848**

[16] **A49-851**

[17] **A851-852; A894-895**

[18] In the September 12, 2013 phone call Appellant says, 'G gotta try to get another pistol. I just let Boo take the pistols out the house, man. 'cause shit. I don't want that shit in the building with all them cops right there. I ain't tryin' to (UI) that shit, dog. Then, they comin' down. Housing, they on some other shit. They just keep searching everybody over on the building …' and 'I'm, man, I'm scared to even get in this car with this pistol, man (UI). I ain't drivin'. (UI). They see the (UI). They's gonna know something was up.'

use violence, or directed the use of violence and was a leader in the drug organization. Based upon this calculation plus the enhancements, the court found the guideline range to be 360 months to life. The court sentenced Appellant to 360 months.

**B.      Procedural History**

On February 8, 2017, a federal grand jury in the Eastern District of Pennsylvania returned a 48-count Indictment charging Juan Jarmon, Damon Edwards, Edward Stinson, Donta Edwards, Raheen Butler, Michael Farrell, Dottie Good, Taft Harris, Jr., Stephen Thompson, Stephen Dawkins, Sr., Derek Fernandes, Anthony Lee Staggers and Gene Wilson, Jr. with the following offenses: conspiracy to distribute 280 grams or more of cocaine base ('crack'), in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A) [Count 1]; distribution of crack, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) [counts 3, 5, 7, 9, 11, 13, 15, 22, 34, 38, and 44]; distribution of cocaine base ('crack') and aiding and abetting, in violation of 21 U.S.C § 841(a)(1)and (b)(1)(C) and 18 U.S.C. § 2 [counts 17, 42 and 46]; possession with intent to distribute cocaine base, in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C) [count 40]; possession with intent to distribute cocaine base and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1)and (b)(1)(C) and 18 U.S.C. § 2 [counts 20, 24, 26, 28, 30, 32 and 36]; distribution of cocaine base within 1000 feet of public housing, in violation of  21 U.S.C § 841(a)(1)and (b)(1)(C) and 18 U.S.C. § 2 [counts 4, 6, 8, 10, 12, 14, 16, 23, 35, 39 and 45]; distribution of cocaine base within 1000 feet of public housing and aiding and abetting in violation of 21 U.S.C §860 (a) and 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 [counts 18, 43 and 47];  possession with intent to distribute cocaine base within 1000 feet of public housing, in violation of 21 U.S.C §860 (a) and 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 [count 4]; possession with intent to distribute cocaine base within 1000 feet of

public housing and aiding and abetting, in violation of 21 U.S.C § 841(a)(1)and (b)(1)(C) and 18

U.S.C. § 2 [counts 21, 25, 27, 29, 31, 33 and 37]; unlawful use of a communication facility

furtherance of a drug felony, in violation of 21 U.S.C. § 843(b) [counts 2 and 19]; and

maintaining a drug house and aiding and abetting, in violation of 21 U.S.C. § 856 and 18 U.S.C.

§ 2 [count 48]. Specifically, Juan Jarmon was charged in counts 1, 2, 7, 8, 9, 10, 11, 12, 13, 14,

15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 36 and 37 of the

Indictment.

On March 1, 2019, the US Attorney's Office for the Eastern District of Pennsylvania filed

an Information with the court, pursuant to 21 U.S.C § 851(a), stating in writing that they

intended to rely upon Mr. Jarmon's previous conviction for possession with intent to deliver

charge for sentencing purposes.

Appellant's trial began on March 5, 2019. At the conclusion of the government's case,

Appellant moved for a judgement of acquittal pursuant to Fed.R.Crim.P. 29 on all charges.

**A709, A760** The district court denied the Rule 29 motion. **A760** The court issued a

Memorandum Opinion of Appellant's Rule 29 denial on May 7, 2019. **A13-28** On March 13,

2019 Appellant was convicted by the jury on Counts 1, 2, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18,

24, 25, 26, 27, 28, 29, 30, 31, 32 and 33. He was acquitted on Counts 22 and 23. The District

On November 21, 2019 Juan Jarmon was sentenced as follows: Count 1, imprisonment:

360 months with supervised release of five (5) years; special assessment of $1300; Counts 8, 12,

14, 16, 18, 25, 27, 29, 31 and 33 imprisonment of 360 months; supervised release of 6 years;

special assessment: $1300; Count 2, imprisonment of 48 months; supervised release of one (1)

year; special assessment of $1300; counts 9, imprisonment of 240 months; supervised release of

three (3) years; special assessment of $1300. **A38-45**

On December 2, 2019, Appellant filed an appeal from a judgement of the United States District Court, Eastern District of Pennsylvania from Appellant's conviction and sentence that was entered on November 27, 2019.  **A1**

### C.    Rulings Presented for Review

The First ruling presented for review is the district court's denial of the Edward Stinson's Motion to Suppress the October 12, 2013 recorded phone call that was joined by Appellant. **A10-11** The second ruling is the district courts denial of Appellant's Motion for Judgement of Acquittal under Rule 29.  **A12**  The third ruling presented is district court's overruling of Appellant's PSR objections including the finding of a conspiracy, the amount of drugs attributed to Appellant and the application of the enhancements as applied in the PSR.  **A840-883**  The fourth ruling presented is the district court's determination of the amount of drugs attributable to Appellant.  **A851-852; A894-895**  The fourth ruling presented is the district court's sentence of 360 months to life on counts 1, 8, 12, 14, 16, 18, 25, 27, 29, 31 and 33 and 240 months on count 9.  **A38-45**

### SUMMARY OF ARGUMENT

There was insufficient evidence presented by the government to support Appellant's conspiracy conviction as charged in Count One.  The government charged Appellant in one overarching conspiracy, specifically, that Appellant was the leader of a multiple person drug organization that sold drugs and employed lookouts from 2012 to mid-2014 on the 18th floor of the NBA.  Instead, the evidence showed that different types of drugs, including crack cocaine,

were being sold on several floors of the NBA by multiple people who used and shared the same workers.  The evidence showed that Appellant was involved in with multiple people who were working in multiple roles for many different people involved in multiple distinct and overlapping conspiracies that operated during the time outlined in the indictment.

There was insufficient evidence presented to show that Appellant sold at least 280 grams through a one overarching conspiracy.  The testimony was unreliable as the two cooperating codefendants gave conflicting testimony and had a tremendous motive to lie and exaggerate.  The confidential sources had been convicted of multiple drug felonies, had open cases, were on probation or parole and one even terminated by the FBI for unreliability. The chain of custody evidence was non-existent and the weights of drugs seized and submitted by the police and then recored the lab vary to such a significant degree, that no reasonable trier of fact could have determined a reliable amount.

The government failed to prove any of the three enhancements at Appellant's sentencing hearing.  First, for reasons stated above, the evidence relied upon by the court as presented by the cooperating codefendants regarding Appellant's 'leadership' role in the drugs being sold out of the NBA was completely unreliable.  Second, the phone call played at the sentencing hearing that the court relied upon,  only established that Appellant did not want to possess any firearms and, therefore, did not meet the burden of preponderance.  Third, the testimony from the cooperating codefendants Dottie Good did not establish a level of proof required for the enhancement of violence and intimidation as she gave contradictory testimony to the agents who interviewed her and the hospital staff who treated her.  Additionally, the court erred by using a drug amount of 280 grams for sentencing purposes.

The government did not provide proof beyond a reasonable doubt that Appellant engaged in any hand to hand sales with JF. The confidential source was a completely unreliable source, the records kept by the government were not completed by the agents, the system of drug measurements varied between agents and did not match that of the lab, Agent Cardona's testimony was contradicted by the physical evidence and other agents and no exchange of money or drugs between Appellant and JF was ever shown on any of the many videos used in the case.

Finally, the district court erred in denying Appellant's Motion to Suppress the recorded phone call of October 12, 2013, seized by the FBI through a blanket subpoena demanding all of Edward Stinson's prison calls covering almost four years. Under Carpenter v. US, Fourth Amendment protections extend to third parties in possession of mass caches of data that allow law enforcement to chart the movement of an individual under criminal investigation. These protections should be extended to the seizure of hundreds of prison calls recorded for security purposes. Carpenter v. United States, 138 S. Ct. 2206 (2018)

## ARGUMENTS FOR APPEAL

1. **WHETHER THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT APPELLANT OF ONE OVERARCHING CONSPIRACY AS SET FORTH IN COUNT ONE OF THE SUPERSEDING INDICTMENT?**

There was no reasonable basis for the decision of the jury to find Appellant guilty of one overarching conspiracy. Instead, the evidence proved a number of small and separate conspiracies, some involving Appellant and some involving people either charged in the

indictment, charged in other indictments or not charged at all.   The standard of review for a claim of insufficiency is that the court must view the record in a light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. United States v. Smith, 294 F.3d 473 (3rd Cir. 2002); United States v. Wolfe, 245 F.3d 257 (3rd Cir. 2001).

Federal Rule of Criminal Procedure Rule 29(a) before submission to the jury asserts that:

> "After the close of all the evidence, the government in a defendant's motion must enter judgment of acquittal for any defense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so."

The defendant may challenge the sufficiency of the evidence at the close of the government's case, or once the prosecution has rested under Federal Rule of Criminal Procedure Rule 29. United States v. Miller, 527 F.3d 54 (3rd Cir. 2008).  In determining whether to grant a Rule 29 motion the Court must view the available evidence in a light most favorable to the government. United States v. Smith, 294 F.3d 473 (3rd Cir. 2002).  A jury may use circumstantial evidence to support reasonable inferences of fact. However, inferences may be drawn from established facts, as long as there exists a logical and convincing connection between the facts established and the conclusion inferred. United States v. McNeill, 887 F.2d 448 (3rd Cir. 1989) However, such inferences may not be based on mere speculation or conjecture.

As to offenses involving controlled substances, a defendant is accountable for all quantities of contraband with which he was directly involved and in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal conduct that he jointly undertook. United States v. Price, 13 F. 3d 711 (3rd Cir. 1994) The Third Circuit has made it clear that a defendant is responsible for the amount of drugs distributed by his co-conspirators **only if** the drugs were distributed in furtherance of the conspiracy and within the scope of the agreement. United States v. Price, at 732.

The essential elements of conspiracy are a shared united purpose, an intent to achieve a common goal and an agreement to work together toward that common goal. United States v. Mastrangelo, 172 F.3d 288 (3rd Cir. 1999).  While the question of whether a single conspiracy is established as set forth in the indictment, or whether there are multiple conspiracies, is a fact question to be decided by a jury. United States v. Perez, 280 F.3d 318 (3rd Cir. 2002); Blumenthal v. United States, 332 U.S. 539 (1947).  Where the government fails to present sufficient evidence of the charged conspiracy, a Rule 29 Motion is appropriate.

The government will argue under the theory that drug conspiracies involving numerous suppliers and distributors operating under the aegis of a common core group can be treated as a single conspiracy. The government need not prove that each defendant knew all the details, goals, or other participants. United States v Theodoropoulos, 866 F.2d 587, 594 (3d Cir. 1989). On the other hand, unless the "peripheral members . . . have been aware of one another and have done something in furtherance of a single illegal enterprise, . . the conspiracy alleged lacks 'the rim of the wheel to enclose the spokes.' United States v. Castro, 776 F.2d 1118, 1124 n.4 (3d Cir. 1985), cert. denied 475 U.S. 1029, 89 L. Ed. 2d 342, 106 S. Ct. 1233 (1986) (quoting Kotteakos

v. United States, 328 U.S. 750, 755, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946)).  Whether there are several criminal enterprises overlapping criminal conspiracies, or a single overarching conspiracy, depends upon whether they share a single unified purpose in understanding one common agreement.  United States v. Brown, 587 F.3d 1082 (11th Cir. 2009)

A single conspiracy does not exist solely because many individuals deal with a common central player or common geographical location. What is required is a shared single criminal objective not just similar or parallel objectives between similarly situated people.  United States v. Calderon, 578 F.3d 78 (1st Cir. 2009); United States v. Lapier, 796 F.3d 1100; United States v. Bostic, 791 F.3d 127 (D.C. Cir. 2015). In determining whether separately charged conspiracies are really a single conspiracy the court applies a totality of circumstances test:  (1) the timing of the alleged conspiracies; (2) the identity of the alleged co-conspirators; (3) the offenses charged in the indictment; (4) the overt acts charged or description of the offense charged which indicate the nature and scope of the activity charged; and (5) the locations of the alleged conspiracies. United States v. Rivera, 800 F.3d 1, 45 (1st Cir. 2015)

In United States v. Pressler, the court did not find a conspiracy between Caban, the large heroin distributor) and Shreffler (a buyer and seller of Caban's heroin) even though Caban also sold to customers that were referred to him by Shreffler.  The court found that even though Shreffler distributed a sizable amount of heroin, most of the people to whom Shreffler distributed heroin had other sources of supply, and many of them distributed the drug as well.  The court found: 'here there was no independent evidence of an overarching conspiracy, that Shreffler knew that his seller sold drugs to other people or that some of his buyers did likewise provides scant support for the proposition that any of these individuals agreed to cooperate with one another.' United States v. Pressler, 256 F.3d 144, 152

The Court went on to distinguish the facts of this case from <u>Gibbs</u>:

This basic difference also explains why one of the factors about which we spoke in Gibbs does not translate well to the situation at bar. Gibbs stated that "the length of affiliation between the defendant and the conspiracy" was relevant to determining whether the defendant agreed to join it. 190 F.3d at 199 (emphasis added). We explained that this factor is relevant because "when a defendant drug buyer has repeated, familiar dealings with members of a conspiracy, that buyer probably comprehends fully the nature of the group with whom he [or she] is dealing, is more likely to depend heavily on the conspiracy as the sole source of his [or her] drugs, and is more likely to perform drug-related acts for conspiracy members in an effort to maintain his [or her] connection to them." <u>Id</u>. at 199. This factor (and our explanation for it) assumes the existence of an underlying conspiracy; after all, it makes little sense to talk about the defendant's comprehension of the nature of the "group" with whom he or she is dealing unless it has already been shown that there is an underlying group. The lack of an underlying (or overarching) conspiracy is the Government's problem here.

   <u>United States v. Pressler</u>, 256 F.3d 144, 152

Moreover, the court found that '[T]he fact that several of Shreffler's buyers knew that Shreffler often got his drugs from Caban and that they knew about each other is not enough to establish an agreement among them to distribute heroin. <u>United States v. Pressler</u>, 256 F.3d 144, 153

   Here, the proof admittedly made out a case, not of a single conspiracy, but of several conspiracies, notwithstanding only one was charged in the indictment. <u>United States v. Falcone</u>, 311 U.S. 205; <u>United States v. Peoni</u>, 100 F.2d 401; <u>Tinsley v. United States</u>, 43 F.2d 890, 892-893. Appellant's drug business was only one of many operating in the NBA. All of the drug dealers used workers and lookouts that were independent contractors who worked for many dealers at the same time. Rasheen Chandler used lookouts that either were not charged in the conspiracy or were charged in conspiracies in other indictments and that the lookouts were free agents, worked for various groups at the same time and even worked for dealers selling in different buildings at the same time. **A349-350** Dottie Good told the government in 2014 that she was unaware of the presence or identities of any lookouts white she told drugs for Appellant.

Five years later during her direct testimony she said that she remembers three lookouts; one who was charged in two different conspiracies and a husband and wife couple, one of whom was charged in a conspiracy in a different case. **A669** This evidence shows that, not only were the two cooperating codefendants completely unreliable, but that the 'lookouts' were not involved in a single overarching conspiracy with Appellant, because they did not share a single criminal objective. Instead, if this Court believes the testimony that lookouts existed, they shared were similar or parallel objectives with Appellant. These people were being used by multiple groups for multiple purposes. The government did not charge or even know the identities of the majority of people named by the cooperators. Therefore, this evidence helped to prove that there were multiple conspiracies.

Second, the evidence showed that there were multiple conspiracies because the two government witnesses testified that they sold drugs for multiple people throughout the time period covered in Appellant's indictment. The first phone call played by the government established that their cooperating codefendant sold drugs for Edward Stinson in a different conspiracy charged by the government. Stinson told Appellant that he could sell drugs in any color other than pink because Chandler was only allowed to sell drugs for Stinson in pink bags. Not only did Chandler testify that he sold drugs for Stinson, but Agent Trainor testified that Chadler told him that Appellant only sold his drugs in red packets. All of the sales, that the government put into evidence in their case, including those sold by Chandler, to the confidential sources, were in pink bags. When agents raided Chandler's room they recovered 43 pink bags of crack contained in a cooking bowl. Dottie Good testified that she sold for three different people

and told Agent Baver about a fourth. Additionally, Dottie Good (and the government's CS) were arrested for selling drugs to the CS six months after the date of the indictment.

Both cooperators had open prior PWID arrests, both received extremely significant breaks on their open cases during the time of their cooperation and one was suffering from severe mental health issues at least at the time of her testimony. Neither one spent any significant time in any jail on this case, despite facing decades in both mandatories and guideline ranges. In fact, Dottie Good, a career criminal under federal law for three prior PWID convictions, served less than one day in jail. It is unknown what significant break was given to Rasheen Chandler as he was not sentenced at the time of Appellant's sentencing hearing. These witnesses were consistently inconsistent, incredible and were given unbelievable breaks by the government in their cases. No rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the testimony of Rasheen Chandler or Dottie Good.

The remainder of witnesses presented were agents of the government. Despite having cameras positioned both in the hallway of the 18th floor and outside the NBA from November 27, 2013, there was no photograph or video from either of these cameras that ever showed Appellant with anyone mentioned in the indictment or in the trial, of Appellant dealing any drugs within the NBA or of Appellant even present on the 18th floor of the NBA.

The phone calls that were introduced through Agent Cardona showed a disorganized, loosely held unreliable hodgepodge of people that worked in the NBA in the drug trade. The calls showed that multiple dealers operated within the NBA at multiple, overlapping times frequently against each other. The evidence from the calls showed that people lied to Appellant,

did not show to sell drugs for him, were only around the building for short periods of time, were stealing from Appellant or not selling at all.

Finally, Agents Trainor and Baver introduced evidence of eight hand to hand sales inside of the NBA involving codefendants and two confidential sources, DA and VB.  Make Ferrell ('Diamond') made a sale of four red packets to DA on September 20, 2013 and was never seen again.  On April 18th and 25th of 2014, Dottie Good made two sales - one on the 15th floor consisting of four blue packets and one on the 18th floor consisting of ten blue packets to VB and was never seen again.  On October 31, 2013, Taft Harris (Taz) sold six pink packets to DA. Finally,  Rasheen Chandler sold six times to DA.  One sale is for red packets and all the remaining sales are solely pink packets.

The confidential sources used in the aforementioned sales all had prior convictions, pending cases, drug habits and were even on probation or parole at the time of their buys. The confidential source (CS) used in all of the transactions with Chandler, Ferrell and Harris was identified as DA (sometimes DS).  Agent Trainor testified that DS had a number of arrests prior to her use, was arrested using eight (8) different names and three (3) different dates of birth, several convictions for felony drugs and other crimes.  DA was on probation at the time of her cooperation for a felony possession with intent to deliver case.  When agent Cardona received the requested rap sheet back from the Pennsylvania State Police, she was informed that DA was wanted on an outstanding warrant for failure to appear on an assault case.

The CS used in the drug sales with Dottie Good was 'purchasing drugs without authorization from the FBI or the DEA' and was subsequently 'terminated as a source for the FBI and DEA.' Appellant was not informed by the government that the CS was terminated. In fact, Appellant found

out only through it's own investigation that both the CS and the co-operating co-defendant Dottie

Good had been arrested together for buying and selling drugs to each other, while cooperating with

the government, in the lobby of the NBA during the time of the conspiracy.  Both were charged in

that incident and those cases remained open during the investigation and most of Dottie Good's

cooperation.

    The government's evidence showed a disorganized dysfunctional group of people who were

working for a number of different sellers at any given time.  It showed that the government used

unreliable sources who each had a myriad of past convictions and had open cases, bench warrants

and one who was even terminated by the government for 'purchasing drugs without authorization

from the FBI 5 or DEA '[19]  and who were paid, in total, over $25,000 by the government for their

services.  Here, the government's evidence presented through recorded phone calls, hand to hand

sales and two cooperating codefendants showed overlapping, competing and distinct multiple

conspiracies including those run by Rasheen Chandler for Edward Stinson and Dottie Good selling

for several different people in the NBA, including herself.

    For these reasons, there was no rational basis for the decision by the jury to find one

overarching conspiracy beyond a reasonable doubt.


2. **WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT APPELLANT
CONSPIRED TO SELL 280 GRAMS OF CRACK COCAINE AS PART OF ONE
OVERARCHING CONSPIRACY?**


    The government did not prove beyond a reasonable doubt that Appellant sold 280 grams

of crack cocaine as part of a single overarching conspiracy as charged in the indictment and there

---

[19]  Confidential source VB was arrested for buying drugs from Dottie Good outside the purview of the government
for her own personal use.

was, therefore, no rational basis upon which the jury could have found him guilty.  The government's testimony regarding the amount of drugs sold in the conspiracy came from three sources: (1) the testimony of two cooperating co-defendants, (2) two confidential sources and (3) the testimony of two DEA lab chemists.

The standard of review for a claim of insufficiency is that the court must view the record in a light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. United States v. Smith, 294 F.3d 473 (3rd Cir. 2002); United States v. Wolfe, 245 F.3d 257 (3rd Cir. 2001).

This Court stated that "the standard for accomplice attribution under § 1B1.3 is stringent." Price at 732, citing  United States v. Miele, 989 F.2d 659, 666 (3d Cir. 1993). In United States v. Collado, 975 F.2d 985, 990 (3d Cir. 1992), this Court also held that a defendant can be responsible for the quantity of drugs distributed by his or her co-conspirators only if the drugs distributed (1) were in furtherance of the jointly-undertaken activity, (2) were within the scope of the defendant's agreement, and (3) were reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake. United States v. Price, 13 F.3d 711, 732; *See* 975 F.2d at 995.  With regard to what is reasonably foreseeable, this Court has made it clear that when applying "accomplice attribution" in determining the drug amounts that are reasonably foreseeable in a drug conspiracy the sentencing court must conduct a "searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical." Unites States v. Collado, 975 F.2d at 995. (Also see United States v. Whitted, 502 Fed. Appx. 143 (3rd Cir. 2020).

As argued in Argument 1, Appellant was not involved in one overarching conspiracy. Instead the evidence showed multiple conspiracies all running at the same time, in the same location and sometimes using the same workers. As argued above, the evidence showed that the drugs sold by Rasheen Chandler in the pink packets were drugs sold at the direction of and for the benefit of Edward Stinson and Rasheen Chandler. Edward Stinson stated that only his crack could be sold in pink packets and that he had a 'boy on the 18th floor that was selling for him' that Appellant avers was Rasheen Chandler. **Agent Trainor testified that Rasheen Chandler told him that Appellant always sold his drugs in red packets**. Moreover, Dottie Good admitted in her testimony and in her statements to the government that she sold crack cocaine for at least three different sellers (and herself) within the NBA. All fourteen of the packets sold by Dottie Good were packaged in blue . There were only two sales that were put into evidence that consisted of red packets, four sold by Mike Farrell on September 20, 2013 and four sold by Rasheen Chandler on February 11, 2014. Every other packet either sold by Rasheen Chandler or seized in Rasheen Chandler's room were pink as described by Edward Stinson. As such, most of the drugs used by the district court in its sentencing calculations were not in furtherance of any jointly undertaken activity by Appellant, but instead by Chandler and Good in their own separate conspiracies selling for individuals who do not appear on Appellant's indictment.

Appellant also avers that the evidence presented was insufficient to prove that Appellant was responsible for 280 or more grams of crack cocaine because the weights given by the chemists and Agent Trainor were unreliable and inconsistent and wholly without any evidence of a chain of custody.

The government need not prove a perfect chain of custody for evidence to be admitted at trial; gaps in the chain normally go to the weight of the evidence rather than its admissibility. The

Third Circuit has long rejected the proposition that evidence may only be admitted if a "complete and exclusive" chain of custody is established.  United States v. Rawlins, 606 F.3d 73, 82 (3d Cir. 2010);  United States v. DeLarosa, 450 F.2d 1057, 1068 (3d Cir. 1971).  Gaps in the chain normally goes to the weight of the evidence.  Id. at 83, citing, Melendez-Diaz v. Massachusetts, 557 U.S. ___, 129 S. Ct. 2527, 2532 n.1, 174 L. Ed. 2d 314 (2009) (quoting United States v. Lott, 854 F.2d 244, 250 (7th Cir. 1988);  See also United States v. Clark, 425 F.2d 827, 833 (3d Cir. 1970).

Agent Trainor testified that none of the forms for any of the drugs purchased in this case that were sent to the laboratory for weighing and testing were filled out with regard to the chain of custody information, even though there are boxes on each form to record such information. One of the lab chemists, Ms. Vitale, testified that she could not say when any of the drugs were received at the lab for testing.  She also testified that the evidence was often times opened, resealed, opened again to put something in and then resealed again.  The evidence also showed that, on some occasions, the 'seized' amount of evidence from the drug sales matched the 'submitted' amount, but many times it varied greatly.  Moreover, the amounts 'seized' by the agents varied greatly from the 'net' weight recorded by the lab chemist.  According to what constitutes the 'seized' weight and the 'net' weight from the testimony of Agent Trainor and Ms. Vitale, these number should match exactly.  The evidence also showed that different agents recorded vital information regarding the amounts seized and submitted in different ways. Appellant compiled and provided to the jury a chart that contained all of the discrepancies in weight regarding the seized and submitted drugs to show the inconsistent weights of the collected evidence.

Based upon the inconsistent weights, the inconsistent methods used to weigh the evidence, the lack of any chain of custody and the procedures used at the laboratory, Appellant argues that the no rational trier of fact could have found proof of any amount of drugs attributable to Appellant beyond a reasonable doubt based on the presented evidence.

3. **WHETHER DISTRICT COURT ERRED IN SENTENCING APPELLANT BASED ON THREE ENHANCEMENTS AND AN AMOUNT OF 280 GRAMS OR MORE THAT WERE NOT PROVEN BY PREPONDERANCE OF THE EVIDENCE?**

The sentencing court added 4 levels for the court's decision that Appellant was a leader in the conspiracy charged in the indictment, 2 levels based for the court's decision that Appellant possessed a dangerous weapon during the course of the conspiracy and 2 additional levels for the court's decision that Appellant used violence, made a credible threat to use violence, or directed the use of violence in the conspiracy.  Moreover, the district court decided that Appellant was accountable for at least 280 grams of crack cocaine.  The district court erred  in all four of these decisions because the evidence did not establish these elements by a preponderance of the evidence.

This Honorable Court reviews factual findings relevant to the guidelines for clear error, however exercise plenary review over a district court's interpretation of the Guidelines. United States v. Grier, 475 F.3d 556 (3rd Cir. 2007)(en banc);  United States v. Bell, 947 F.3d 49 (3rd Cir. 2020).  Once it is determined that the sentencing decision by the district court is procedurally

sound the appellate court should then consider the substantive reasonableness of the sentence

imposed under an abuse of discretion standard. Gall v. United States, 552 U.S. 38 (2007).

Moreover, This Court has insisted that "information used as a basis for sentencing under

the Guidelines must have 'sufficient indicia of reliability to support its probable accuracy.'"

United States v. Harris, 44 F.3d 1206, 1216 (3d Cir. 1995), citing United States v. Miele, 989

F.2d 659, 663 (3d Cir. 1993) (quoting U.S.S.G. § 6A1.3(a)). This standard should be applied

rigorously. Miele, at 664.

A. **WHETHER THE DISTRICT COURT ERRED IN APPLYING A FOUR LEVEL ENHANCEMENT WHEN GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT APPELLANT WAS A LEADER IN THE CONSPIRACY?**

The United States Guidelines authorize a four level addition to any defendant that  the

court determines was an organizer or leader of a criminal activity that involved five or more

participants or was otherwise extensive and is only appropriate if Appellant directed and

controlled at least 1 individuals. U.S.S.G. § 3B1.1(a) and Application Note 2; United States v.

King, 21 F.ed 1302, 1305 (3d cir. 1994); United States v. Katora, 981 F.2d, 981 F.2d 1398, 1402

(3d Cir.1992).

The evidence proves that Appellant was not involved in 'a criminal activity' that involved

5 or more people or was extensive.  The evidence in this case showed that no one person was

involved in any extensive operation.  The exhausting number of  phone calls played by the

government to show an extensive operation only proved Appellant's frustration with trying to

find people to work for him.  The phone calls showed people did not show up for work, fell

asleep during their shift, through money out of windows, lost money, could not account for drugs or money, moved away, etc.

One recorded call that the government used to forward their theory of an extensive 'operation' was from Mike Farrell.  In this call,  Mike Farrell tells Appellant that he (Mike Ferrell) finished Ra-Ra's joint off and did a little bit of a bean sixty jawn.'   Even if Ferrell used the term 'jawn' to mean crack, there is no indication that Ferrell was selling crack for Appellant. On direct, Rasheen Chandler testified that Farrell sold drugs for Appellant.  Agent Trainor testified, however, that back on February 18, 2014, when shown a picture of Mike Ferrell, Rasheed Chandler 'identified Mike Ferrell, as Mike, and said, Ferrell, to his knowledge was not involved in drug trafficking.'

The government failed to prove an overarching conspiracy as argued above and failed to prove even by a preponderance that Appellant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  The court erred by applying a 4 level enhancement.

### B. WHETHER THE DISTRICT COURT ERRED IN APPLYING A TWO LEVEL ENHANCEMENT WHEN THE GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT APPELLANT POSSESSED A DANGEROUS WEAPON?

U.S.S.G. § 2D1.1(b)(1) is a "specific offense characteristic" which allows the district court to increase the base sentence level of a person convicted of drug related offenses by two points "if a firearm or other dangerous weapon was possessed during the commission of the offense." Here, Appellant avers that the district court improperly increased his base sentence level under section 2D1.1(b)(1) because the facts presented in this case do not warrant the

increase.  Application Note 3 to section 2D1.1(b)(1) provides: "the adjustment should be applied

if the weapon was present, unless it was clearly improbable that the handgun was connected to

the drug transaction." United States v. Paulk, 917 F.2d 879, 882 (5th Cir. 1990)

In United States v. McFadden, This Court declined to conclude that the after-the-fact gun

references by two members of the conspiracy to Mr. McFadden, without more, beyond an almost

too convenient assumption about "tools of the trade," should be a basis for application of the two

point enhancement. United States v. McFadden, 2018 U.S. Dist. LEXIS 185120, *10.  This Court

found it relevant that there was no argument, much less evidence, that Mr. McFadden either had

a gun on his person or in his home during the time or in connection with the activities at issue.

United States v. McFadden, 2018 U.S. Dist. LEXIS 185120, *7.  Moreover, there was no

evidence in the record that there was widespread weapons usage within the conspiracy.  Id, at 7.

Here, the district court based its decision on a call recording that was only played at the

sentencing hearing and on the erroneous decision that the possession was part of the conspiracy.

**A852**

The evidence presented falls far short of a preponderance standard.  First, for reasons

argued previously, the court erred by finding that there was a conspiracy for which Appellant

possessed a gun.  Second, the call reveals that Appellant no longer has any guns because

someone else took them out of a 'house.'  The reference to a house does not indicate in any way

that the location of the 'house' was near the NBA.  There was no evidence that Appellant was

ever seen with a gun, let alone conducted any drug activity with a gun.  In fact, Appellant voiced

his concern of even getting into a car with a gun.  This call only goes to show that Appellant is

distancing himself from guns.  Therefore the court erroneously added two levels as  no firearm or

other dangerous weapon was possessed by Appellant during the commission of the any offense.

C. **WHETHER THE DISTRICT COURT ERRED IN APPLYING A TWO LEVEL ENHANCEMENT WHEN THE GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT APPELLANT USED VIOLENCE, MADE A CREDIBLE THREAT TO USE VIOLENCE, OR DIRECTED THE USE OF VIOLENCE?**

The district court added two levels to Appellant's offense level under 2D1.1(b)(2) because the court found that Appellant used violence, made a credible threat to use violence, or directed the use of violence based upon Dottie Good's testimony of an assault as well as 'the phone calls' between Rasheen Chandler and Appellant.  **A849**

The evidence presented regarding the assault of Dottie Good consisted of Dottie Good's testimony and medical records.  Dottie Good testified on direct that she was assaulted by Appellant when he tried to reach into her pocket to retrieve his money.  As a result, Dottie Good testified that she fell into a table and cut her head. She testified that this happened in a room on the 18th floor and that she lied to the medical staff because Appellant threatened her not to go to the hospital.  The medical records that were admitted for the altercation by the government showed that Good told the admitting nurse that her drunk cousin slammed her around and she hit the corner of a table.  Good told the doctor that that her cousin was drunk and was being too rough while playing with her, grabbed her headband she accidentally fell against a table.  Good told Agent Baver that the incident occurred on a completely different floor, that Appellant did not reach for her pocket and that Appellant did not threaten her to not go to the hospital.

The government tried to introduce evidence into the trial that Appellant used violence against a woman named Norma Mercado, however, they did not produce the witness.  Instead the government relied on statements made by Appellant in phone calls in which he stated that he was going to send people up to Norma's apartment and that he punched her after she hit him twice.  A

photograph shown to Agent Trainor of Norma Mercado from a few days after the alleged

altercation did not show any indication of an assault.  Moreover, there was no evidence presented

that any assault actually did take place.

The decision of the district court to apply the two level enhancement was clear error.  The

evidence presented was either non existent or contradictor and, hence, unreliable.  The

government did not meet a preponderance standard.


D. **WHETHER THE DISTRICT COURT ERRED IN ATTRIBUTING AT LEAST 280 GRAMS OF CRACK COCAINE TO APPELLANT DUE TO APPELLANT'S PARTICIPATION IN ONE OVERARCHING CONSPIRACY?**


In a conspiracy case the court must make individualized finding as to drug amounts

attributable to, or foreseeable by the defendant. United States v. Trinidad-Acosta, 773 F.3d 298

(1st Cir. 2014) The court is required to conduct a searching and individualized inquiry into the

circumstances surrounding each defendant's involvement in the charged conspiracy. United

States v. Collado, 975 F.2d 985 (3rd Cir. 1993).  The majority of the crack cocaine sold by

Rasheen Chandler and Dottie Good was neither within the scope of the defendant's agreement

with them, nor was it reasonably foreseeable in connection with the criminal activity the

defendant agreed to jointly undertake, therefore, such conduct should not have been included in

establishing the defendant's offense level under the guidelines.

Appellant filed several objections to the PSR regarding the weight attributed to Appellant

based on both the theory that Appellant was involved in a single overarching conspiracy and

second that the government's evidence did not establish any amount beyond a reasonable doubt.

**A835-839**

The quantity of drugs attributed to Appellant was the single most important determinant of his sentence. The sentencing court used the testimony of Rasheen Chandler and Dottie Good to establish the amount of drugs attributable to Appellant on the theory of one overarching conspiracy. **A854** This amount dramatically increased Appellant's guidelines. Appellant avers that the court erred because these drug amounts were not the amounts distributed by the defendant's co-conspirators "in furtherance of the . . . jointly-undertaken . . . activity," were not "within the scope of the defendant's agreement," and were not "reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." Collado, at 995; USSG § 1B1.3, application note 1. A searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role. Collado, at 995

For the reasons stated in both Argument 1 and Argument 2, the drug amounts sold by these two cooperators were not sold in furtherance of any activity with Appellant, were not pithing the scope of their agreements with Appellant and were not in connection with Appellant's drug activity. Appellant knew Chandler was involved in his own conspiracy with Edward Stinson as laid out in the October 12, 2013 prison phone call. Chandler was selling crack cocaine in pink packets for Edward Stinson. Dottie Good was selling drugs for several crack dealers on several different floors of the NBA, the 18th floor, that were not within the scope of Appellant's agreement with her. For these and the reasons stated above, Appellant avers that he should not be held accountable for the drugs sold by Rasheen Chandler and Dottie

Good as they were also selling crack cocaine within the NBA for other crack dealers in separate

conspiracies during the time frame of Appellant's indictment.  There is insufficient evidence to

show which drugs and what amounts were sold by Appellant, Edward Stinson or any of the

three people for whom Good was also selling.

Therefore, the district court erred in setting forth a total offense level of 40 and the

criminal history category VI with a guideline range of 360 months to life.  Appellant asserts that

the quantity of drugs attributed to him during the conspiracy does not rise to the offense level of

36 and therefore, requests that this Honorable Court order a remand for re-sentencing.

4. **WHETHER THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT APPELLANT OF KNOWINGLY AND INTENTIONALLY DISTRIBUTING CRACK COCAINE AS SET FORTH IN COUNTS 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 AND 18, AND ADDITIONALLY AIDING AND ABETTING IN COUNTS 24, 25, 26, 27, 28,  29 , 30 , 31, 32 AND 33, OF THE SUPERSEDING INDICTMENT?**

The government charged Appellant with hand to hand sales to a confidential source on

May 3, 2013, May 8, 2013, May 17, 2013, June 11, 2013, August 2, 2013 and August 14, 2013 in

counts 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18 respectively.  Counts 24, 25, 26, 27, 32 and

33 charge Appellant with possession with intent to distribute and aiding and abetting Rasheen

Chandler in hand to hand sales with confidential source DA on September 7, 2013 at 4:41 am,

September 7, 2013 at 7:15pm, September 18, 2013 and September 19, 2013 at 7:18pm

respectively.  The government charged Appellant in counts 28, 29, 30 and 31 with possession

with intent and aiding and abetting based upon phone calls that were made on September 12,

2013 at 1:09am and September 18, 2013 at 8:16am.

The evidence presented by the government regarding these dates contradicted what was captured on their own audio and video recordings, the government lost evidence seen in their own videos, failed to provide any chain of custody for the drugs seized, provided inconsistent weights for the drugs and used an unreliable confidential sources for the buys.

When sufficiency of the evidence at trial is challenged, the Court must affirm if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt and if the verdict is supported by substantial evidence. United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995).

Appellant will first address counts 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18.

First, the government gave testimony that contradicted what was captured on their own audio and video recordings.  For example, Agent Cardona testified that Appellant sold drugs to JF in the doorway of a minimart on August 2, 2013.  When the video was played for the jury on cross examination, not only was there no transaction whatsoever in the doorway of the minimart, but Appellant did not appear in the video at all.  Agent Cardona then admitted that the person on the video in the store was not Appellant and that JF only told them that Appellant sold him the drugs.  On July 12, 2013, JF was given $1700 to purchase crack from Appellant.  He returned with a bag of powder that Agent Cardona told Agent Trainor tested positive for cocaine and recoded it in the government's reports.  The lab, however, tested the powder and found no cocaine at all in the substance.  Agent Trainor testified that the government stopped using JF because Appellant stated that he thought JF was a cop.  When they transcript was shown to the jury on cross examination, however, Agent Trainor agreed that Appellant was forcefully denying that he believed JF was a cop.

Second, the government lost pieces of evidence that were shown in their hand to hand videos.  For example, on May 3, 2013, the government sent JF into the NBA with $200 in cash to try to buy drugs.  JF approached someone identified as Appellant's brother and asked for drugs.  The male handed JF a black bag, JF peels off some of the money from a stack that he had in his hand, and the remaining money disappears off screen.  The black bag was then lost by the government.  The government also had no accounting of the remaining money as it was not recovered in the search of JF nor was it recorded on any DEA 6, 7 or 7A.

Third, the government did not provide any chain of custody information for any of the drugs seized in the hand to hand sales. Chemist Vitale testified that she did not know when any of the drugs were delivered to the lab, but that it would be on the DEA 7.  However, Agent Trainor admitted that, even though there are boxes on the DEA 7 reports specifically for purposes of chain of custody, none of the information was filled in for any of the buys.

Fourth, the system that the government used to determine the weights of the drugs was severely flawed creating inconsistent numbers and, as a result, produced unreliable evidence.  Agent Trainor was not sure how, the 'seized weights' matched the 'submitted weights' in some hand to hand sales, but then differed greatly on others.  He testified that the 'seized weight' was supposed to be the evidence seized directly from the CS after a buy, however, some agents **may** have included the weight of the packaging that was used to send the drugs to the DEA laboratory (depite the fact that there was a 'submitted' weight given).  Moreover, many times the weights recorded by the laboratory specifically for the evidence allegedly turned over by the CS (termed 'net weight' by the lab), was vastly different from the weight recorded by the DEA.  One

46

example is a drug sale from November 8, 2013.[20]  The government recorded a 'seized weight of 3.4 grams and a 'submitted weight's 3.4 grams.  The lab recorded a 'gross' weight of 31.0 grams and a 'net' weight of .39 grams.  This example shows that the agent who recorded the weights clearly did not follow the same protocol that Agent Trainor did for measuring weights.  The difference between the 'seized and net weights, however, is inexplicable.  The court admitted Appellant's chart that showed many examples of unexplained differences in measurements for the drugs that were attributed to Appellant both for the verdict and for the sentencing.  Appellant avers that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt of any amount based on this evidence.

Finally, the confidential source was not properly vetted and was not reliable.  Agent Cardona testified that, 'a criminal history check is conducted on any potential confidential source.'  **A98**  On cross examination, she was shown and questioned about the content of confidential source JF's NCIC ('rap sheet'), specifically the number of different names used by JF, and the various fake dates of birth and social security numbers that he gave law enforcement pursuant to his many arrests and convictions.  Agent Cardona testified that she did not run the NCIC rap sheet.  Agent Trainor, however, testified on cross examination that Agent Cardona had, in fact, requested JF's complete NCIC rap sheet from the Pennsylvania State Police and that the State Police had sent the NCIC rap sheet back to Agent Cardona.  Other than the NCIC rap sheet run by Agent Cardona on July 13, 2018 (five years after his cooperation in this case), no evidence was presented that anyone had ever checked JF's criminal background.  There was video proof from May 8, 2013, that JF beat the government out of money in the hand to hand

---

[20]  This was a sale by Rasheen Chandler to DA for 10 pink packets, **A629**

sale.  The government's video and DEA reports show that JF was given $200, spent an unknown amount on drugs and then put the change somewhere on his person.  JF did not return any money to the agents after the buy.  The agents did not find the money on JF during their 'search.'

JF was given large amounts of cash in this case and returned with, several times, sham substances.  For example on September 30, 2013, agents gave JF $1300 and he returned with fake powder and on September 5, 2013, agents gave JF $2400 and he returned with fake powder.  As mentioned above, the video recording from the September 5th did not show any physical transaction between JF and Appellant and Appellant did not appear at all on the video recording from September 30th.  Appellant avers that JF, based on his prior convictions, his experience in the drug world and the video proof of his ability to hide money from the government proves that he was more than capable of secreting money on his person, out of the detection of the government, and handing over fake powder for a very substantial personal profit.  The fact that there was no video proof of Appellant handing over or accepting anything to/from JF is enough reasonable doubt to make the government's evidence insufficient.

Appellant herein addresses counts 24, 25, 26, 27, 32 and 33.

First, counts 24 and 25 charged Appellant with possession for distribution and aiding and abetting Rasheen Chandler.  No evidence was presented at all regarding a call on September 7, 2013 at 4:41pm.  There were three phone calls that were played in court and their transcripts displayed for the jury, however, none of those calls were from 4:41pm.[21]

---

[21]  Agent Cardona testified to calls made on September 7, 2013 at 11:26am, (government exhibit 207) **A140**; September 7, 2013 at 5:35pm (government exhibit 208) **A142**; September 7, 2013 at 7:15pm (government exhibit 209) **A143**

Counts 26 and 27 involved Appellant's telephone conversations with Rasheen Chandler on September 7, 2013. The government relied on the testimony of Rasheen Chandler to interpret the meaning of these phone calls. Appellant has argued previously that Rasheen Chandler's testimony was completely inconsistent, that he had an enormous motive to lie, that he was paid for his cooperation, his prior conviction for dealing and the fact that he was selling drugs in pink packets for Edward Stinson. There was absolutely no corroboration of Chandler's opinion and, therefore, no evidence upon which a jury could rely. No drugs were ever seized, tested or weighed, no one ever saw a transaction despite government surveillance, and no one from the government ever saw or even determined the true identity of 'Diane.'

The evidence regarding the September 19, 2013 call from Counts 32 and 33 is, again, supplied by Rasheen Chandler. This call does not mention drugs, but only Chandler stating that he had $100 left. Again, for the reasons stated above about Chandler, Appellant avers this count must also fall for no sufficient evidence that Appellant played any role with Chandler in the majority of Chandler's drug sales.

Finally, Appellant will address counts 28, 29, 30 and 31.

The September 12, 2013 call listed in Counts 28 and 29 likewise fall far short of providing sufficient evidence. The call consists of Appellant stating to someone only identified as 'Auntie' that 'we got something poppin' on the 18th floor of this building,' and directs 'Auntie' to the hallway of the 18th floor. No drugs were discussed, no names of people to look for were mentioned and no money was discussed. There is no proof that Appellant was talking about crack cocaine, that any transactions ever made or that Auntie even went inside the building. This is not evidence beyond a reasonable doubt, it is mere conjecture.

49

Counts 30 and 31 pertain to a phone call between Appellant and an unidentified individual known only as 'Ms. Pat' that took place on September 18, 2013 at 8:16pm.   Appellant only agrees to see Ms. Pat once she arrives at the NBA.   The woman states 'the number is six' to which Appellant responds 'uh-huh' and 'call me when you get there.'   The government was recording every conversation that Appellant had on his telephone during this period.   There was no evidence that Ms. Pat ever called Appellant after this call, no evidence that Ms. Pat ever arrived at the NBA and no evidence whatsoever that Appellant ever saw or spoke to Ms. Pat again.

The government presented over 50 recorded calls from their Title III interception of Appellant's phone.   Despite the sheer volume of calls and transcripts that were played for the jury, the government still has the burden of proving, behind a reasonable doubt, that Appellant possessed these drugs for distribution and aided and abetted for **each** call as they have charged in the count of the indictment.   For the reasons stated above, in looking at each call, the government has only provided their own opinions and a wholly unreliable cooperating codefendant as proof. This evidence falls far short of their burden of beyond a reasonable doubt.

5. **WHETHER DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS APPELLANTS TAPE RECORDED CONVERSATION FROM AN INCARCERATED CO-DEFENDANT BASED ON <u>CARPENTER V. UNITED STATES?</u>**

Appellant joined in co-defendant Edward Stinson's Motion to Suppress filed on July 13, 2018.[22]   The Motion to Suppress sought to suppress any and all prison calls subpoenaed by the

---

[22]   On October 5, 2017, Appellant filed a Motion to Join Pretrial Motions filed by all co-counsel.   The court granted this Motion to Join on July 19, 2018.  **A3-5**

government from the Curran Fromhold Correctional Facility during the time period that co-defendant Stinson was there as a pretrial detainee.  The calls covered five separate periods of time; April 21, 2011 to August 24, 2012, August 24, 2012 to August 3, 2015, August 4, 2015 to October 13, 2015, October 13, 2015 to November 6, 2015, November 6, 2015 to January 26, 2016.  The district court denied Appellant's Motion to Suppress after a hearing on  September 14, 2018.  This Honorable Court reviews an order denying a motion to suppress under a mixed standard of review. This Court reviews findings of fact for clear error but exercises plenary review over legal determinations. United States v. Tracey, 597 F.3d 140 (3rd Cir. 2010)

In 2018, the Supreme Court issued a landmark decision in Carpenter v. United States, 585 U.S. _____, 138 S. Ct. 2206 (2018) finding that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured though CSLI and that the government's collection of CSLI requires a showing of probable cause under the Fourth Amendment." United States v. Goldstein, 914 F.3d 200, 203 citing Carpenter, 138 S. Ct. at 2217, 222.  Consequently, Section 2703(d) may not be used to access CSLI because it requires less than probable cause. Goldstein, at 203.

The Supreme Court in Carpenter traced the history of the third-party doctrine beginning with United States v. Miller, 425 U. S. 435, 443, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976) and Smith v. Maryland, 442 U. S. 735, 741, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979)).  These cases stood for the proposition that there was no expectation of privacy in bank and records of phone numbers dialed on a landline because the defendants had 'take[n] the risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the Government." Miller at 443, 96 S. Ct. 1619, 48 L. Ed. 2d 71.  The Supreme Court declined to extend Miller and Smith to cover cell-site records. Carpenter at 2217.  The Court held, '[G]iven the unique nature of cell

phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection.' Id at 2217.

In United States v. Katz, the Supreme Court also found that '[A] person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." United States v. Katz, 389 U. S., at 351-352, 88 S. Ct. 507, 19 L. Ed. 2d 576.

In United States v. Jones, 132 S.Ct. 945 (2012), the Court held that the use of a global positioning system (GPS) tracking a vehicle for a month violated the Fourth Amendment of the United States Constitution. In Jones, the Court opined that people expect their public movement on the street to remain private. Although the Court ultimately held that placing a GPS tracking device on a vehicle was a search because it was a physical trespass onto private property, in two separate concurring opinions, five members of the Court recognized that longer term GPS tracking infringes on a defendant's expectation of privacy.

Following Jones, the Supreme Court cited location privacy as the basis to limit law enforcement searches of cellphones incident to arrest.  In Riley v. California, 134 S.Ct. 2473 (2014) the Court ruled that the stored data contained within a person's cell phone which discloses where a person has been making it possible to reconstruct an individual's specific movements, not only in public, but within a particular building as well, constituted a search under the Fourth Amendment. The decisions in Jones v. U.S 565 U.S. 400 (2012) and Riley v. California, 134 S.Ct. 2473 (2014) stood for the idea that the technological innovations developed in the digital age preclude a strict application of precedents set prior to the advent of this technology.  While Carpenter acknowledged the holdings in Miller and Smith, the Court

found that, technological advances had to be factored into decisions and that, specifically, location data obtained through cell phone technology was not a voluntary conveyance of private information but rather a function of advances inherent in smart phones technology.

Appellant avers that the holding in Carpenter expanding the expectation of privacy to location information held by third party telephone companies applies to the recorded prison call in this case and the government agents should have sought a warrant. Although prison calls begin with a recording that all calls are recorded, Appellant believes that the Supreme Court's rationale that the use of a cell phone's transmitted location data was not consent, is applicable to the call in this case.

To date, the decision as to whether or not there is an expectation of privacy has been in part predicated on the implied consent to the tape recorded phone conversations made from jail where every call was preceded by a message warning the caller that the call would be recorded and monitored. United States v. Hodge, 85 F. Appx. 278 (3rd Cir. 2003); United States v. Shavers, 693 F.3d 363 (3rd Cir. 2012). The Carpenter case directly impacts the expectation of privacy of an individual pre-trial detainee like Appellant, when challenging the government's blanket subpoenas submitted to county jail for a volume of that inmate's recorded phone conversations.

If a pretrial detainee wants to communicate with anyone by phone they are forced to "consent" to use the telephone system in the prison, otherwise they cannot contact the outside world. Based upon the holding in Carpenter, Stinson had a reasonable expectation of privacy in the recorded calls. As such, the government should have applied for and obtained a search warrant.

The District Court found that, even if Stinson had an expectation of privacy requiring a warrant, the phone calls should not be suppressed because the FBI acted in good faith by relying on law existing prior to Carpenter and citied <u>United States v. Goldstein</u>, 914 F.3d 200 (3rd Cir. 2019). However, the good faith exception applies if the government acted upon an objectively reasonable, good faith belief that obtaining Stinson's calls under Section 2703(d) was legal.

Appellant argues that the good faith exception should not apply here as the FBI did not have a reasonable, good faith belief that their actions were legal. <u>Goldstein</u> at 201. In <u>Goldstein</u>, the prosecutors obtained a court order under the Stored Communications Act (SCA) specifically 18 U.S.C. § 2703(d) compelling Goldstein's cell phone carrier to turn over 57 days' worth of his cell phone location metadata. The FBI and other federal law enforcement agencies routinely gather the tape-recorded conversations of pretrial detainees based on the government's belief that the seizure of these tape recordings "may" be fruitful in the pending criminal cases against defendant. However, § 2703(d) requires that the governmental entity offer specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation. If the government is using an administrative subpoena as opposed to a warrant, the government provide prior notice from the governmental entity to the subscriber or customer. 18 USCS § 2703(b)(1)(B).

In Appellant's case, the government obtained a blanket subpoena demanding all of Stinson's recorded prison calls spanning a period of almost four years. Moreover, there were no 'specific and articulable facts' shown that there were 'reasonable grounds to believe that the contents' of the calls were relevant and material to the 'ongoing' investigation as required by the statute. There was no evidence presented that Agent Baver knew what was contained on those

calls prior to him obtaining and listening to them.  Therefore, the good faith exception should not apply and the recorded phone calls should have been suppressed.

Once an expectation of privacy is found, The inquiry then becomes whether the FBI's method of acquisition was legal.   If this Honorable Court were to determine that Edward Stinson did not have a reasonable expectation of privacy in his prison calls or that the good faith exception does apply, the recordings should still be suppressed as the **t**he Court in Carpenter set definitive limits on the government's use of administrative subpoenas in securing certain business and personal records held by third parties.  Carpenter, at 2222.[23]  Moreover, this Court has recognized that under Federal Rule of Criminal Procedure 17(c) the impermissible use of subpoenas as a discovery device may result in the exclusion of tape- recorded phone calls. U.S. v. Amirnazmi, 645 F.3d 564 (3rd Cir. 2011) *citing* United States v. Nixon, 418 U.S. 683 (1974).

To enforce an administrative subpoena an agency must demonstrate that the subpoena meets certain threshold requirements.  SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118 (3rd Cir. 1981)( en banc) Those requirements are (1) the inquiry must be within the authority of the agency, (2) the demand for production must not be too indefinite, and (3) the information sought must be reasonably relevant to the authorized inquiry. Chao v. Community Trust Co. 474 F.3d 75 ( 3rd Cir. 2007)  United States v. Westinghouse Elec. Corp., 638 F.2d 570 ( 3rd Cir. 1980)  If the government makes this preliminary showing, the burden then shifts to the respondent to prove the enforcement of the subpoena would be improper.  Wheeling-Pittsburgh, 648 F.2d at 128.

---

[23]  Where the Court determines that the administrative subpoena is for an individual's records that do not impact a reasonable expectation of privacy, the government need not notify the investigative target. SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735 (1984).

The government will argue that they have met the threshold requirements of the

Wheeling-Pittsburgh case and cite <u>Bansal v. Pavlock</u>, 352 Fed.Appx. 611 (3d Cir.2009) and/or

<u>U.S. v. Ewell</u>, 2016 W.L. 463784 (W.D. Pa., February 8, 2016).

In <u>Bansal v. Pavlock</u>, the court was presented with the question of whether the

government's acquisition of plaintiff's recorded phone calls was within the authority of the FBI

and did not violate the Privacy Act, the Wiretap Act or the Stored Communications Act.  First,

Plaintiff sued members of the government for sharing his recorded prison calls as a violation of

the Privacy Act.  This Court found:

> [T]he Privacy Act prohibits agencies from disclosing records contained in a system of
> records except pursuant to a written request by, or with the written consent of, the
> individual to whom the record pertains. 5 U.S.C. § 552a(b). This prohibition is subject to
> various exceptions, including disclosure for a "routine use" as defined in § 552a(a)(7)
> and described under § 552a(e)(4)(D). *Id*. § 552a(b)(3). Under § 552a(a)(7), a "routine
> use" means, with respect to a disclosure of a record, the use of such record for a purpose
> which is compatible with the purpose for which it is collected. *Id*. § 552a(a)(7). Section
> 552a(e)(4)(D) requires each agency that maintains a system of records to publish in the
> Federal Register a notice of each routine use of the records contained in the system of
> records. *Id*. § 552a(e)(4)(D).  <u>Bansal v. Pavlock</u>, 352 Fed. Appx. 611, 613
> Second, Plaintiff sued under the averment that the sharing of his records were a violation

of the Wiretap Act.  This Court affirmed the District Court's summary judgement based on this

Court's finding that, because the plaintiff consented to the monitoring and recording of his phone

calls there was no violation of the Wiretap Act.

Finally, Plaintiff argued that the records were illegally obtained under the Stored

Communications Act.  The District Court granted summary judgement noting that the

Department of Justice published a notice in the Federal Register that use of the Bureau of Prison

telephone records maintained in the system of records constitutes records for routine use includes

disclosure to federal law enforcement agencies for law enforcement needs including criminal

prosecutions.

In United States v. Ewell, defendant filed to suppress inmate recorded phone calls that the government obtained, through a subpoena, on the basis that they violated Rule 17. The district court held Rule 17 inapplicable to pre-Indictment subpoenas served on the Atlantic County jail and state prison for recorded jail calls. In analyzing whether or not this was a violation of the Pennsylvania Wiretap Act pursuant to 18 Pa. Cons. Sta. Ann. Section 5704, the district court found that a subpoena was not required to obtain the jail recordings from either the Atlantic County Jail or the state prison. Significantly, the court asserted that a defendant can demonstrate standing to challenge administrate subpoenas issued to third parties when he/she can show a legitimate expectation of privacy attached to the records obtained.

Appellant avers that the government has not met its burden under Wheeling-Pittsburgh as the demand for production was far too indefinite and the information sought was not known, prior to the obtaining of the records, to be reasonably relevant to the authorized inquiry. The government violated the requirements set out in SEC v. Wheeling-Pittsburgh Steel Corp by using a blanket subpoenas for all of Edward Stinson's prison calls covering the time periods from April 21, 2011 to August 24, 2012; from August 24, 2012 to August 3, 2015; from August 4, 2015 to October 13, 2015; from October 13, 2015 to November 6, 2015 and from November 6, 2015 to January 26, 2016 without any basis to assume that they involved criminal conduct1.[24] **A1472-A1477(United States v. Edward Stinson,  20-1315).** The blanket use of the administrative subpoena in this case for Stinson's prison phone conversations covering various periods of his incarceration in the Philadelphia county prison system from 2011 to 2016 is overbroad and violated Stinson's Fourth Amendment rights.

---

[24]   Counsel for Edward Stinson made this same argument in appellant's brief at US v. Stinson, 20-1315

The government will also argue that the October 12, 2013 phone recording was properly admitted based on the prisoner's consent and the good faith exception.  However, post <u>Carpenter</u> it is hard not to question the broad powers used by the government to seize every prison call covering four years to search for evidence of a crime without specific and articulable facts or even probable cause.  The scope of the seizure by the government based on the blanket "consent" to have tape recorded all of Edward Stinson's phone calls for 'security reasons' does not translate into a universal consent to have all of his phone conversations spanning four years available to the FBI based on the issuance of a blanket subpoena. It is precisely the scope of this seizure which is the subject of this Fourth Amendment challenge based on <u>Carpenter</u>.

Moreover, as argued above, the good faith exception does not apply here.  As in <u>Carpenter</u>, it is hard to argue that the good faith exception to the warrant requirement applies to obtaining information in the hands of a third party in order to chart the movements of an individual over seven months, it is equally hard to do in this context. Any government agency that abuses the power of the subpoena to seize every single prison phone call, comprising of hundreds of calls over a four- year period of time in order to search for criminal conduct cannot be done in good faith. To permit such a practice would give no limitation to the government's power to access third party records and would reinforce the idea that the government is has no limits on the time, content, duration or scope of it's subpoena power. Instead, under Carpenter, the government's power to subpoena is now is limited by the Fourth Amendment in cases similar to Appellant's. These limits should be applied to the government in this context as well.

6. **WHETHER DISTRICT COURT COMMITTED PALIN ERROR IN SENTENCING APPELLANT TO 360 MONTHS ON EACH OF COUNTS 8, 12, 14, 16, 18, 25, 26, 27, 29, 31 AND 33AND 240 MONTHS ON COUNT 9?**

Appellant avers that his sentence on the listed counts is unreasonable under Booker because the district court failed to adequately consider the parsimony provision 3553(a), which directs the court to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes specified in the statute.  United States v. Dragon, 471 F.3d 501, 505 (3d Cir. 2006).

The standard of review for this claim is for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).  Under this standard, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'" Olano, 507 U.S. at 732 (quoting United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L.Ed.2d 1 (1985)). An error is a "[d]eviation from a legal rule[,]" and an error is "plain" if it is "clear" or "obvious." Id. at 732-33, 734. Generally, an error affects substantial rights when it is prejudicial, i.e., it "affected the outcome of the district court proceedings." Id. at 734. Moreover, even if such an error is found, "the court of appeals has the authority to order correction, but is not required to do so." Id. at 735. This Court should exercise the court's discretion to correct the error only if it "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S. Ct. 391, 80 L. Ed. 555 (1936)).

At the sentencing hearing, the court listened to the arguments made by both the government and defense counsel.  The district court also stated its reasons on the record for the court's determination of the base offense level and guideline range for count 1 which charged conspiracy.  Appellant made arguments above as to the guideline range above.  The court determined an appropriate sentence to be 360 months for count 1.  However, district court also sentenced Appellant to 360 years on most of the remaining charges despite the fact that, taken alone, the guideline range would have been drastically lower.  Apart from count 1, the highest

base offense level for all of the remaining counts was 22 for a hand to hand transaction for 22.4 grams of crack cocaine. That offense level together with Appellant's criminal history category of VI reveals a guideline range of 84-105 months.

Both the PSR and district court used §3D1.2 and 3D1.3(b).

§3D1.2 states:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
> (d)     When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

§3D1.3(b) states:

> In the case of counts grouped together pursuant to §3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three. When the counts involve offenses of the same general type to which different guidelines apply, apply the offense guideline that produces the highest offense level.

District erred in its application of these sections to reach a total amount of at least 280 grams of crack cocaine attributable to Appellant. This amount could only have been reached if the court determined that Appellant was involved in one overarching conspiracy. For the reasons argued above, the government did not prove one conspiracy, but a number of small independent conspiracies. Because the government failed to prove that Appellant was involved in a conspiracy either beyond a reasonable doubt or by a preponderance of the evidence, the district court clearly erred by holding Appellant responsible for the drugs sold by Rasheen Chandler and Dottie Good. Appellant should have been sentenced only on the amount of drugs that were actually proven by the government.

Based upon the arguments made above, Appellant avers that the government did not prove any drug amount to any degree of certainty in any of the transactions. However, if the Court were to find that Appellant engaged in the crimes outlined in the Counts listed above, Appellant should be re-sentenced in accordance with the guideline range based upon the drugs seized in the hand to hand sales (ie what the government actually collected and weighed) as opposed to the extrapolation used by district court based on the testimony of the two cooperating codefendants.

## **CONCLUSION**

WHEREFORE, Appellant respectfully requests that this Honorable Court grant this appeal and reverse the conviction on the Counts listed above. In the alternative Appellant requests that this Honorable Court grant the Motion to Suppress and suppress the October 12, 2013 phone call and remand for a new trial. Finally, in the alternative Appellant respectfully requests that this Honorable Court remand for a new sentencing hearing.

Respectfully Submitted,

/s/ Maureen Coggins
Maureen Coggins
Attorney for Appellant

Date: January 22, 2021

## COMBINED CERTIFICATION

### BAR MEMBERSHIP

I, Maureen Coggins, Esquire, hereby certify that I am a member in good standing with the Bar of this Court.

### CERTIFICATION OF WORD COUNT

This brief is in compliance with the word count limitation of Fed. App. R. 32(a)(7)(b) This brief contains a word count of 18,916.

### ELECTRONIC FILING

The text of the electronic brief filed with the Clerk is identical to the text in the paper copies.

### VIRUS CHECK

A virus detection program has been run on the electronic file sent to the Clerk for filing and no virus was detected.

/s/ Maureen Coggins
MAUREEN COGGINS
Attorney for Appellant

DATE: January 22, 2021

## CERTIFICATE OF SERVICE

I, Maureen Coggins, Esquire, certify that a copy of the foregoing was served upon the following individuals on this date via electronic filing (ecf) and U.S. Mail, postage pre-paid:

Jerome Miatico, Esquire
Assistant United Sates Attorney
United States Attorney's Office
615 Chestnut Street, 12th Floor
Philadelphia, PA 19106

Juan Jarmon
Inmate No. 75891-066
USP Allenwood
US Penitentiary
PO Box 3000
White Deer, PA 17887

/s/ Maureen Coggins

MAUREEN COGGINS
Attorney for Appellant

Date: January 22, 2021

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No.    19-1652

## UNITED STATES OF AMERICA,
### Respondent/Appellee,

v.

## JUAN JARMON,
### Petitioner/Appellant.

## APPENDIX TO BRIEF
## VOLUME I

**MAUREEN COGGINS**
**Attorney for Appellant Juan Jarmon**
**463 West Linden Street**
**Allentown, PA 18101**
**(610) 400-3015**

# **TABLE OF CONTENTS**

Notice of Appeal dated December 2, 2019 …………………………    A1

Defendant's Motion to Join dated October 2017 ……………………    A2

Order of the Honorable Paul S. Diamond dated July2018 ………….    A3-5

Defendant's Motion to Suppress dated July 13, 2018 ………………    A6-9

Order of the Honorable Paul S. Diamond dated January 10, 2019 …    A10-11

Order and Memorandum of the Honorable Paul S. Diamond
             dated May 7, 2019 ……………………………………………    A12-28

Order of the Honorable Paul S. Diamond dated November 27, 2019 .    A29-37

Judgement Sheet ……………………………………………………..    A38-45

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NO. |
| | : | |
| JUAN JARMON | : | 17-cr-72 |

## **NOTICE OF APPEAL**

Juan Jarmon, by and through his attorney, Maureen Coggins, Esquire, hereby gives notice

that he appeals to the UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

the conviction and sentence entered on November 27, 2019.

Respectfully submitted:

*Maureen Coggins*
MAUREEN COGGINS, ESQ.

DATED: December 2, 2019, 2019

A1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | **NO. 2:17-cr-00072** |
| | : | |
| JUAN JARMON | : | |
| | : | |

## DEFENDANT JUAN JARMON'S MOTION TO JOIN IN
## PRE-TRIAL MOTIONS FILED BY CO-DEFENDANTS

Defendant Juan Jarmon, by his attorney, Maureen Coggins, moves to join in pre-trial motions filed by co-defendants, and states the following:

1.  On January 3, 2017, an indictment was filed against defendant and twelve (12) other codefendants, charging 21 USCA 846 Conspiracy to Distribute and related charges.

2. In an Order dated September 8, 2017, defendant may file pre-trial motions by October 5, 2017.

3. Defendant requests to join his co-defendants' pre-trial motions as issues of the co-defendants also apply to him.

4. Defendant wishes to join in pre-trial motions already filed by co-defendant Stinson and Staggers, specifically:

- Defendant's Motion to Identify Co-Conspirator's Statement;

-  Defendant's Combined Motion and Memorandum of Law for Discovery Pursuant to Rule of Criminal Procedure (16)(a)(1)(G);

-  Defendant's Motion in Liminae to Exclude Other Crimes Evidence;

5.  To the extent that other of defendant's co-defendants will file pre-trial motions in the future that are applicable to defendant, he requests leave to join in such motions and supplement where necessary.

WHEREFORE, defendant respectfully requests leave to join the pre-trial motions specified above as well as any pre-trial motions filed in the future that are applicable to defendants case.

Respectfully Submitted,

**/s/ Maureen Coggins**
**MAUREEN COGGINS**
**Attorney for Defendant**

October 5, 2017

ID 67126
509 Swede Street
Norristown, PA 19404
(610) 400-3017

A2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 17-72 |
| | : | |
| JUAN JARMON, et al. | : | |

## O R D E R

**AND NOW**, this 18th day of 2018, upon consideration of Defendant Edward Stinson's Motion for Discovery Pursuant to Federal Rule of Criminal Procedure Rule 16 (Doc. No. 78), Motion for Early Production of Jencks Act Materials (Doc. No. 79), Motion for Government Agents to Retain Rough Notes (Doc. No. 80), Motion for Disclosure of Exculpatory Evidence (Doc. No. 82), Motion for Discovery Pursuant to Federal Rule of Criminal Procedure Rule 16(a)(1)(G) (Doc. No. 178), Motion to Suppress Statements (Doc. No. 179), Motion in Limine to Exclude Other Crimes Evidence (Doc. No. 181), Defendant Juan Jarmon's Motion to Join in Pretrial Motions Filed by Co-Defendant (Doc. No. 194), Motion in Liminae [sic] to Exclude Other Crimes Evidence (Doc. No. 195), the Government's Consolidated Response to Defendants' Pretrial Motions (Doc. No. 198), and the Government's Motion to Admit Audio and Video Recordings (Doc. No. 176), it is hereby **ORDERED** that:

1. Defendant Stinson's Motion for Discovery Pursuant to Federal Rule of Criminal Procedure Rule 16 (Doc. No. 78) is **DENIED as moot**. Discovery is limited to those areas of evidence outlined in Rule 16 "with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution," such as Jencks Act and *Brady* materials. United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994). The Government represents that it has complied with Rule 16 and will continue to comply with its obligations under the Jencks Act, *Brady*, and *Giglio*. (Doc. No. 198);

A3

2. Defendant Stinson's Motion for Early Production of Jencks Act Materials (Doc. No. 79) is **DENIED without prejudice**. "[N]o statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500 (a); see also Fed. R. Crim. P. R. 26.2(a). Defendant may renew his request at the appropriate time: either at at trial or at the July 24, 2018 pre-trial hearing. See Fed. R. Crim. P. R. 26.2(g) (allowing production of Jencks Act material prior to trial for purposes of a suppression hearing). The Government is encouraged to produce Jencks materials at an earlier time; it has indicated it will do so approximately two weeks before trial. See United States v. Hill, 976 F.2d 132, 140 (3d Cir. 1992);

3. Defendant Stinson's Motion for Government Agents to Retain Rough Notes (Doc. No. 80) is **DENIED as moot**. The Government represents that it "has already instructed the case agent to remind agents to maintain copies of rough notes of interviews, to the extent that they exist, and to direct other law enforcement personnel to preserve existing notes once they are identified as prospective trial witnesses." (Doc. No. 198 at 8); see also United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994) (outlining government duty to preserve all rough interview notes with witnesses so that determinations can be made on whether these notes should be made available under *Brady* and the Jencks Act);

4. Defendant Stinson's Motion for Disclosure of Exculpatory Evidence (Doc. No. 82) is **DENIED as moot**. The Government represents that it has complied with its *Brady* obligations, will continue to do so, and has agreed to early production of Jencks and

*Giglio* materials two weeks before trial.   Defendant may renew his Motion in the event that the Government fails to comply with these obligations;

5.   Defendant Stinson's Motion for Discovery Pursuant to Federal Rule of Criminal Procedure Rule 16(a)(1)(G) (Doc. No. 178) is **DENIED as moot**.  The Government represents that such expert witness material has been disclosed;

6.   Defendant Stinson's Motion to Suppress Statements (Doc. No. 179) is **DENIED in part as moot**, as it pertains to Defendant's March 30, 2015 statement.   The Government states it does not intend to introduce at trial any of Defendant's statements from March 30, 2015.  (Doc. No. 198.)   There shall be a suppression hearing on Defendant's Motion (Doc. No. 179) as it pertains to Defendant's February 16, 2017 statement at the Pretrial Motions Hearing scheduled for July 24, 2018 at 2:00 p.m.;

7.   The Court will consider Defendant Stinson's Motion in Limine to Exclude Other Crimes Evidence (Doc. No. 181) and Defendant Jarmon's Motion in Liminae [sic] to Exclude Other Crimes Evidence (Doc. No. 195) at the Pretrial Motions Hearing scheduled for July 24, 2018 at 2:00 p.m.; and

8.   Defendant Juan Jarmon's Motion to Join in Pre-trial Motions Filed by Co-Defendant (Doc. No. 194) is **GRANTED**.  Orders granting or denying the Motions Defendant Jarmon has moved to join (Doc. Nos. 181, 183, 178) shall apply to Defendant as well.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.

**PAUL J. HETZNECKER, ESQUIRE**
**Attorney I.D. No. 49990**
**1420 Walnut Street, Suite 911**
**Philadelphia, PA   19102**
**215 893-9640**                                  **Attorney for Defendant, Edward Stinson**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

**UNITED STATES OF AMERICA**          :          **CRIMINAL ACTION**
                                                                 :
                          **V.**                                 :
                                                                 :
**EDWARD STINSON**                          :          **NO. 17-71 and 17-72**

_____

## DEFENDANT'S MOTION TO SUPPRESS PRISON RECORDINGS

**TO THE HONORABLE PAUL S. DIAMOND, JUDGE OF THE UNITED STATES**
**DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA, PHILADELPHIA:**

Edward Stinson, by and through his attorney Paul J. Hetznecker, Esquire,   files this

Defendant's Motion to Suppress Prison Recordings and submits the following in support

thereof:

1.      On February 16, 2017 Edward Stinson was arrested and charged in an 86 count

Indictment charging him with violations of 21 U.S.C. § 846 (conspiracy to distribute 280 grams

or more of cocaine base ("crack").   The defendant was detained pursuant to the government's

omnibus motion for pretrial detention.

- 1 -

2.      Prior to the Indictment the government submitted administrative subpoenas to the Philadelphia Prison System for Edward Stinson's prison records.    The subpoenas included the prison recordings of his telephone calls for the time periods covering April 21, 2011 to August 24, 2012; .from August 24, 2012 to August 3, 2015; from August 4, 2015 to October 13, 2015; from October 13, 2015 to November 6, 2015 and from November 6, 2015 to January 26, 2016. The requested records included phone calls from November 16, 2015 to January 27, 2016.[1] (See Exhibit 1 attached)

3.      In June, the Supreme Court of the United States ruled that the right to privacy covers third party cellphone data utilized by the government to track an individual's movements. Carpenter v. United States, No. 16-402, 585_____(2018).    The Court ruled that an expectation of privacy extends to third parties, including telephone companies where the right to privacy has been implicated.

4.      Defendant, Edward Stinson, moves to suppress the seizure of all of his recorded telephone calls obtained by the government in violation of his right under the Fourth Amendment to be protected against an unlawful search and seizure by the government. Furthermore, the consent the government relies upon in seizing the recorded telephone conversations is invalid pursuant to Carpenter v. United States, supra.

---

[1] At present, counsel could only locate one of the subpoenas submitted by the government for prison records, including recorded telephone calls from Edward Stinson.

WHEREFORE, we respectfully request that Your Honor grant this Motion to Suppress and suppress all of the prison recordings obtained by the government whether through a subpoena or by other means, as a violation of his Fourth Amendment rights under the United States Constitution.

Respectfully submitted,

/s/ Paul J. Hetznecker, Esquire
Paul J. Hetznecker, Esquire
Attorney for Defendant, Edward Stinson

DATE:         July 13, 2018

- 3 -

A8

JAN-27-2016  17:31        CMR RECORDS        Fax 215-685-7984    Jan 27 2016 06:26pm P002/003
                          215 418 4585                           215 418 4585    P.01

UNCLASSIFIED

U.S. DEPARTMENT OF JUSTICE/FEDERAL BUREAU OF INVESTIGATION

# SUBPOENA

FD-1035 (REV 2014-07-22)

Subpoena number: 103345   When responding please reference this subpoena number.

In the matter of case number(s): 2810-PH-2693590

| | |
|---|---|
| **TO:** | Philadelphia NOC<br>Officer Paris |
| **ADDRESS:** | 8001 State Road<br>Philadelphia, PA 19136 |
| **TELEPHONE:** | 2156858434 |
| **FAX:** | 2156858397 |

**GREETING:**

By the service of this subpoena upon you by Christine Cloney, who is authorized to serve it, you are hereby commanded and required to disclose to Christine Cloney, a representative of the FBI, the following information for the period 2015-11-16 to 2016-01-27 or the billing cycle including the requested time period: which may be relevant to an authorized law enforcement inquiry, involving the following:

- Continued on Attachment A

Please see the attached page explaining some terms that may be used in this demand. All time values are in the US/Eastern time zone, unless otherwise indicated.

THE INFORMATION SOUGHT THROUGH THIS SUBPOENA RELATES TO A FEDERAL CRIMINAL INVESTIGATION BEING CONDUCTED BY THE FBI.

YOUR COMPANY IS REQUIRED TO FURNISH THIS INFORMATION.

YOU ARE REQUESTED NOT TO DISCLOSE THE EXISTENCE OF THIS SUBPOENA INDEFINITELY AS ANY SUCH DISCLOSURE COULD INTERFERE WITH AN ONGOING INVESTIGATION AND ENFORCEMENT OF THE LAW.

Compliance must be made by personal appearance or production of records no later than the 26th day of February, 2016 at 09:00 o'clock AM, at William J. Green, Jr. Building, 600 Arch Street, 8th Floor, Philadelphia, PA 19106

In lieu of a personal appearance, the information can be provided, via mail, marked to the attention of Christine Cloney, at the following address: William J. Green, Jr. Building 600 Arch Street, 8th Floor , Philadelphia, PA 19106

If you refuse to obey this subpoena, the United States Attorney General may invoke the aid of a United States District Court to compel compliance. Your failure to obey the resulting court order may be punished as contempt.

Issued under authority of Sec. 506 of the Comprehensive Drug
Abuse Prevention and Control Act of 1970, Public Law No. 91-513

(21 U.S.C. 876)

ORIGINAL

Signature: S/ JAMES CROWLEY

Name: JAMES CROWLEY

Title: Supervisory Special Agent

Issued this 27th day of January, 2016

UNCLASSIFIED

RECEIVED

JAN 2 8 2016

Office of Contract Administration

**EXHIBIT 1**

US-10950

A9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Crim. No. 17-72-3** |
| **EDWARD STINSON, et al.,** | : | **Crim. No. 17-71-1** |
| | : | |

## O R D E R

On February 8, 2017, the grand jury charged Defendant Edward Stinson in two separate indictments with conspiring to distribute crack cocaine. (Doc. No. 1, Crim. No. 17-72; Doc. No. 1, Crim. No. 17-71.) Defendant filed Motions to Suppress recordings of his prison telephone calls from April 21, 2011 through January 26, 2016. (Doc. No. 309, Crim. No. 17-72; Doc. No. 361, Crim. No. 17-71.) The Government responded. (Doc. No. 342, Crim. No. 17-72). I conducted an evidentiary hearing on September 14, 2018. I will deny Defendant's Motions.

Relying upon *Carpenter v. United States*, Defendant argues that because he had a reasonable expectation of privacy in his prison telephone calls, the Government had to obtain a warrant before compelling the state to provide recordings of his prison calls. 138 S. Ct. 2206 (2018). The Government responds that *Carpenter* applies only to the use of cell-site location information ("CSLI") to track physical movements, not prison telephone call recordings. I agree with the Government.

In *Carpenter*, the Government used compulsory process to compel a wireless carrier to turn over a subscriber's CSLI. Id. at 2221. The Government used CLSI to track a suspect's physical movements. Id. The Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." Id. at 2217. Because "the acquisition of [an individual's] CSLI [is] a search, . . . the Government must

A10

generally obtain a warrant supported by probable cause before acquiring such records." Id. at 2221.

On September 14, 2018, Philadelphia Prison System custodian of records Brad Cakrane testified credibly that each prisoner is notified in three ways that his prison telephone calls are recorded and monitored: (1) a handbook given to each prisoner upon arrival at the prison; (2) signage in the area around the telephones; and (3) an audio message played at the beginning of each telephone call informing both the prisoner and the other party on the line that the call is being recorded and monitored.  (See Tr. 3–7, Doc. No. 387, Crim. No. 17-72.)  He reiterated that testimony during the January 9, 2019 evidentiary hearing I conducted relating to the Government's *Starks* Motion.  Because Defendant knew that his telephone calls would be recorded he had no expectation of privacy.  See Lanza v. New York, 370 U.S. 139, 143 (1962); United States v. Shavers, 693 F.3d 363, 389–90 (3d Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2877 (2013) (no expectation of privacy where handbook and signage informed prisoner his calls are recorded); United States v. Sababu, 891 F.2d 1308, 1329 (7th Cir. 1989).  The Government thus properly obtained Defendant's prison telephone records without first serving a warrant.  See Carpenter, 138 S. Ct. at 2221.  Accordingly, I will deny Defendant's Motions.

**AND NOW**, this 10th day of January, 2019, it is hereby **ORDERED** that Defendant's Motions (Doc. No. 309, Crim. No. 17-72; Doc. No. 361, Crim. No. 17-71) are **DENIED**.


**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.


A11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 17-71-1, 5** |
| | : | |
| **EDWARD STINSON, et al.** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 17-72-1** |
| | : | |
| **JUAN JARMON, et al.** | : | |

## O R D E R

**AND NOW**, this 7th day of May, 2019, it is hereby **ORDERED** that:

1. Defendant Juan Jarmon's Motion for Judgment of Acquittal is **DENIED**;

2. Defendant Edward Stinson's Motion for Judgment of Acquittal (Doc. Nos. 517, 557) is **DENIED**; and

3. Defendant Debra Baylor's Motion for Judgment of Acquittal is **GRANTED in part**:

   a. Baylor's conviction for conspiracy to distribute 280 grams or more of cocaine base (Count 1) is **VACATED**. Judgment of Acquittal will be entered for this offense; and

   b. Baylor's conviction for the lesser-included offense of Count 1, conspiracy to distribute 28 grams or more of cocaine base, is **SUSTAINED**. Judgment of Conviction will be entered for this lesser-included offense.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

_____

Paul S. Diamond, J.

A12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 17-71-1, 5** |
| | : | |
| **EDWARD STINSON, et al.** | : | |

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 17-72-1** |
| | : | |
| **JUAN JARMON, et al.** | : | |

---

Diamond, J.          **MEMORANDUM**          May 7, 2019

Defendants Edward Stinson, Debra Baylor, and Juan Jarmon have moved for judgments of acquittal respecting their convictions for conspiring to distribute 280 grams or more of cocaine base ("crack"). 21 U.S.C. §§ 841, 846; Fed. R. Crim. P. 29. I took Stinson and Baylor's Motions under advisement during their recently completed trial. Fed. R. Crim. P. 29(b). I will now deny Stinson's Motion and grant Baylor's Motion in part. I denied Jarmon's Motion during his trial, stating that I would issue this Memorandum to explain my ruling more fully.

## I.    Procedural History

On February 8, 2017, in Matter 17-71, the grand jury charged Edward Stinson, Debra Baylor, Emmett Perkins, Rondell Holloway, Jamillah Bellamy, Jerry Lawrence, Germel Perkins, Carl Stinson, Imere Stinson, Daquian Brown, Reginald Copper, Terrance Jackson, and Stephen Dawkins Sr. with conspiring from 2010 to 2015 to distribute 280 grams or more of crack in the Norman Blumberg Public Housing Complex in North Philadelphia and numerous related offenses. (Indict., Doc. No. 1.) Stinson was charged in Counts: 1 (conspiring to distribute 280 grams or more of crack); 2, 3, 8, 9, and 66 (using a communication facility in furtherance of a drug felony).

A13

(Verdict Form, Doc. No. 533, Crim. No. 17-71) Baylor was charged in Counts: 1 (conspiring to distribute 280 grams or more of crack); 64, 67 (possessing crack with intent to distribute); 65, 68 (possessing crack with intent to distribute within 1,000 feet of public housing); 66 (using a communication facility in furtherance of a drug felony); and 86 (maintaining a drug house). (Id.) All Defendants other than Stinson and Baylor pled guilty to the charged offenses or lesser included offenses. (See Docket, Crim. No. 17-71.)

In a separate but related Indictment (17-72), the grand jury charged Juan Jarmon, Edward Stinson, Damon Edwards, Donta Edwards, Raheen Butler, Michael Ferrell, Dottie Good, Taft Harris, Steven Thompson, Stephen Dawkins Sr., Derek Fernandes, Anthony Lee Staggers, and Gene Wilson Jr. with conspiring from late 2012 to mid-2014 to distribute 280 grams or more of crack in the Blumberg Complex and related offenses. (Indict., Doc. No. 1.) Jarmon was charged in Counts: 1 (conspiring to distribute 280 grams or more of crack); 2 (using a communication facility in furtherance of a drug felony); 7, 9, 11, 13, 15, 22 (distributing crack); 8, 12, 14, 16, 23 (distributing crack within 1,000 feet of public housing); 17 (distributing crack and aiding and abetting); 18 (distributing crack within 1,000 feet of public housing and aiding and abetting); 24 (possessing crack with intent to distribute); 25 (possessing crack with intent to distribute within 1,000 feet of public housing); 26, 28, 30, 32 (possessing crack with intent to distribute and aiding and abetting); 27, 29, 31, and 33 (possessing crack with intent to distribute within 1,000 feet of public housing and aiding and abetting). (Verdict Form, Doc. No. 480, Crim. No. 17-72.) As alleged, in late 2012, while Stinson was in state custody, he gave control of crack trafficking in one of the Blumberg towers to Jarmon. (Indict. at 3–4.) All Defendants other than Stinson and Jarmon pled guilty. (See Docket, Crim. No. 17-72.)

On February 7, 2017, Rasheen Chandler was charged by Information with the 17-72 conspiracy: as alleged, from late 2012 to mid-2014 Chandler conspired with Jarmon and Stinson to distribute 280 grams or more of crack in the Blumberg Complex and committed related offenses. (Information, Doc. No. 1, Crim. No. 17-69.)  On April 25, 2018, Chandler pled guilty to the Information.  (Doc. No. 10, Crim. No. 17-69.)

Trial of Stinson and Baylor in the 17-71 Matter began on January 17, 2019.  On January 24, 2019, the Government rested and both Defendants moved for judgments of acquittal. Fed. R. Crim. P. 29(a).  (Doc. Nos. 516, 517.)  Defendants argued that the Government presented evidence of multiple conspiracies, not one over-arching conspiracy.  (Id.)  Both Defendants also argued that the Government failed to introduce evidence sufficient for the jury to find that the object of any such conspiracy was to distribute in excess of 280 grams of crack or 28 grams (the lesser included offense).  (Id.)  Baylor also moved for judgment of acquittal on the remaining Counts against her. (Id.)

On January 28, 2019, I granted Baylor's Rule 29 Motion as to the aiding and abetting portion of Count 86, denied her Motion as to Counts 64, 65, 66, 67, 68, and 86, and reserved judgment on both Defendants' Motions as to Count One (conspiring to distribute 280 grams or more of crack).  (Doc. No. 519, Crim. No. 17-71); Fed. R. Crim. P. 29(b).

On January 29, 2019, the jury acquitted Baylor of Count 68 (possessing crack within 1,000 feet of public housing with intent to distribute), and convicted her of the remaining six Counts (1, 64, 65, 66, 67, and 86).  (See Doc. No. 532, Crim. No. 17-71.)  The jury convicted Stinson on all Counts (1, 2, 3, 8, 9, and 66).  (Id.)  On January 30, 2019, I ordered the Parties to submit additional memoranda in support of their Rule 29 Motions as to Count One.  (Doc. No. 528.)  The matter has been fully briefed.  (Doc. Nos. 514, 516, 517, 556, 557, 569, Crim. No. 17-71.)

Following Stinson's conviction in the 17-71 Matter, the Government moved to dismiss all charges against him in the 17-72 Matter, leaving Jarmon, who went to trial on March 5, 2019. (Doc. Nos. 442, 448, 465, Crim. No. 17-72.)  At the close of the Government's case, I denied Jarmon's Rule 29 Motion, stating that I would issue this Memorandum to explain more fully my ruling as to Count One of 17-72 (conspiring to distribute 280 grams or more of crack).  (Mar. 12, 2019 Tr. 54–55.)  On March 13, 2019, the jury convicted Jarmon of Counts 1, 2, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 24, 25, 26, 27, 28, 29, 30, 31, 32, and 33.  (Doc. No. 480, Crim. No. 17-72.) The jury acquitted on Counts 22 and 23 (distributing crack on September 5, 2013).  (Id.)

## II.    **Legal Standard**

I "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could [find] the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  I may not "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [my] judgment for that of the jury," and should find insufficient evidence only "where the prosecution's failure [to prove its case] is clear."  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

## III.    **Discussion**

Each of the three Defendants was charged with conspiring to distribute 280 grams or more of crack cocaine.  21 U.S.C. §§ 841, 846.  As I have described, the conspiracy charged at 17-71 against Stinson and Baylor is distinct from that charged against Jarmon at 17-72.

Section 841 includes increased penalties based on the quantity of crack the defendant conspired to distribute.  See 21 U.S.C. § 841(b)(1) (10-year mandatory minimum sentence for

distributing 280 grams or more; 5-year mandatory minimum sentence for distributing 28 grams or more).  Each of the three Defendants argued that the Government failed to prove: (1) the existence of one over-arching conspiracy, or (2) that the object of any such conspiracy was to distribute 28 or 280 grams of crack.

"The issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury."  United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006).  "[A] single conspiracy is proved when there is 'evidence of a large general scheme, and of aid given by some conspirators to others in aid of that scheme.'"  Id. at 494 (quoting United States v. Reyes, 930 F.2d 310, 312–13 (3d Cir. 1991)).

Because § 841 provides an increased penalty based on the drug quantity a defendant conspired to distribute, quantity "is an element [of the crime] that must be submitted to the jury and found beyond a reasonable doubt."  Alleyne v. United States, 570 U.S. 99, 103 (2013) (internal quotation marks omitted).  There exists a Circuit split as to whether a quantity determination may be conspiracy-wide or if it must be individualized as to each conspirator.  See United States v. Stoddard, 892 F.3d 1203, 1220 (D.C. Cir. 2018) (discussing split and requiring individualized determinations).  The First, Fourth, Fifth, Ninth, and D.C. Circuits have adopted the individualized approach.  See Id.; United States v. Haines, 803 F.3d 713, 738–42 (5th Cir. 2015); United States v. Rangel, 781 F.3d 736, 742–43 (4th Cir. 2015); United States v. Pizarro, 772 F.3d 284, 292–94 (1st Cir. 2014); United States v. Banuelos, 322 F.3d 700, 704–06 (9th Cir. 2003).

When making an individualized determination as to drug quantity, the "jury may draw reasonable inferences from direct or circumstantial evidence."  United States v. Arras, 373 F.3d 1071, 1073 (10th Cir. 2004).  "[A]n inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on

A17

inference." Id. The jury may not "engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." Id.

Although the Third and Seventh Circuits have adopted the conspiracy-wide approach, neither Circuit has addressed the issue since the Supreme Court's ruling in *Alleyne*. See United States v. Phillips, 349 F.3d 138, 141 (3d Cir. 2003), *vacated on other grounds*, 543 U.S. 1102 (2005); United States v. Knight, 342 F.3d 697, 709–12 (7th Cir. 2003). Both Circuits that have addressed the issue following *Alleyne* have adopted the individualized approach. See Stoddard, 892 F.3d at 1220; Pizzarro, 772 F.3d at 292–94. The *Stoddard* Court explained that "the conspiracy-wide approach . . . has been called into question by *Alleyne* . . . ." 892 F.3d at 1220. Moreover, the Court suggested that "[t]he circuits that earlier adopted the conspiracy-wide approach have, at times, failed to grapple with it in subsequent published and unpublished cases decided after *Alleyne*." Id.

Accordingly, in an abundance of caution, I applied the individualized approach in both 17-71 and 17-72, instructing each jury that a defendant was only responsible for the quantity of crack: (1) that was reasonably foreseeable to that Defendant, and (2) that was distributed by members of the conspiracy during the time that the Defendant was a member of the conspiracy. (January 29, 2019 AM Tr. 38–39, Crim. No. 17-71; March 13, 2019 Tr. 34–35, Crim. No. 17-72); see Stoddard, 892 F.3d at 1220. The verdict form was crafted to ensure that the jury's conspiracy determination would be individualized. The jury first had to determine whether the Government had proven the Defendant guilty beyond a reasonable doubt of the conspiracy charged in Count One. If the jury found a Defendant guilty, it was then asked to answer the following interrogatory:

> If you find [the Defendant] guilty of conspiracy to distribute cocaine base ("crack")
> as charged in Count 1, please answer the following question:



1) Do you unanimously agree, by proof beyond a reasonable doubt, that the quantity of the mixture or substance containing a detectable amount of cocaine base ("crack") which was involved in the conspiracy and which was attributable to and/or reasonably foreseeable to the defendant was 280 grams or more?

_____Yes    _____No

If your answer is "no," please answer question 2. If your answer is "yes," please skip question 2 and proceed to Count 2.

2) Do you unanimously agree, by proof beyond a reasonable doubt, that the quantity of the mixture or substance containing a detectable amount of cocaine base ("crack") which was involved in the conspiracy and which was attributable to and/or reasonably foreseeable to the defendant was 28 grams or more?

_____Yes    _____No

(See Verdict Form, Doc. No. 533, Crim. No. 17-71; Verdict Form, Doc. No. 480, Crim. No. 17-72.)

### A. *Juan Jarmon*

At trial, the Government introduced, *inter alia*, dozens of wire intercepts, audio and video recordings of controlled purchases of crack, the testimony of cooperating coconspirators Rasheen Chandler and Dottie Good, and the expert testimony of Drug Enforcement Administration Agent Randy Updegraff.

The testimony of Chandler, Good, and Updegraff provided ample basis for the jury to find that Jarmon headed a single conspiracy to distribute at least 280 grams of crack. Chandler and Good each admitted to conspiring with Jarmon (and others) to distribute at least 280 grams of crack and acknowledged that they had pled guilty to that crime. (Mar. 7, 2019 Tr. 131; Mar. 8, 2019 Tr. 25.) In addition, the Government introduced considerable evidence confirming Chandler's and Good's testimony that Jarmon headed and directed this conspiracy. (Mar. 7, 2019 Tr. 72, 88, 169; Mar. 8, 2019 Tr. 165; Gov't Exs. 203–04, 208–10, 220–29, 234, 243–44, 402,

409.)  This alone is evidence supporting the jury's determination that Jarmon could reasonably foresee the distribution of at least 280 grams of crack.  United States v. Gibbs, 190 F.3d 188, 219 (3d Cir. 1999) ("a leader of a drug conspiracy is responsible for drug quantities transacted by his subordinates in furtherance of the conspiracy").

The Government also established by a second method that the distribution of at least 280 grams of crack was foreseeable to Jarmon.  Through Chandler's testimony, the Government established a baseline sales average of two crack bundles (100 nickel bags) per eight-hour shift. (Mar. 7, 2019 Tr. 76, 79, 100.)  Each nickel bag sold for $5.00.  (Id. at 76–77.)  Chandler also testified that he sold more crack early in the month, and never sold less than one crack bundle (50 nickel bags) in a shift.  (Id. at 78–79.)  Chandler sold crack at Jarmon's direction every day for eight to nine months, during which he missed only five days of work.  (Id. at 79.)  Agent Updegraff testified that a nickel bag typically contains 0.05 grams of crack but could contain as little as 0.03 grams of crack.  (Mar. 12, 2019 Tr. 26, 52.)  Based on this testimony, the jury could conservatively find that Chandler sold one bundle of 0.03-gram nickel bags per shift for eight months, totaling over 340 grams of crack.  Because Jarmon and Chandler were in constant contact regarding crack distribution, any crack distributed by Chandler was reasonably foreseeable to Jarmon.  See Stoddard, 892 F.3d at 1220.

By either method, the jury could reasonably find that Jarmon conspired to distribute 280 grams or more of crack.

### B.  *Edward Stinson*

Once again, the Government introduced considerable trial evidence that Stinson headed and directed the conspiracy charged in 17-71.  The Government introduced, *inter alia*: (1) the testimony of cooperating coconspirators Jamillah Bellamy, Terrance Jackson, and Steven Dawkins

Sr. (all three of whom pled guilty to conspiring to distribute 280 grams or more of crack in the 17-71 Matter); (2) expert testimony of Agent Updegraff; (3) dozens of recordings of consensually and non-consensually intercepted telephone calls; (4) video recordings of controlled crack purchases; and (5) lab reports identifying the quantity of crack cocaine actually contained in controlled purchases.

The fifty-one phone call recordings introduced at trial showed a single, overarching conspiracy headed by Stinson, spanning from at least September 4, 2012 to June 14, 2015. (See Govt. Exs. 11–15, 17, 21–22, 24, 29, 21, 35, 39, 40–43, 54, 59–60, 66–69, 80, 83, 85, 92, 94–95, 98, 101–103, 108–10, 112–13, 115, 126, 128, 153–59, 161–62.) Throughout these phone calls, Stinson and his coconspirators discuss the supply of crack, the daily volume of crack sales, the availability of shift sellers and lookouts, the process of cooking powder cocaine into crack, the storage of crack at Blumberg, and their sales proceeds. (Id.) Indeed, Stinson himself discusses these topics, giving orders and instructions to his employees, in the vast majority of the calls. Moreover, Bellamy testified that Stinson and Emmett Perkins were business partners in the sale of crack at Blumberg, and that they used her apartment to store, cook, package, and sell crack. (Jan. 18, 2019 Tr. 97–98, 101–02.) Bellamy described Stinson as "the boss," who was "in charge" of crack distribution. (Id. at 132–33.) This evidence was more than sufficient for the jury to find that Stinson led one over-arching conspiracy from at least 2012 to 2015. See Bobb, 471 F.3d at 495.

In seeking to establish the amount of crack attributable to Stinson, the Government asks me to assume a low weekly crack sales baseline, and then extends that amount over five years to arrive at a figure well in excess of 280 grams. (See Govt. Mem., Doc. No. 514.) Because, unlike in the 17-72 trial, during the 17-71 trial the Government failed to present evidence of an actual sales baseline, its conclusion amounts to impermissible speculation and conjecture. See Arras,

A21

373 F.3d at 1073.

Even without sales figures derived from a "baseline"—real or imagined— the Government nonetheless introduced sufficient evidence for the jury to attribute 280 grams or more of crack to Stinson. Bellamy, Jackson, and Dawkins each told the jury that they had conspired with Stinson to distribute at least 280 grams of crack. (Jan. 18, 2019 Tr. 87; Jan. 22, 2019 Tr. 152; Jan. 23, 2019 PM Tr. 18.) Because Stinson led the conspiracy, this same amount may properly be attributed to him. See Gibbs, 190 F.3d at 219.

The Government also introduced numerous intercepted phone calls during which Stinson and his codefendants discussed their drug operations. Applying the prices, amounts, and activities mentioned during the recorded phone calls and the testimony of Bellamy, Jackson and Updegraff, I have compiled a crack distribution spreadsheet which I have appended to this Memorandum. (See Ex. A.) The spreadsheet includes an explanation of how crack quantities were derived from the recordings. (Id. at 3.) I have calculated conservatively that the recordings and testimony confirm the distribution of at least 281.70 grams of crack. (See id.); see also Gibbs, 190 F.3d at 219. This figure does not include the five sandwich sized bags stuffed with crack cocaine that Bellamy testified were cut up into nickel bags for further sales. (Jan. 18, 2019 Tr. 104–09.) Given that evidence presented during the 17-71 trial established that each nickel bag—the smallest crack amount handled by the conspirators—contained a "dot" of crack weighing on average 0.0362 grams, the five sandwich-sized bags stuffed with crack rocks necessarily contained hundreds of grams of the drug. (Jan. 18, 2019 Tr. 104–05; Gov't Exs. 35, 39–43, 83.) When the 281.70 grams I have calculated is combined with the five sandwich bags of crack, the Government necessarily showed that Stinson conspired to distribute considerably more than 280 grams of crack. See Arras, 373 F.3d at 1076; see also United States v. Kloszewski, No. 17-4054, 2019 WL 181175, at *3 (2d

Cir. Jan. 14, 2019); United States v. Ferguson, 729 F. App'x 314, 316 (5th Cir. 2018).

In sum, whether based on the admissions of Bellamy, Jackson, and Dawkins, or on the actual drugs sold (as described by Bellamy, Jackson, and Updegraff, as recorded in the audio intercepts, and as contained in the five sandwich sized bags of crack), the jury could easily find that Stinson conspired to distribute at least 280 grams. Accordingly, I will deny his Rule 29 Motion.

### C. *Debra Baylor*

The Government based its case against Baylor almost entirely on twenty-one consensually recorded phone calls made from September 4, 2014 to June 12, 2015. (See Govt. Exs. 94–95, 98, 101–03, 108–10, 112, 113, 115, 126, 153–59, 161.) These ten months are substantially shorter than Stinson's five to six year leadership of the conspiracy. The phone calls nonetheless confirmed that Baylor worked with others (such as Rondell Holloway and Carl Stinson) in Edward Stinson's over-arching distribution operation by storing crack in her apartment and distributing it to those others to be sold at Blumberg. (See Gov't Exs. 94–95, 98, 101–03, 108–10, 112, 113, 115, 126, 153–59, 161.) Accordingly, I will deny Baylor's Rule 29 Motion to the extent she argues that the Government proved only multiple, discrete conspiracies. See Reyes, 930 F.2d at 313 ("[A] single conspiracy is proved when there is evidence of a large general scheme, and of aid given by some conspirators to others in aid of that scheme." (internal quotation marks omitted)).

No matter how favorably viewed, however, the Government's evidence was not sufficient to show that Baylor conspired to distribute 280 grams or more of crack. In opposing Baylor's Motion, the Government offers the previously discussed baseline assumptions to show that over 280 grams of crack is attributable to her. (See Govt. Mem., Doc. No. 514.) Once again, this is little more than impermissible conjecture. Moreover, the Government's assumptions are largely

A23

inapplicable to Baylor because her involvement in the conspiracy was comparatively brief. The great bulk of the evidence respecting Stinson related to the four years before Baylor was a proven member of the conspiracy and so is inapplicable to her. For instance, Jackson withdrew from the conspiracy before Baylor joined. (See Jan. 22, 2019 Tr. 151 (testifying that he worked as a lookout "between 2010 and '12").) Similarly, Bellamy's guilty plea and related testimony does not make out sales attributable to Baylor. Bellamy testified to joining the conspiracy in 2011 or 2012 and withdrawing some time in 2014. (See Jan. 18, 2019 Tr. 80–81, 118.) This is not proof that any of the drug activity Bellamy described took place after September 4, 2014, when Baylor joined the operation. (See id.) Finally, Dawkins testified that he participated in the conspiracy "on and off" between 2012 and 2017. (See Jan. 23, 2019 PM Tr. 21–25.) This sporadic distribution of at least 280 grams of crack over these six years is not attributable to Baylor, whose participation lasted only ten months.

In these circumstances, the only trial evidence that can sustain Baylor's conspiracy conviction is that showing actual sales foreseeable to her during her ten-month involvement. As the attached spreadsheet shows, the jury could attribute no more than 142.6 grams of crack to Baylor by adding up evidence of: (1) the Group's crack distribution from September 4, 2014 to June 14, 2015; and (2) the Group's purchase and possession of powder cocaine (that it cooked into crack for sale at Blumberg). (See Quantity Spreadsheet, Ex. A.) Even without consideration of the powder cocaine, the recorded phone conversations show that Baylor was personally involved in the sale of at least 29.78 grams of crack. (See Gov't Exs. 94, 109, 126, 153–54, 157, 159, 161.) The Government's evidence is thus sufficient to sustain the verdict against her only for the lesser included offense of conspiring to distribute 28 grams or more of crack. 21 U.S.C. § 841(b)(1)(B)(iii); See United States v. Petersen, 622 F.3d 196, 207–08 (3d Cir. 2010); Gov't of

<u>Virgin Islands v. Josiah</u>, 641 F.2d 1103, 1108 (3d Cir. 1981) ("A jury's finding of guilt on all elements of the greater offense is necessarily a finding of guilt on all elements of the lesser offense . . . . A trial court therefore has authority to enter a judgment of conviction on a lesser-included offense when it finds that an element exclusive to the greater offense is not supported by evidence sufficient to sustain the jury's finding of guilt on the greater offense." (internal citation omitted)).

Accordingly, I will grant Baylor's Motion in part.

An appropriate Order follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

May 7, 2019

_____

Paul S. Diamond, J.

A25

## EXHIBIT A

| Exhibit Number | Description | Date | Time | Crack Weight (g) | Price | Explanation |
|---|---|---|---|---|---|---|
| 11 | Call Transcript | 9/4/2012 | 13:06:00 | 68.25 | $ 2,500 | Germel Perkins was arrested with half an ounce of crack (14g),  E. Stinson and E. Perkins also discuss having spent $2500 (which they took from their girlfriends' tax refunds) on powder cocaine |
| 12 | Call Transcript | 9/4/2012 | 13:23:00 | 16.78 | $ 1,100 | E. Stinson, E. Perkins, and Bellamy discuss being supplied by "Doom" on three occasions.  The first time, they paid $500 for 20 grams of cocaine.  On a subsequent occasion, they "bagged up" $600 worth of crack.  I will thus assume that they sold one nickel or bag crack from the third supply package. |
| 13 | Call Transcript | 9/4/2012 | 13:39:00 | 0.00 | | No quanity/price discussed |
| 14 | Call Transcript | 9/6/2012 | 20:56:00 | 0.00 | | No quanity/price discussed |
| 15 | Call Transcript | 9/7/2012 | 21:14:00 | 0.00 | | No quanity/price discussed |
| 17 | Call Transcript | 9/10/2012 | 9:33:00 | 0.00 | | No quanity/price discussed |
| 21 | Call Transcript | 10/14/2012 | 10:52:00 | 0.07 | | Bellamy tells E. Stinson that E. Perkins worked a sales shift each day for two days.  I will assume that he sold one $5 bag each day |
| 22 | Call Transcript | 1/1/2013 | 17:33:00 | 0.00 | | Drugs are discussed but the quanity is unclear |
| 24 | Call Transcript | 1/1/2013 | 21:40:00 | 0.36 | $ 50 | Imere Stinson sold crack for $50 |
| 29 | Call Transcript | 1/3/2013 | 13:36:00 | 0.00 | | No quanity/price discussed |
| 31 | Call Transcript | 1/3/2013 | 21:46:00 | 1.81 | $ 250 | Imere Stinson will sell $250 of crack |
| 35 | Call transcript and lab report | 2/8/2013 | 15:02:00 | 0.14 | $ 25 | 5 bags sold |
| 39 | Call transcript and lab report | 3/20/2013 | 15:46:00 | 0.20 | $ 20 | 4 bags sold |
| 40 | Call transcript and lab report | 3/27/2013 | 15:00:00 | 0.14 | $ 20 | 4 bags sold |
| 41 | Call transcript and lab report | 3/27/2013 | 15:20:00 | 0.13 | $ 40 | 8 bags sold |
| 42 | Call transcript and lab report | 4/24/2013 | 15:45:00 | 0.18 | $ 20 | 4 bags sold |
| 43 | Call transcript and lab report | 4/24/2013 | 16:25:00 | 0.33 | $ 30 | 6 bags sold |
| 54 | Call Transcript | 8/1/2013 | 17:17:00 | 14.00 | | Germel Perkins states he has a half ounce of crack to sell. (See Jan 18, 2019 Tr. 171.) |
| 162 | Call transcript | 8/2/2013 | 14:02:00 | 0.00 | | No quanity/price discussed |
| 59 | Call transcript | 8/8/2013 | 11:28:00 | 0.04 | | Daquian Brown tells E. Perkins that he sold "all the shit" last night.  I will assume one bag of crack was sold |
| 60 | Call transcript | 8/8/2013 | 13:15:00 | 0.00 | | No quanity/price discussed |

| 66 | Call transcript | 8/22/2013 | 20:20:00 | 0.00 | | | No quanity/price discussed |
|---|---|---|---|---|---|---|---|
| 67 | Call transcript | 8/22/2013 | 21:05:00 | 0.00 | | | No quanity/price discussed |
| 68 | Call transcript | 8/22/2013 | 21:24:00 | 0.04 | | | T-Mac is waiting for newly cooked crack to dry before bagging it for sale.  I will assume that one bag of crack was sold from this newly prepared batch. |
| 69 | Call transcript | 8/26/2013 | 14:41:00 | 0.18 | $ | 20 | E. Perkins tells Bellamy to charge a customer only $20 for 5 bags of crack. |
| 80 | Call transcript | 9/2/2013 | 14:00:00 | 0.00 | | | No quanity/price discussed |
| 83 | Call transcript and lab report | 2/10/2014 | 15:02:00 | 0.29 | $ | 40 | Confidential informant purchased 8 bags from Imere Stinson |
| 85 | Call transcript | 8/28/2014 | 9:20:00 | 0.04 | | | A "bit" of crack discussed.  I will assume this is no more than one bag. |
| 92 | Call transcript | 9/2/2014 | 14:16:00 | 0.00 | | | No quanity/price discussed |
| 94 | Call transcript | 9/4/2014 | 21:17:00 | 3.62 | | | E. Stinson and Baylor discuss having two yaks to sell (equivalent to two bundles of crack) |
| 95 | Call transcript | 9/5/2014 | 13:18:00 | 0.00 | | | No quanity/price discussed |
| 98 | Call transcript | 9/6/2014 | 22:08:00 | 0.00 | | | No quanity/price discussed |
| 101 | Call transcript | 9/9/2014 | 11:47:00 | 13.02 | $ | 800 | E. Stinson and Baylor discuss paying $800 for 21 grams, which is most likely powder cocaine that will be cooked into crack |
| 102 | Call transcript | 9/10/2014 | 15:44:00 | 13.02 | $ | 800 | E. Stinson and E. Perkins discuss spending $800 for 21 grams, which is most likely powder cocaine that will be cooked into crack |
| 103 | Call transcript | 9/12/2014 | 22:15:00 | 19.53 | $ | 900 | E. Stinson and Baylor discuss buying $900 of cocaine |
| 153 | Call transcript | 4/2/2015 | 8:50:00 | 1.09 | $ | 150 | E. Stinson gives Baylor $150 from crack sales |
| 154 | Call transcript | 4/2/2015 | 8:57:00 | 5.07 | $ | 700 | Holloway sold $700 of crack |
| 155 | Call transcript | 4/3/2015 | 13:43:00 | 20.18 | $ | 930 | Holloway paid $930 for powder |
| 156 | Call transcript | 4/3/2015 | 14:18:00 | 0.00 | | | No quanity/price discussed |
| 157 | Call transcript | 4/3/2015 | 21:58:00 | 0.04 | | | Holloway says "shit still flowing."  I will assume the sale of one bag. |
| 158 | Call transcript | 4/5/2015 | 11:29:00 | 39.06 | | | Holloway bought three "sevens."  Updegraff explains that these are three 21 gram packs of powder, which results in 39.06 grams of crack after cooking |
| 159 | Call transcript | 4/5/2015 | 13:23:00 | 13.00 | | | E. Stinson tells Holloway that 21 grams of powder will cook down to a minimum of 13 grams of crack |
| 161 | Call transcript | 4/8/2015 | 21:17:00 | 5.07 | $ | 700 | Holloway discusses selling another $700 of crack |
| 108 | Call transcript | 6/4/2015 | 8:38:00 | 0.00 | | | No quanity/price discussed |
| 109 | Call transcript | 6/4/2015 | 20:09:00 | 1.09 | $ | 150 | Carl Stinson agrees to sell $150 of crack |
| 110 | Call transcript | 6/4/2015 | 21:53:00 | 0.00 | | | No quanity/price discussed |
| 112 | Call transcript | 6/5/2015 | 12:46:00 | 8.03 | $ | 370 | Baylor spent $370 on powder cocaine |
| 113 | Call transcript | 6/5/2015 | 21:14:00 | 0.00 | | | Sales are discussed, but it appears to be related to crack sold earlier in the day |
| 115 | Call transcript | 6/6/2015 | 13:01:00 | 0.00 | | | Again, sales appear related to crack sold the day before |
| 126 | Call transcript | 6/12/2015 | 12:44:00 | 0.80 | $ | 110 | Baylor "put together" $110 of crack |
| 128 | Call transcript | 6/14/2015 | 12:36:00 | 0.00 | | | No quanity/price discussed |

| | Testimony | | | 6.52 | $ | 900 | Perkins bought Bellamy a $900 gift.  Because selling crack was Perkins' only income source, I have converted the dollar amount into crack weight.  (See Jan. 18, 2019 Tr. 140.) |
| | Testimony | | | 28.96 | $ | 4,000 | Terrance Jackson testified that he sold over $1000 of crack on four occasions. (Jan. 23, 2019 AM Tr. 29.) |
| | Testimony | | | 0.65 | | | Bellamy testified that for the 18 months she worked with Perkins, she received a package of crack at least once a month, sometimes twice a month.  These packages were "for both of them," meaning E. Stinson and E. Perkins.  (Jan 22, 2019 TR. at 47-49.)  I will assume that Bellamy received 18 packages, each containing one nickel bag of crack. |

| Stinson Total | 281.70 |
|---|---|
| Baylor Total | 142.60 |

| Conversion Rates | |
|---|---|
| Nickel Bag Weight | 0.0362 |
| Powder Cocaine per Dollar Spent | 0.035 |
| Powder to Crack Cooking | 0.62 |

| Methods |
|---|

-The average weight of a nickel bag of crack--as determined from the weight of all the nickel bags obtained by the Government during its controlled purchases--is 0.0362g

-Each nickel bag costs $5.  (Jan. 22, 2019 Tr. 17.)

-Based on Bellamy's testimony, one "yak" or "bundle" contains 50 nickel bags.  (Jan. 18, 2019 Tr. 116.)

-Based on expert testimony and audio recordings, the Stinson Group's practice was to "cook" 21 grams of powder cocaine to at least 13 grams of crack.  Using this ratio, 1g of powder  cocaine will be cooked into 0.62g of crack cocaine.  (Gov't Ex. 159; Jan. 24, 2019 PM Tr. 27.)

-Updegraff testified that "an ounce of [powder] cocaine is typically between $800 and $1,000" in Philadelphia.  (Jan. 24, 2019 AM Tr. 54.)  At the lowest price--$800 per ounce of powder--$1  would buy  0.035g of powder cocaine (28/800).

-Because the crack Holloway sold was stored in Baylor's apartment, his sales quantities may be attributed to her.

-Unless otherise specified, I have assumed a sale, package, container, or parcel of crack contained the smallest quantity: a nickel (i.e. $5) bag.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 17-72-1** |
| | : | |
| **JUAN JARMON** | : | |

## ORDER

On March 13, 2019, after a seven-day trial, the jury convicted Defendant Juan Jarmon of 23 drug trafficking offenses. (Doc. No. 480.) At sentencing, Defendant objected to some 83 paragraphs in the Presentence Investigation Report, including Probation's finding (also urged by the Government) that Defendant distributed 3.4 kilograms of crack cocaine. (Def.'s Objs., Ex. A.) I ruled on each of Defendant's objections, overruling some and sustaining others. In particular, I sustained Defendant's objection to the PSR drug quantity calculation and found that the Government had actually proven that Defendant was responsible for distributing only 723.33 grams. I sentenced him accordingly and stated that I would issue this Order to explain more fully the bases of my rulings.

## I.   PROCEDURAL BACKGROUND

I have previously set out a detailed history of this matter. (Rule 29 Memo, Doc. No. 527.) On February 8, 2017, in Matter 17-72, the grand jury charged Juan Jarmon and twelve others with conspiring to distribute 280 grams or more of crack in the Norman Blumberg Public Housing Complex and related offenses. (Indict., Doc. No. 1.) In a separate but related Indictment (17-71), the grand jury charged Edward Stinson, Debra Baylor, and eleven others with conspiring to distribute 280 grams or more of crack in the Blumberg Complex and related offenses. (Crim. Docket 17-71, Doc. No. 1.)

A29

On January 29, 2019, a jury convicted Stinson on all counts and Baylor on six of seven counts. (Doc. No. 533.) Defendant Jarmon was convicted a little over a month later. (Doc. No. 480.) Defendant, Stinson, and Baylor had all moved during their trials for judgments of acquittal respecting their convictions for conspiring to distribute 280 grams or more of crack. Fed. R. Crim. P. 29. I deferred ruling on the Motions. Fed. R. Crim. P. 29(b). On May 7, 2019, I issued a Memorandum Opinion granting Baylor's Motion in part and denying both Stinson's and Jarmon's Motions. (Rule 29 Memo.) I explained in detail my methodology for calculating drug quantity based on testimony and evidence presented at trial. (Id.) I incorporate here that methodology and those calculations.

On October 21, 2019, Jarmon's counsel submitted objections to 83 PSR paragraphs. (Ex. A.) On November 15, 2019, the Government submitted its response. (Ex. B.) On November 21, 2019, I sentenced Defendant to a low-end Guidelines term of 360 months imprisonment to run concurrent to his undischarged state sentence, six years of supervised release, and a $1,300.00 special assessment. (Sent. Tr. 40.)

## II. LEGAL STANDARDS

For any disputed portion of the PSR, I must "rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3)(B). I must "exercise independent judgment in sentencing," at which the Government bears "the burden of proving facts relevant to sentencing by a preponderance of the evidence." United States v. Prior, 941 F.2d 427, 431 (6th Cir. 1991); United States v. Moment, 750 F. App'x 68, 71 (3d Cir. 2018); United States v. Maxshure, 579 F. App'x 136, 139 (3d Cir. 2014).

"[D]rug quantity is a factor of extraordinary importance to the sentencing calculus." United States v. Tavano, 12 F.3d 301, 306 (1st Cir. 1993). The Third Circuit has thus admonished

that "the sentencing court must carefully scrutinize the government's proof to ensure that its estimates are supported by a preponderance of the evidence." United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir. 1993); see United States v. Collado, 975 F.2d 985, 998 (3d Cir. 1992). In determining a quantity, I consider any "relevant conduct," including acts and omissions of the defendant as well as acts and omissions of co-conspirators that were: (1) "within the scope of the jointly undertaken criminal activity"; (2) "in furtherance of that criminal activity"; and (3) "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); see also Tavano, 12 F.3d at 305.

My drug quantity finding at sentencing is not controlled by the trial verdict. Tavano, 12 F.3d at 305. Rather, I must make an independent quantity determination. Id. That quantity may be "greater than that found by the jury" if it is "supported by the record." United States v. Lopez-Esmurria, 714 F. App'x 125, 126 (3d Cir. 2017); United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005). The Third Circuit has recognized that in determining the quantity of drugs distributed by many conspirators, "a degree of estimation is sometimes necessary." United States v. Paulino, 996 F.2d 1541, 1545 (3d. Cir. 1993); see also United States v. Gibbs, 190 F.3d 188, 219 (3d Cir. 1999) ("A district court may carefully estimate the total drug quantities involved in a conspiracy based on evidence of average drug transactions during the conspiracy.").

### III. DISCUSSION

Defendant contested four aspects of the PSR: (1) that Defendant was part of a large, overarching conspiracy; (2) that he led the DTG (and thus was subject to an aggravated role enhancement); (3) that he engaged in violence, intimidation, or threats of violence in furtherance of the conspiracy; and (4) that he possessed a firearm during the commission of his drug crimes. (See generally Def.'s Objs.) Defendant objected to Probation's finding that he was responsible for

the distribution of 3.4 kilograms of crack. (Id.) Defendant also objected to a number of phone calls and text messages included in the PSR because the Government did not introduce them at trial. (Id.) Finally, the Defendant raised objections regarding how Probation described each co-conspirator's role and the drug quantities attributable to each co-conspirator. (Id.) At sentencing, the Government relied on its trial evidence and one additional telephonic intercept and transcript, which I reviewed carefully. Although I determined that only Defendant's objections to the offense level enhancements and drug quantity affected his advisory Guidelines calculation, I nevertheless ruled on all his objections.

### Phone Calls and Text Messages

Defendant objected to those PSR paragraphs that mentioned phone calls and text messages because those calls and texts had not been introduced at trial and were not introduced at sentencing. (Def.'s Objs. Nos. 20–60.) The Government agreed. I sustained Defendant's objections. (Sent. Tr. 5.)

### Controlled Buys

Defendant objected to those PSR paragraphs that mentioned eight controlled purchases of crack, arguing that they did not occur. (Def.'s Objs. Nos. 12–14, 16–19, 24, 36.) I overruled six of those objections because the Government introduced at trial audio, video, and still photos proving that the controlled buys occurred. (Sent. Tr. 5.) I sustained two of Defendant's objections because the buys involved sham substances. (Id.)

### Co-Conspirators' Roles and Drug Quantities

Defendant objected to seventeen PSR paragraphs that described co-conspirators' roles and the drug quantity attributable to each. (Def.'s Objs. Nos. 66–75.) Because all these co-conspirators had pled guilty to participating in Defendant's drug trafficking conspiracy, I overruled objections

as to their roles. (Sent. Tr. 5–6.) I sustained Defendant's objections to Probation's drug quantity calculations, finding that Probation had overstated the amount attributable to each co-defendant. (Sent. Tr. 6.)

### Miscellaneous Objections

Defendant objected to nine other PSR paragraphs. (Def.'s Objs. Nos. 2, 4, 6–8, 10, 62, 81.) I sustained three of these objections, ruling that: (1) Defendant demonstrated that he had earned his high school diploma; (2) the Government had not introduced trial evidence that Persons #4, #5, and #6 worked as lookouts for Defendant; and (3) Paragraph 46 included unproven facts relating only to Edward Stinson. (Sent. Tr. 7.)

 I overruled the five remaining miscellaneous objections, finding that: (1) the October 3, 2012 prison phone call between Edward Stinson and Defendant did take place; (2) the Government demonstrated that Defendant distributed, packaged, and cooked crack; (3) the Government presented sufficient evidence at trial that Stephen Dawkins was a lookout for Defendant's Drug Trafficking Group; (4) Rasheen Chandler was not "dealing his own drugs"; rather, he was selling drugs in furtherance of the charged conspiracy; and (5) the Government demonstrated through phone calls and transcripts that Defendant and other co-conspirators attempted to avoid detection by law enforcement by limiting communications and obtaining burner phones. (Sent. Tr. 6–8.)

### Violence Enhancement

Defendant objected to four PSR paragraphs that set out his acts of violence and intimidation, and threats of violence in furtherance of the drug trafficking conspiracy. (Def.'s Objs. Nos. 9, 15, 63, 77.) In two of these objections, Defendant challenged Probation's application of a two-level Guidelines enhancement. (Def.'s Objs. Nos. 63, 77.) I found that the Government demonstrated through phone calls and direct trial testimony that Defendant used and threatened

violence throughout the course of the drug trafficking conspiracy. (Sent. Tr. 8); see U.S.S.G. § 2D1.1(b)(2). For instance, Dottie Good testified credibly that Defendant had violently assaulted her when she failed to turn drug sale proceeds over to him. (Tr. 03/08/19 at 17–22.) I thus overruled Defendant's objections and found that the two-level enhancement was warranted. (Sent. Tr. 8.)

### *Defendant's Leadership and Overarching Conspiracy*

Defendant objected to seven PSR paragraphs describing Defendant as a leader of the Drug Trafficking Group and characterizing the Group as a large, overarching conspiracy. (Def.'s Objs. Nos. 1, 3, 5, 11, 62, 65, 66.) In making these objections, Defendant argued against the applicability of a four-level Guidelines enhancement.

Four levels are added to the base offense level if Defendant played an aggravating role in the commission of the offense. U.S.S.G. § 3B1.1. To qualify for this enhancement, "the defendant must have been an organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 comment n.2. I must consider the following factors: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. 3B1.1 comment n.4.

The Government proved at trial that Defendant led the Drug Trafficking Group and that he employed and supervised supervisors, shift sellers, and lookouts. (Tr. 03/06/19 at 133–136, Gov't Exhs. 232, 232A 233, 233A); (Tr. 03/06/19 at 91–93, 11–13, 112–115.) For instance, Defendant would advise sellers when a preferred customer approached, and directed the drug amount the customer would receive. (Id.) Both Rasheen Chandler and Dottie Good testified that Defendant

hired them to sell crack and continuously supplied them with crack.  (Tr. 03/07/19 at 71–72, 76, 78–79, 80–84, 86–87); (Tr. 03/08/19 at 11–24.)

I thus overruled Defendant's objections and found that the four-level Guidelines enhancement was warranted.  (Sent. Tr. 9.)

### Dangerous Weapon

Defendant objected to the two-level Guidelines enhancement for the use of a firearm during the commission of crimes.  See U.S.S.G. § 2D1.1(b)(1).  The enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected to the offense."  U.S.S.G. § 2D1.1, comment n.11(A).  Further, as a leader of the drug trafficking group, Defendant is liable for "all acts and omissions that were reasonably foreseeable" to him in connection with the jointly undertaken criminal activity.  U.S.S.G. § 1B1.3.

At sentencing, the Government introduced a transcript and audio of an intercepted phone call that took place on September 12, 2013 (during the conspiracy's pendency).  (Sent. Tr. 9–10.) On the call, Defendant said that he had to acquire "another pistol" after he had directed "Boo" (co-defendant Damon Edwards) to "take the pistols out of the house" because Defendant "don't want that shit in the building with all them cops right there."  (Sent. Ex. 1A.)  Defendant was especially concerned about "Housing" police: "[t]hey just keep searching everybody . . ." (Id.)  Indeed, Defendant was so concerned about the police that he was "scared to even get in the car with this pistol . . . they's gonna know something was up."  (Id.)

Because the Government thus showed by an evidentiary preponderance that Defendant and Edwards (the Group's co-leader) used guns in their criminal activities, I ruled that the dangerous weapon enhancement was applicable.  (Sent. Tr. 12.)

### Drug Quantity

I sustained Defendant's objection to Probation's finding (with the Government's agreement) that 3.4 kilograms of crack cocaine were attributable to him. (Sent. Tr. 12.) In accordance with my earlier Memorandum (Doc. No. 527), I introduced a chart (attached here at Appendix A) setting out my quantity calculations. (Sent. Tr. 12.) I thus found that Defendant was responsible for distributing 723.33 grams of crack. (Id.)

### Guidelines Calculations

Defendant objected to Probation's determination that his offense level was 43, resulting in an advisory Guidelines sentence of life imprisonment. (Def.'s Objs. Nos. 79, 80, 83.) Based on my finding that Defendant was responsible for distributing only 723.33 grams of crack, I reduced his base offense level to 32. (Sent. Tr. 13.) Adding the two-level enhancement for use of violence, the two-level enhancement for use of a dangerous weapon, and the four-level enhancement for Defendant's aggravating role, his total offense level was 40. (Sent. Tr. 13.) With an offense level of 40 and a criminal history level of VI, Defendant's Guidelines range was 360 months to life imprisonment. U.S.S.G. § 5, Part A Sentencing Table.

I thus sustained Defendant's objections as to the Guidelines calculations.

## IV. SENTENCING

The Government requested a very lengthy sentence, arguing that a low-end Guidelines sentence would be insufficient, and emphasized the devastating impact that Defendant's drug trafficking conduct had on the Blumberg Housing Complex community. (Sent. Tr. 26–30.) Defendant argued, inter alia, that his Level VI Criminal History was overstated, and that the drug trafficking conspiracy was unsophisticated. (Sent. Tr. 15–24.) Defendant also emphasized the extraordinarily difficult circumstances in which he was raised. (Sent. Tr. 18.)

After considering the § 3553(a) factors and everything argued and submitted to me by the Parties, I determined that a low-end Guidelines sentence of 360 months imprisonment (to run concurrently with his undischarged state sentence), six years of supervised release, and a $1,300.00 special assessment was reasonable.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.

November 27, 2019

AO 245B (Rev 09/19)   Judgment in a Criminal Case
                      Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of Pennsylvania

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| JUAN JARMON | Case Number: DPAE2:17CR000072-0001 |
| | USM Number: 75891-066 |
| | Maureen Claire Coggins |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☑ was found guilty on count(s)    *1, 2, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 24, 25, 26, 27, 28 29, 30, 31, 32 and 33 on 3/13/2019 by a Jury
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 USC §§846, 841(a)(1) & (b)(1)(A) and 851 | Conspiracy to distribute 280 grams or more of cocaine base (crack) | 9/30/2014 | 1 |

The defendant is sentenced as provided in pages 2 through    8    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)    22 and 23 on 3/13/2019 by a Jury.

☐ Count(s)  __    ☐ is   ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

                                        11/21/2019
                    Date of Imposition of Judgment

                    Signature of Judge

                    Paul S. Diamond, United States District Court Judge
                    Name and Title of Judge

                    Date

A38

DEFENDANT:  JUAN JARMON
CASE NUMBER:  DPAE2:17CR000072-0001

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 USC §843(b) | Unlawful use of a communication facility in furtherance of a drug felony | 9/30/2014 | 2 |
| 21 USC §§841(a)(1) and (b)(1)(C) and 851 | Distribution of cocaine base ("crack") | 9/30/2014 | 7, 9, 11, 13 & 15 |
| 21 USC §§860(a), 841(b)(1)(C) and 851 | Distribution of cocaine base ("crack") within 1,000 feet of public housing | 9/30/2014 | 8, 12, 14 & 16 |
| 21 USC §§841(a)(1), (b)(1)(C) and 851, and 18 USC §2 | Distribution of cocaine base ("crack") and aiding and abetting | 9/30/2014 | 17 |
| 21 USC §§860(a), 841(b)(1)(C) and 851, and 18 USC §2 | Distribution of cocaine base ("crack") within 1,000 feet of public housing, and aiding and abetting | 9/30/2014 | 18 |
| 21 USC §§841(a)(1), (b)(1)(C) and 851, and 18 USC §2 | Possession with intent to distribute cocaine base ("crack") and aiding and abetting | 9/30/2014 | 24, 26, 28, 30 & 32 |
| 21 USC §§860(a), 841(b)(1)(C) and 851, and 18 USC §2 | Possession with intent to distribute cocaine base ("crack") within 1,000 feet of public housing and aiding and abetting | 9/30/2014 | 25, 27, 29, 31 & 33 |

A39

AO 245B (Rev 09/19) Judgment in Criminal Case
    Sheet 2 – - Imprisonment

DEFENDANT:  JUAN JARMON
CASE NUMBER:  DPAE2:17CR000072-0001

Judgment — Page    3    of    8

# IMPRISONMENT

      The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

360 Months on Count 1, 48 Months on Count 2, 360 Months on each of Counts 8, 12, 14, 16, 18, 25, 27, 29, 31 and 33, and 240 Months on Count 9, all to run concurrently with each other and concurrently with any state sentence  *(Counts 7, 11, 13, 15, 17, 24, 26, 28, 30 and 32 are lesser included offenses of Counts 8, 12, 14, 16, 18, 25, 27, 29, 31 and 33 and will merge for the purposes of sentencing. Therefore, the Court did not impose a term of imprisonment on Counts 7, 11, 13, 15, 17, 24, 26, 28, 30 and 32).

☑  The court makes the following recommendations to the Bureau of Prisons:

    It is recommended Defendant receive vocational and educational training.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at                 ☐  a.m.    ☐  p.m.   on

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on                   to

at                 , with a certified copy of this judgment.

                        UNITED STATES MARSHAL

          By

                        DEPUTY UNITED STATES MARSHAL

AO 245B (Rev 09/19)   Judgment in a Criminal Case
                 Sheet 3 –  Supervised Release

Judgment—Page   4   of   8

DEFENDANT:  JUAN JARMON
CASE NUMBER:  DPAE2:17CR000072-0001

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

5 Years on Count 1, 1 Year on Count 2, 6 Years on each of Counts 8, 12, 14, 16, 18, 25, 27, 29, 31 and 33, and 3 Years on Count 9, all to run concurrently with each other. *(Counts 7, 11, 13, 15, 17, 24, 26, 28, 30 and 32 are lesser included offenses of Counts 8, 12, 14, 16, 18, 25, 27, 29, 31 and 33 and will merge for the purposes of sentencing. Therefore, the Court did not impose a term of supervised release on Counts 7, 11, 13, 15, 17, 24, 26, 28, 30 and 32).

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you
       pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

A41

AO 245B (Rev 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | | Judgment—Page | 5 | of | 8 |

DEFENDANT: JUAN JARMON
CASE NUMBER: DPAE2:17CR000072-0001

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____          Date _____

A42

DEFENDANT: JUAN JARMON
CASE NUMBER: DPAE2:17CR000072-0001

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall refrain from the illegal possession and use of drugs and shall submit to urinalysis or other forms of testing to ensure compliance. It is further ordered that the defendant shall submit to evaluation and treatment as approved by the U. S. Probation Office. The defendant shall abide by the rules of any program and shall remain in treatment until satisfactorily discharged with the approval of the Court.

Payment of the Restitution and the Fine is a condition of Supervised Release and the defendant shall satisfy the amount due in monthly installments of not less than $25.00.

AO 245B (Rev 09/19)    Judgment in a Criminal Case
                       Sheet 5 — Criminal Monetary Penalties

Judgment – Page  7  of  8

DEFENDANT: JUAN JARMON
CASE NUMBER: DPAE2:17CR000072-0001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 1,300.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

  If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ | 0.00 | $ | 0.00 | |
|---|---|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

  ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A44

DEFENDANT: JUAN JARMON
CASE NUMBER: DPAE2:17CR000072-0001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $   1,300.00        due immediately, balance due

        ☐  not later than _____ , or
        ☑  in accordance with  ☐  C,   ☐  D,   ☐  E, or   ☑  F below; or

**B**  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☐  Payment in equal _____ *(e g , weekly, monthly, quarterly)* installments of $ _____  over a period of
        _____ *(e.g , months or years)*, to commence _____ *(e.g . 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g , weekly, monthly, quarterly)* installments of $ _____  over a period of
        _____ *(e.g , months or years)*, to commence _____ *(e g , 30 or 60 days)* after release from imprisonment to a
        term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
        imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:
        The defendant shall make payments in the amount of $25.00 per quarter from any wages he may earn in prison in
        accordance with The Bureau of Prisons' Inmate Financial Responsibility Program. Any portion of the special
        assessment that is not paid in full at the time of release from imprisonment shall become a condition of Supervised
        Release and shall be paid at the rate of $25.00 per month to commence 30 days after release from confinement.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
        $4,250.00.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

A45