NO. 19-1652

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee

v.

JUAN JARMON,
Appellant

APPEAL FROM JUDGMENT OF CONVICTION AND SENTENCE
IN CRIMINAL NO. 17-0072-01 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

JEROME M. MAIATICO
Assistant United States Attorney

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8258

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT....................................................................1

STATEMENT OF ISSUES ...........................................................................2

STATEMENT OF THE CASE ......................................................................3

I.    Procedural History .......................................................................3

II.   Statement of Facts .......................................................................5

A.   The Offense Conduct ........................................................5

1.   Testimony of sellers R.C. and D.G. ..........................7

2.   The intercepted calls.................................................9

3.   Controlled purchases of crack................................12

B.   The Sentencing................................................................12

STATEMENT OF RELATED CASES............................................................16

SUMMARY OF ARGUMENT ......................................................................17

ARGUMENT.............................................................................................21

I.    THE EVIDENCE IS SUFFICIENT TO
SUPPORT JARMON'S CONVICTION
ON ALL COUNTS........................................................................21

A.   Jarmon's Conviction on the Conspiracy
Count is Supported by Sufficient Evidence....................22

B.   Jarmon's Convictions on the Substantive
Distribution Counts Are Supported by
Sufficient Evidence.........................................................23

II.   THE DISTRICT COURT DID NOT
      ERR IN DENYING CODEFENDANT
      STINSON'S MOTION TO SUPPRESS
      HIS PRISON PHONE CALLS ................................................... 37

III.  THE DISTRICT COURT DID NOT
      CLEARLY ERR BY APPLYING A FOUR-
      LEVEL LEADERSHIP ENHANCEMENT ................................ 47

IV.   THE DISTRICT COURT DID NOT
      CLEARLY ERR IN APPLYING THE
      DANGEROUS WEAPON
      ENHANCEMENT .................................................................... 51

V.    THE DISTRICT COURT DID NOT
      CLEARLY ERR IN APPLYING AN
      ENHANCEMENT FOR THE USE
      OF VIOLENCE AND THREATS
      OF VIOLENCE ........................................................................ 5

VI.   THE DISTRICT COURT DID NOT
      CLEARLY ERR IN DETERMINING
      THAT JARMON WAS RESPONSIBLE
      FOR AT LEAST 280 GRAMS OF CRACK
      UNDER THE GUIDELINES ...................................................... 58

VII.  THE DISTRICT COURT DID NOT
      ERR IN IMPOSING CONCURRENT
      TERMS OF IMPRISONMENT OF
      360 MONTHS ON THE CONSPIRACY
      COUNT AND THE SUBSTANTIVE
      DISTRIBUTION COUNTS ...................................................... 61

CONCLUSION .............................................................................. 65

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of Bessemer City*,
    470 U.S. 564 (1985) ..................................................................47, 57

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) ......................................38, 43-45, 46

*Coleman v. Johnson*,
    566 U.S. 650 (2012) ............................................................21

*Hudson v. Palmer*,
    468 U.S. 517 (1984) ..................................................... 42, 43

*Ianelli v. United States*,
    420 U.S. 770 (1975) .......................................................... 23

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ............................................................21

*Lanza v. New York*,
    370 U.S. 139 (1962) .......................................................... 39

*Northwest Airlines, Inc. v. Minnesota*,
    322 U.S. 292 (1944) .......................................................... 45

*Oliver v. United States*,
    466 U.S. 170 (1984) ............................................................41

*Rakas v. Illinois*,
    439 U.S. 128 (1978) .......................................................... 40

*Real v. Shannon*,
    600 F.3d 302 (3d Cir. 2010) .............................................. 35

*Rita v. United States*,
    551 U.S. 338 (2007) .......................................................... 64

*United States v. Applewaite,*
    195 F.3d 679 (3d Cir. 1999)...........................................................22, 23

*United States v. Bailey,*
    840 F.3d 99 (3d Cir. 2016)..........................................................23, 27

*United States v. Balon,*
    384 F.3d 38 (2d Cir. 2004).................................................................42

*United States v. Bierley,*
    922 F.2d 1061 (3d Cir. 1990) ............................................................47

*United States v. Booker,*
    543 U.S. 220 (2005) ...........................................................................61

*United States v. Boyd,*
    595 F.2d 120 (3d Cir. 1978).............................................................24

*United States v. Brodie,*
    403 F.3d 123 (3d Cir. 2005)...............................................................21

*United States v. Caraballo-Rodriguez,*
    726 F.3d 418 (3d Cir. 2013) ..............................................................21

*United States v. Cooper,*
    437 F.3d 324 (3d Cir. 2006) ..............................................................61

*United States v. Gibbs,*
    190 F.3d 188 (3d Cir. 1999) ...............................................24, 27, 29

*United States v. Grier,*
    475 F.3d 556 (3d Cir. 2007)...............................................................61

*United States v. Helbling,*
    209 F.3d 226 (3d Cir. 2000).........................................................48, 50

*United States v. Iglesias,*
    535 F.3d 150 (3d Cir. 2008)...............................................................58

*United States v. Kelly*,
892 F.2d 255 (3d Cir. 1989).......................................................... 23, 27

*United States v. Myers*,
102 F.3d 227 (6th Cir. 1996) ............................................................40

United States v. Napolitan,
762 F.3d 297 (3d Cir. 2014) .........................................................51, 52

*United States v. Novak*,
531 F.3d 99 (1st Cir. 2008) ..........................................................41, 43

*United States v. Pawlowski*,
967 F.3d 327 (3d Cir. 2020).............................................................. 64

*United States v. Perez*,
280 F.3d 318 (3d Cir. 2002) ....................................................... 23, 37

*United States v. Price*,
13 F.3d 711 (3d Cir. 1994).................................................................. 24

*United States v. Price*,
418 F.3d 771 (7th Cir. 2005) ............................................................. 26

*United States v. Rawlins*,
606 F.3d 73 (3d Cir. 2010)................................................................. 32

*United States v. Sababu*,
891 F.2d 1308 (7th Cir. 1989) ...........................................................41

*United States v. Schurr*,
775 F.2d 549 (3d Cir. 1985)................................................................ 35

*United States v. Shavers*,
693 F.3d 363 (3d Cir. 2012),
*vac'd on other grounds*, 570 U.S. 913 (2013...........................39, 41, 44

*United States v. Van Poyck*,
77 F.3d 285 (9th Cir. 1996) ...............................................................41

*United States v. Ward,*
626 F.3d 179 (3d Cir. 2010) ............................................................... 63

*United States v. Willoughby,*
860 F.2d 15 (2d Cir. 1988) ................................................................. 41

*United States v. Yeung,*
241 F.3d 321 (3d Cir. 2001) ............................................................... 58

## Statutes and Rules

18 U.S.C. § 2 .......................................................................................... 3

18 U.S.C. § 2703(d) ............................................................................... 43

18 U.S.C. § 3231 .................................................................................... 1

18 U.S.C. § 3553(a) ............................................................................... 15

18 U.S.C. § 3742 .................................................................................... 1

21 U.S.C. § 841(a)(1) ............................................................................. 3

21 U.S.C. § 843(b) ................................................................................. 3

21 U.S.C. § 851 ...................................................................................... 3

21 U.S.C. § 860(a) ................................................................................. 3

28 U.S.C. § 1291 .................................................................................... 1

Fed. R. Crim. P. 29 ................................................................................ 22

U.S.S.G. § 1B1.3 .................................................................................... 58

U.S.S.G. § 2D1.1 ................................................................................. 51, 55

U.S.S.G. § 2D1.2 .................................................................................... 62

U.S.S.G. § 3B1.1 ............................................................... 48

U.S.S.G. § 3D1.2(d) ......................................................... 62

U.S.S.G. § 4B1.1 ................................................................13

U.S.S.G. § 5G1.2 ................................................................ 63

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

# STATEMENT OF ISSUES

1. Was the evidence sufficient to support the defendant's conviction for conspiracy to distribute at least 280 grams of crack cocaine?

2. Was the evidence sufficient to support the defendant's conviction on the substantive drug distribution counts?

3. Did the district court err by denying a codefendant's motion to suppress recordings of the codefendant's prison phone calls?

4. Did the district court commit clear error in applying:

      a. a leadership enhancement under the Sentencing Guidelines?

      b. an enhancement for possession of a dangerous weapon?

      c. an enhancement for using or threatening violence?

      d. the offense level applicable to 280 grams of crack cocaine?

5. Did the district court commit plain error in calculating the guideline range and imposing a within-range sentence?

# STATEMENT OF THE CASE

## I. Procedural History

On February 8, 2017, defendant Juan Jarmon and 12 other individuals were indicted on various drug trafficking crimes. Supp. App. 1-73. Jarmon was charged with conspiracy to distribute 280 grams or more of cocaine base ("crack") and multiple counts of distributing crack. Jarmon alone proceeded to trial, beginning on March 5, 2019.[1] On March 13, 2019, Jarmon was convicted of the conspiracy offense (Count 1), as well as one count of using a communication facility in furtherance of a drug felony, in violation of 21 U.S.C. § 843(b) (Count 2); six counts of distribution of crack, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 7, 9, 11, 13, 15, 17); five counts of distributing crack within 1,000 feet of public housing, in violation of 21 U.S.C. § 860(a) and 18 U.S.C. § 2 (Counts 8, 12, 14, 16, 18); five counts of possession of crack with intent to distribute (Counts 24, 26, 28, 30, 32); and five counts of possession of crack with intent to distribute within 1,000 feet of public housing (Counts 25, 27, 29, 31, 33). PSR ¶ 4. Jarmon was found not guilty of two distribution counts (Counts 22 and 23). *Id.*

---

[1] Prior to trial, the government filed an information pursuant to 21 U.S.C. § 851, identifying Jarmon's prior felony drug conviction. The government withdrew the information prior to sentencing. PSR ¶ 3.

Jarmon moved for a judgment of acquittal on all counts at the close of the government's case but did not present any specific argument in support. App. 760. The district court denied the motion, stating that it would issue a written memorandum after the completion of the trial. App.760. Jarmon did not file a post-trial motion or memorandum in support of his motion for acquittal. On May 7, 2019, the district court issued a memorandum explaining why the evidence was sufficient to support Jarmon's conviction on the conspiracy count. App. 13-20.

On November 21, 2019, the district court sentenced Jarmon to a total term of imprisonment of 360 months: 360 months on Count 1 and the Section 860 counts (the protected location counts), the statutory maximum of 48 months on Count 2 (the telephone count), and the statutory maximum of 240 months on the crack distribution offense charged in Count 9.[2] The court also imposed a five-year term of supervised release, and ordered Jarmon to pay forfeiture in the amount of $4,250 and a special assessment of $1,300. App. 41-45.

---

[2]  The court did not impose sentence on the crack distribution offenses that were lesser included offenses of the Section 860 counts.

On November 27, 2019, the district court filed a written order that explained more fully the bases of its rulings at the sentencing hearing. App. 29-37.

## II. Statement of Facts

### A.    The Offense Conduct.

From early 2013 to mid-2014, Jarmon led a drug trafficking operation that sold crack cocaine in the Norman Blumberg Apartment complex, a public housing facility in Philadelphia. For a period of time prior to late 2012, drug sales in the Hemberger Building (one of the two main buildings in the complex) were controlled by Edward Stinson.[3] In October 2012, while Stinson was incarcerated, Stinson told Jarmon in a call from prison that Jarmon could take over drug sales on the 18th floor of the Hemberger Building, telling Jarmon that he could "get the sh*t rollin'" and could "make all the money off the building, right now." PSR ¶ 40; App. 122, 125-27; Supp. App. 110-15. Stinson also told Jarmon that he could use a stash house and seller on the 18th floor. App. 125-27; Supp. App. 114-15.

---

[3] Stinson was charged in the indictment in this case but was also charged in a separate indictment in Cr. No. 17-71, returned on the same day. The indictment in 17-71 charged Stinson and 12 others with drug trafficking offenses committed in the Blumberg complex in an earlier time frame. The government dismissed the charges against Stinson in this case and proceeded solely on the other indictment. Stinson was tried in January 2019 and found guilty of many of the charged drug trafficking offenses.

Jarmon and his group sold crack in this location all day, every day for months on end in 2013 and 2014.[4] PSR ¶¶ 37-41, 121, 159. Jarmon employed a number of shift sellers and lookouts, who worked eight-hour shifts over a 24-hour period. PSR ¶ 39. As leader, Jarmon purchased bulk quantities of crack cocaine, recruited, hired, and fired sellers and lookouts, supplied the sellers with bundles of crack cocaine, gave them authority to sell the drugs within his drug territory, collected drug proceeds, paid them for their shifts, levied taxes on sellers and customers, and provided protection from rival drug traffickers, among other duties. PSR ¶ 42. Jarmon ruled with an iron fist, threatening and assaulting those who disrupted his drug trafficking business. PSR ¶¶ 47, 54, 67.

R.C., D.G., Raheen Butler, Michael Ferrell, Taft Harris, and others were sellers in Jarmon's drug trafficking group, typically selling $5 bags of crack. PSR ¶ 43; App. 265-69, 310-12. Stephen Dawkins, Derek Fernandes, and others were lookouts for the group, alerting other members of the presence of law enforcement in the area. PSR ¶ 44; App. 228, 273-74.

---

[4] As noted in the PSR, codefendant Damon Edwards led the drug trafficking operation along with Jarmon, supervising the shift sellers and drug sales. Edwards pled guilty to the conspiracy count and substantive distribution counts. PSR ¶ 8.

As described in detail in the Presentence Report, during the course of the investigation, the FBI and DEA conducted court-approved Title III wire intercepts of phone calls between members of the drug trafficking group. The wiretap intercepted dozens of phone calls in which Jarmon arranged drug sales and oversaw the group's operations. Law enforcement also made controlled purchases of crack from Jarmon and other members of his group, using confidential informants who recorded the transactions on audio and video.

At trial, the government presented the testimony of two shift sellers, R.C. and D.G, dozens of intercepted calls, audio and video recordings of the controlled purchases, and the testimony of agents and other law enforcement officers involved in the investigation.[5]

### 1. Testimony of sellers R.C. and D.G.

Two codefendant shift sellers, R.C. and D.G.,[6] testified at trial that they worked with Jarmon to sell crack cocaine in the public housing

---

[5] Jarmon's lengthy but scattershot statement of the case consists almost entirely of testimony and evidence that was elicited on cross-examination or that otherwise arguably supported the defense, while ignoring the substantial evidence presented by the government that supported the jury's guilty verdict. The government responds to specific contentions where appropriate.

[6] The appellant's brief refers to R.C. and D.G. by their full names. Because they both cooperated and also acted as confidential sources for

community. R.C. testified that Jarmon's sellers and lookouts worked around-the-clock shifts selling crack in Jarmon's territory within the complex. App. 260-61, 265-69, 271-274, 310-12. R.C. identified other sellers, including Michael Ferrell, D.G., Raheen Butler, and Taft Harris, and lookouts, including Derek Fernandes and Stephen Dawkins, all of whom worked with Jarmon. App. 265-69, 271-274, 310-12.

R.C. testified that he sold crack bundles for Jarmon every day for eight to nine months in 2013 and 2014, missing only about five days of work.[7] App. 256-57, 264. R.C. sold up to four bundles per shift on busy days (there were 50 $5 bags in each bundle, each containing about .05 grams of crack) but typically never sold less than two bundles. App. 263-64. Based on this testimony, R.C. sold more than 1,000 grams of crack for Jarmon during this period.

---

federal law enforcement after their arrests, the government refers to them by their initials rather than by name.

[7] Contrary to Jarmon's repeated contention, Br. 13-14, 30, 35, R.C. did not sell drugs for other individuals at the Blumberg complex in the time frame in which he worked for Jarmon. R.C. had sold drugs for Edward Stinson in the complex prior to his involvement with Jarmon; in fact, Stinson recommended R.C. to Jarmon. App. 256-58, 352.

D.G. testified that she was a seller for Jarmon for about two months in mid-2013. App. 373-77, 384-86.[8] She provided a similar description of the staffing of the round-the-clock operation. App. 374-77. D.G. typically sold up to four bundles per shift on busy days, but no less than one and a half or two bundles even on slow days. App. 377-78.

Jarmon controlled others in the drug trafficking group through intimidation, threats, and violence. In mid-2013, Jarmon physically assaulted D.G. in a dispute over drug proceeds. During the incident, Jarmon grabbed money out of D.G.'s pants pocket, ripping off the pocket, then overpowered D.G. and flung her across the room, cracking her head on a table. D.G. was left bloodied and scared. After the assault, D.G. visited an emergency room where she was treated for lacerations on her left eyebrow and received stitches. App. 208-10, 379-84.

### 2.    The intercepted calls.

The numerous intercepted wiretap calls introduced at trial showed Jarmon's leadership of the drug trafficking operation. As leader, Jarmon often purchased bulk quantities of crack or cocaine in amounts up to nearly

---

[8] Like R.C., D.G. also did not sell crack inside the complex for others in this two-month time frame. App. 384-86.

$5,000, and discussed some of these purchases in intercepted calls. App. 149-50, 196-98, 204-05, 748-49.

In other calls, Jarmon gave directions to his sellers and lookouts, and repeatedly checked on the quantity of drugs they had sold. During a call on August 31, 2013, for example, R.C. provided Jarmon with an update on the quantity of crack sold by the sellers the night before, including by Michael Ferrell and Raheen Butler. App. 127-29, 283-85, 742-46; Supp. App. 74-76. During this call, Jarmon discussed using "lookouts" for their group and his sellers "grind[ing]" (selling crack). Later that day, when R.C. informed Jarmon that a lookout had provided late notice that he could not work that day, Jarmon said, "F*ck all these motherf*ckers, man. I'm going to get some new lookouts, man," and discussed hiring a female to "grind" for the group. App. 129-30, 134-35; Supp. App. 77-82.

Jarmon levied taxes on others in his drug trafficking group who did not properly perform their duties. In a call on September 16, 2013, Jarmon told R.C. that he "should have taxed [seller Raheen Butler's] ass another $40" but that he "only taxed [Butler] for them hours late" on his shift. App. 157-60. The calls also captured Jarmon directing seller Taft Harris on multiple occasions. On October 15, 2013, for example, Jarmon directed Harris not to pay the lookouts until the shift is over, telling Harris, "I'm

trying to get this sh*t to pick up for you all, so you can make more money man." App. 178-79, 741-42. In a conversation a few days later, Harris confirmed that Stephen Dawkins was acting as lookout during his overnight shift, and Jarmon directed Harris to pay Dawkins $20 for the shift. App. 179-81, 574.

The calls also showed that Jarmon used threats to control those who tried to disrupt his business. On September 8, 2013, Jarmon and R.C. discussed one of their drug customers who was robbed while attempting to purchase drugs. Jarmon and R.C. discussed the identity of the perpetrators, and Jarmon said he was going to "beat the sh*t out of them." App. 143-46; Supp. App. 87-90. In another incident, on September 9, 2013, Jarmon and R.C. discussed a female resident of the building, who they believed told others that Jarmon and other members of his group were selling drugs. Jarmon told R.C. that the resident was "ratin' [sic]" (talking to the police). App. 147-50; Supp. App. 91-93. Jarmon said he would get someone "to beat [the female resident] the f*ck up." Jarmon told R.C.:

> Yeah, she don't understand how this sh*t go down around here. She's not from around, I'm gonna get her, I'm gonna get her hurt. I'm a really get her hurt....I'm getting six people to beat her the f*ck up tonight. Umm, she getting her *ss whopped tonight, I ain't playin'.

*Id.* During a phone call a few days later, Jarmon boasted about punching the female resident after she tried to call the police on him. App. 153-54; Supp. App. 97-98.

The calls further showed that Jarmon and others in his group regularly warned each other of police presence. *See, e.g.*, App. 139-40 (conversation with Ferrell).

### 3.    Controlled purchases of crack.

The government made six controlled purchases of crack from Jarmon, including bulk purchases, as well as additional controlled purchases from his sellers. On June 11, 2013, for example, Jarmon sold about 22.7 grams of crack to a confidential informant, in an area across the street from the complex. App. 446-47, 534-39; Supp. App. 105-07. The CI was equipped with audio and video recording devices, and Jarmon's face and voice were captured on the recordings. App. 534-39; Supp. App. 105-06, 108. The government presented evidence of five other controlled purchases of bulk amounts of crack directly involving Jarmon, three of

which occurred in May 2013 and two in August 2013. App. 513-34, 675-95; Supp. App. 103-04, 109.[9]

In addition, the government presented evidence of controlled purchases of crack from Jarmon's sellers between April 2013 and February 2014, including purchases from R.C., D.G., Ferrell, and Harris. App. 567-68, 574-79, 662-64.

## B.    The Sentencing.

The Probation Office determined that as a leader of the drug conspiracy, Jarmon was responsible for approximately 3.4 kilograms of crack. PSR ¶¶ 123-124. This resulted in a base offense level of 34, which was increased by two levels for the Section 860 convictions. The Probation Office found that Jarmon was subject to a number of enhancements:  a two-level enhancement because firearms were possessed by one or more coconspirators during the conspiracy; a two-level increase because the defendant used violence, threatened to use violence, or directed the use of violence in the course of the conspiracy; and a four-level enhancement for his leadership role in the offense, resulting in a total offense level of 44.

---

[9] The video camera worn by the CI captured some but not all of the exchanges of drugs and money. The government introduced both video and still photos of Jarmon's face that were captured on the video camera during several of the crack purchases, as well as the audio recordings in which Jarmon's voice was identified.

PSR ¶¶ 153-159. Because Jarmon had two prior convictions for controlled substance offenses, he was a career offender under U.S.S.G. § 4B1.1. As a result, Jarmon was placed in criminal history category VI. Jarmon's offense level in excess of 43 resulted in a guideline range of life in all criminal history categories.

Jarmon filed numerous objections to the Presentence Report. *See* Addendum to PSR; App. 835-39. At the sentencing hearing, the court began by ruling on the objections, stating that it would also issue a memorandum containing a full explanation of its rulings. App. 843, 29-37 (court's sentencing order). The court first announced its rulings on Jarmon's objections to the description of the offense conduct and his "miscellaneous" objections, sustaining some and overruling others. App. 30-33, 843-46. The court noted that none of these objections affected the guideline calculation. App. 847.

With respect to the guideline objections, the court sustained the objection to the drug quantity of 3.4 kilograms and instead found that Jarmon was responsible for 723.33 grams of crack. The court presented a chart that, using "the most conservative method," laid out its quantity analysis and calculation. App. 26-28, 851-52, 894-95. With the two-level

adjustment for the convictions for distributing crack in a protected location, the base offense level was 32. App. 36, 852.

The court overruled the objections to the enhancements for using or threatening violence, possession of a dangerous weapon, and leadership role.[10] App. 33-35, 847-50. With these enhancements, Jarmon's total offense level was 40. Given his criminal history category of VI, Jarmon's guideline range was 360 months to life imprisonment. App. 36, 852.

After hearing argument on the appropriate sentence, and considering the Section 3553(a) factors, App. 869-75, the court imposed a total sentence of 360 months' imprisonment. App. 875.

---

[10] The court's rulings on Jarmon's objections to these enhancements are explained in more detail in the argument sections addressing these issues.

## STATEMENT OF RELATED CASES

Codefendant Damon Edwards pleaded guilty and was sentenced to 216 months' imprisonment; he filed a notice of appeal, counsel filed an *Anders* brief, the judgment was affirmed, and a *pro se* supplemental brief is pending at No. 19-2732. Nine codefendants pleaded guilty, were sentenced to terms of imprisonment, and have not appealed, and charges were dismissed against the other two codefendants.

Thirteen defendants were charged in a related case, *United States v. Edward Stinson, et al.,* No. 17-71. Appeals were filed by Edward Stinson, No. 20-1315 (pending); Emmett Perkins, No. 19-3689 (resolved); and Rondell Holloway, No. 20-3532 (pending).

# SUMMARY OF ARGUMENT

1. The evidence was sufficient to support Jarmon's conviction for conspiracy to distribute crack as charged in Count 1 of the indictment. Two codefendants testified about the drug trafficking conspiracy and Jarmon's leadership role. The government also presented dozens of intercepted calls in which Jarmon directed the drug trafficking activity and the activities of his co-conspirators, and audio and video recordings of controlled purchases of crack from Jarmon and other members of the conspiracy. The fact that some personnel changed over time does not defeat the existence of a single conspiracy. The evidence was also sufficient to support the jury's conclusion that Jarmon conspired to distribute at least 280 grams of crack. R.C.'s testimony regarding his crack sales for Jarmon alone supported this conclusion, and there was substantial other evidence of crack sales by Jarmon and his sellers, including the controlled purchases.

2. Jarmon's conviction on the substantive drug trafficking counts was supported by the same sufficient evidence, including testimony and surveillance. Jarmon's arguments on appeal were presented to and rejected by the jury and ignore the standard of review.

3. The district court did not err by denying codefendant Edward Stinson's motion to suppress his recorded prison phone calls, which

included a call with Jarmon in which the incarcerated Stinson told Jarmon he could take over his drug territory at the housing complex. Jarmon contends that Stinson's Fourth Amendment rights were violated because the government did not obtain a warrant for the calls, but presents no argument as to how *his* Fourth Amendment rights were violated by this conduct. Even if Jarmon has presented a viable claim in this regard, his Fourth Amendment rights were not violated by the government's conduct, as neither a prisoner nor a person who receives a call from a prisoner has a reasonable expectation of privacy in such phone conversations. As the district court correctly concluded, the Supreme Court's decision in *Carpenter* does not extend to prison phone calls.

4. The district court did not clearly err in applying a four-level enhancement for Jarmon's leadership role in the offense. The coconspirator testimony and intercepted wire calls established that Jarmon hired shift sellers, supplied them with bundles of crack, gave them authority to sell the drugs within his territory in the housing complex, and collected proceeds from them. The evidence further established that Jarmon's drug distribution operation involved more than five people and was also otherwise extensive as defined in the guideline.

5. The district court did not clearly err in applying a two-level enhancement for possession of a dangerous weapon. The court relied on a recorded phone call in which Jarmon unambiguously stated that he possessed a pistol and might have to get rid of it because of police presence in the area.

6. The district court did not clearly err in applying a two-level enhancement on the ground that Jarmon used violence or threatened to use violence in the commission of the offense. D.G. testified that Jarmon physically assaulted her in a dispute over drug proceeds. The assault was corroborated by records of an emergency room visit. Jarmon also explicitly threatened to harm others in intercepted wire calls.

7. The district court did not clearly err in finding that Jarmon was responsible for at least 280 grams of crack under the Sentencing Guidelines. The jury held Jarmon responsible for 280 grams of crack, and its finding was supported by the record. The court conducted its own conservative analysis of the trial evidence and reasonably concluded that Jarmon was responsible for approximately 723 grams of crack.

8. The district court did not commit any error, much less plain error, in sentencing Jarmon to concurrent 360-month sentences on the conspiracy and substantive drug counts. The court properly grouped the

counts and aggregated the drug quantities under the guidelines in
determining the guideline range of 360 months to life, and acted
reasonably in imposing a 360-month term at the bottom of that range.

# ARGUMENT

## I. THE EVIDENCE IS SUFFICIENT TO
## SUPPORT JARMON'S CONVICTION ON ALL COUNTS

## Standard of Review

This Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). The reviewing court "must be ever vigilant…not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Caraballo-Rodriguez*, 726 F.3d at 430, quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). "The district court – and we – are not to act as a thirteenth juror. Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F.3d at 431, quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

## Discussion

Jarmon contends that the evidence is insufficient to support his conviction on the conspiracy count, Br. 25-33, and on the substantive drug counts, Br. 44-50.[11] His arguments are meritless.

### A.    Jarmon's Conviction on the Conspiracy Count is Supported by Sufficient Evidence.

In attacking his conviction on the conspiracy count, Jarmon argues that the evidence failed to prove the conspiracy charge in the indictment, contending that his alleged co-conspirators were only "independent contractors" who also worked for others and were involved in a series of small, separate conspiracies. Br. 28-33.

Where, as here, a defendant claims that he did not enter into an agreement with others to distribute illegal drugs, this Court must determine if the evidence at trial would have allowed a reasonable fact finder to conclude beyond a reasonable doubt that the defendant and at least one other person shared a "unity of purpose" or the intent to "achieve a common goal" and an agreement to "work together toward the goal." *United States v. Applewaite*, 195 F.3d 679, 684 (3d Cir. 1999) (citations

---

[11] Jarmon's motion for judgment of acquittal was made orally at the close of the government's case-in-chief. App. 760 ("I'd like to make a motion for a Rule 29 dismissal of the charges."). Jarmon did not elaborate, make any specific challenges, or file a written motion.

omitted). The government is not required to prove the existence of an express or formal agreement; "a tacit understanding is sufficient." *Ianelli v. United States*, 420 U.S. 770, 777 n.10 (1975). Further, proof of the existence of an agreement may be established entirely by circumstantial evidence. Conspiracy law merely requires that the inferences drawn have a logical and convincing connection to the evidence. *Applewaite*, 195 F.3d at 684. As this Court has stated:

> We can infer such a conspiracy when evidence of related facts and circumstances make clear that the defendants could not have carried out their activities "'except as the result of a preconceived scheme or common understanding.'" The government "need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." Furthermore, the government is entitled to prove these elements entirely through circumstantial evidence. Indeed, "[i]t is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances. A case can be built against the defendant grain-by-grain until the scale finally tips."

*United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016) (citations and internal quotations marks omitted).

Whether the government proved a single conspiracy or multiple conspiracies is a fact question for the jury. *United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002). "A single conspiracy is not transformed into a series of unrelated, multiple conspiracies merely through a change in its membership." *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989). "Parties may join the conspiracy after its inception, and may withdraw and

terminate their relationship with the conspiracy prior to its completion." *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978) (citations omitted). A sporadic participant can be shown to be a member of a conspiracy where "evidence, direct or inferential, of knowledge shows that [he] was part of the larger operation." *United States v. Gibbs*, 190 F.3d 188, 198 (3d Cir. 1999), *quoting United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994). "[E]ven if a small group of co-conspirators [is] at the heart of an unlawful agreement, others who knowingly participate with the core members and others to achieve a common goal may be members of a single conspiracy." *Id.*

As the district court correctly found, the evidence at trial established that Jarmon headed the conspiracy to distribute at least 280 grams of crack at a public housing complex as charged in Count 1. App. 19. There was substantial direct evidence of the conspiracy, including the testimony of sellers R.C. and D.G., who sold crack for Jarmon in the housing complex, dozens of intercepted calls and text messages which discussed drug sales and the operation of the group, and audio and video recordings of controlled purchases of crack from Jarmon and his co-conspirators. Based on this evidence, a rational juror could find that a conspiracy to distribute

at least 280 grams of crack existed, and that Jarmon, R.C., and D.G., among others, were members of that conspiracy.

R.C. and D.G. testified that they worked with Jarmon to sell crack at the housing complex. R.C. testified that Jarmon recruited R.C. to work for him, and he sold bundles of crack on the 18th floor of the building for Jarmon for an eight- to nine-month period in 2013 and 2014. App. 256-57, 260-61, 264-74, 310-12. D.G. also testified that she was a seller for Jarmon for about two months in mid-2013, App. 373-77, 385-86. The testimony of R.C. and D.G. alone showed that Jarmon agreed to work together with others to "achieve a common goal" of selling crack cocaine.

The evidence further showed that Jarmon furthered the conspiracy's objectives and exerted control over members of his group, and sometimes used violence or threats of violence. Jarmon physically assaulted D.G. in a dispute over drug proceeds. App. 379-384. Jarmon threatened to "beat the sh*t out of" those who disrupted his drug business, App. 143-46; Supp. App. 87-90, and to "beat [] the f*ck up" those who were "ratin' [sic]," or talking to the police about members of his drug trafficking group selling drugs, App. 147-50; Supp. App. 91-93.

The intercepted calls also showed that Jarmon controlled and directed his coconspirators, including the activities of sellers and lookouts,

and kept close watch on the quantity of drugs sold by co-conspirators. *See, e.g.,* App. 127-29, 283-85, 742-46; Supp. App. 74-76. He levied taxes on coconspirators who did not properly perform their duties. App. 157-60. He also regularly warned others in his group of police presence. App. 139-40. This evidence also showed the existence of a conspiracy and that Jarmon was a member of that conspiracy. S*ee United States v. Price*, 418 F.3d 771, 780 (7th Cir. 2005) ("Evidence that members of an alleged conspiracy were conducting counter-surveillance of police activity certainly makes more probable the existence of a conspiracy to break the law.").

Jarmon's participation in the conspiracy to distribute crack was also proved through controlled purchases and seizures of crack from Jarmon himself and from his sellers, including from R.C., D.G., Mike Ferrell, and Taft Harris. App. 513-39, 567-68, 574-79, 662-64, 675-95. R.C. testified that Ferrell, Taft, and others sold crack for Jarmon in this time frame, App. 265-69, 310-12.

Ignoring this mountain of evidence proving the existence of the conspiracy and Jarmon's participation in it, Jarmon argues the evidence showed only that that the sellers were merely "independent contractors" who worked for others as well as Jarmon, and thus proved only that there were a number of small, separate conspiracies rather than the single

conspiracy charged in the indictment. Br. 29. This contention is contradicted by the testimony of R.C. and D.G., who both testified that that they sold crack for Jarmon at the housing complex over the course of several months. *See Gibbs*, 190 F.3d at 199 ("[A]n accumulation of deals suggests more trust, garnered over a period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities."). Even if some members of the conspiracy, like the lookouts, changed over time and sometimes worked for other drug dealers, that would not defeat the conspiracy. *See Kelly*, 892 F.2d at 259; *United States v. Bailey*, 840 F.3d 99, 109 (3d Cir. 2016) ("[W]hen a defendant 'acted as a lookout [while an alleged coconspirator] conducted drug sales, [ ] that fact alone may well have been enough to show the existence of a conspiracy between' those persons.").

Jarmon's contention that R.C. and D.G. worked for others in this same time frame is also factually incorrect. R.C. testified that he had previously sold drugs for Stinson from 2010 to 2012, and began working for Jarmon in 2013. App. 256-58, 352. R.C. testified that he then sold crack for Jarmon in the eight to nine months before R.C.'s arrest in 2014. App. 264,

277-78. D.G. sold drugs for others in other time frames, but sold crack for Jarmon in the two-month period at issue. App. 373-77, 384-86.

Moreover, Jarmon was not just a sporadic participant in the conspiracy; the testimony of his coconspirators, intercepted calls, and controlled purchases showed that he was the leader of this conspiracy, directing others and controlling the sale of crack in an area of the housing complex. As the district court noted in denying Jarmon's motion for a judgment of acquittal, there was ample evidence that Jarmon conspired with R.C. and D.G., among others, to distribute crack, and worked with these individuals and others to achieve the common goal of selling crack for profit.

In an effort to defeat this unassailable conclusion, Jarmon contends that the testimony of R.C. and D.G. was unreliable and did not support the conclusion that the conspiracy distributed 280 grams of crack. Br. 31-33. But R.C. and D.G. offered similar and consistent descriptions of the operation of the conspiracy and Jarmon's leadership role in it, and were further corroborated by the intercepted calls and controlled purchases. More importantly, the credibility and reliability of these witnesses was a question for the jury. Jarmon thoroughly attacked the credibility of these witnesses at trial through cross-examination and in closing argument.

Thus, even if the testimony of R.C. and D.G. supported conflicting inferences about the existence of the charged conspiracy, which it does not, those conflicts must be resolved in favor of the jury's verdict. Drawing all inferences in favor of the verdict, this evidence was more than sufficient for a rational jury to find that Jarmon engaged in a conspiracy to distribute crack cocaine as charged in Count 1.

Jarmon's contention that the evidence was insufficient to support the jury's conclusion that the conspiracy distributed at least 280 grams of crack and that this quantity was reasonably foreseeable to Jarmon, Br. 33-37, is similarly unavailing. As the district court noted in denying Jarmon's motion for acquittal, the testimony of R.C. and D.G. that Jarmon directed and controlled their drug sales was corroborated by substantial other evidence, and alone supported the jury's quantity finding. App. 19. *See Gibbs*, 190 F.3d at 219 ("[A] leader of a drug conspiracy is responsible for the drug quantities transacted by his subordinates in furtherance of the conspiracy.").

The court also found that the jury could have relied solely on R.C.'s testimony in concluding that Jarmon was responsible for more than 280 grams of crack. Reviewing R.C.'s testimony, the court stated that the jury could have "conservatively" found that R.C. sold "one bundle of 0.03-gram

nickel bags per shift for eight months, totaling over 340 grams of crack."
The court further stated that Jarmon and R.C. were in "constant contact
regarding crack distribution" in this time frame, so that any crack
distributed by R.C. was reasonably foreseeable to Jarmon.[12] App. 20.

R.C.'s testimony regarding the volume of drug sales was also
corroborated by the intercepted calls in which Jarmon discussed the
amount of crack sold by his sellers. Jarmon stated that his sellers sold a
"stack," or $1,000 worth of crack (about four "$250" bundles) per shift
early in the month. App. 178-79, 742. Jarmon said that "$250 ain't nothing,
man" and agreed that the sellers usually sold "higher numbers" than $250
per shift. App. 181-82, 310-12.

In an effort to defeat this conclusion, Jarmon repeats his claim that
R.C. and D.G. were also selling crack for others, and the jury's quantity
finding necessarily included crack that was attributable to others and not to

---

[12]  The court's estimate of R.C.'s crack sales was exceedingly
conservative. R.C. testified that he sold up to four $250 bundles per shift on
busy days, and rarely sold fewer than two bundles. App. 263-64. A bundle
consists of $250 of crack broken down into 50 $5 bags, each containing
about 0.05 grams of crack. App. 261, 732, 758; PSR ¶ 123 (chart). The
court's analysis used only one bundle of crack per shift, while the jury could
have reasonably relied on R.C.'s testimony that he sold at least two bundles
of crack per shift. The court's estimate also does not include the crack sold
by other sellers in the conspiracy, such as D.G. and co-coconspirators
Michael Ferrell, Raheen Butler, and Taft Harris. App. 265-69, 310-12.

him. In this regard, he contends that R.C. reported that he only sold "red" packets of crack for Jarmon and sold pink packets of crack for Stinson, and that the government improperly attributed to Jarmon the pink packets of crack recovered from R.C. Br. 3, 13-14, 30, 35, 43, 49. This misstates the record. In addition to R.C.'s testimony that he did not sell crack for Stinson in the period in which he worked for Jarmon, other evidence showed that Stinson was in prison in late 2012, and ceded the territory in the Blumberg complex to Jarmon after he was incarcerated. App. 122, 125-27; Supp. App. 110-15 (October 2012 prison call between Stinson and Jarmon). In addition, R.C. testified that Jarmon sold "different color[]" packets of crack, App. 355-56, and that that the "pink" packets of crack seized from R.C.'s apartment at the time of his arrest in 2014 were provided by Jarmon, App. 278, 331. Similarly, D.G. sometimes sold blue packets of crack for Jarmon, App. 372-73, 634-35, 662, and Jarmon himself sold crack packaged in black packets, App. 517.

Jarmon also claims that the government failed to establish a proper chain of custody for the seized drugs, so that it was unclear if the crack that was analyzed was attributable to Jarmon and/or his cohorts. Br. 35-37. This Court has "long rejected the proposition that evidence may only be admitted if a 'complete and exclusive' chain of custody is established."

*United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010) (citation omitted). "To establish a chain of custody sufficient to make evidence admissible, the proponent 'need only prove a rational basis from which to conclude' that the evidence is what the party claims it to be." *Id*. The evidence presented was more than sufficient to support the conclusion that the substances that were analyzed by the chemists came from the controlled purchases in this investigation, as the government presented evidence of the "DEA Exhibit" number for any seized drugs.[13] Other crack that was seized was similarly accounted for. Moreover, any discrepancies in the chain of custody evidence was an issue for the jury and were fully explored at trial, and the resolution of any conflicting inferences was entrusted to the jury.

In sum, as the district court correctly found, the evidence fully supported the jury's conclusion that Jarmon conspired to sell more than 280 grams of crack as charged in Count 1.

---

[13]  For example, the case agent testified that after the controlled purchase of drugs from Jarmon on June 11, 2013, DEA agents placed the drugs in an evidence bag labeled "DEA Exhibit 36," App. 539; the chemist then tested DEA Exhibit 36 and confirmed it contained 22.7 grams of crack cocaine, Supp. App. 107.

**B.    Jarmon's Convictions on the Substantive Distribution Counts Are Supported by Sufficient Evidence.**

Jarmon argues that the evidence was insufficient to support his conviction on the substantive drug trafficking counts. Br. 44-50. This argument is also meritless.

Based on the evidence at trial, a rational juror could readily find that Jarmon was guilty on the substantive drug trafficking counts. The government presented evidence of six controlled purchases of crack from Jarmon, which formed the basis of Counts 7-9 and 11-18. The controlled purchases were recorded, capturing Jarmon's voice and his face during transactions in which he sold bulk crack to a confidential informant. The government introduced still photographs of Jarmon's face captured by the video camera worn by the CI during several of the transactions. Supp. App. 103-04, 108-09. The agents who supervised the controlled purchases identified Jarmon's voice on the recordings. App. 513-39, 675-95.

In attacking this evidence, Jarmon once again resurrects the arguments he presented to the jury at trial, contending that the evidence was insufficient because: 1) the non-testifying confidential informants who

conducted the purchasers were inherently unreliable, Br. 32-33, 47-48;[14]

2) the videos of the transactions did not depict the actual drug transactions

or were otherwise inadequate, Br. 445-46;[15] 3) the government did not

establish a proper chain of custody for the seized drugs, Br. 46; and 4) there

was conflicting evidence regarding the weight of the seized drugs, Br. 4-7,

46-47. Jarmon ignores that these very arguments were presented to and

rejected by the jury. Jarmon presents no valid basis to disturb the jury's

well-supported verdict on these counts, but merely seeks to substitute his

judgment for that of the jury. Jarmon's attempt to usurp the jury's role

must be rejected.

The other substantive counts (Counts 24-33) were based on

intercepted calls in September 2013, in which Jarmon directed drug

customers to his sellers to purchase crack. App. 142-43, 288-90, 747-48,

Supp. App. 83-86 (Sept. 7, 2013); App. 150-51, Supp. App. 94-96 (Sept. 12,

---

[14] As Jarmon recognizes in his brief, the government provided the criminal records of and other pertinent information relating to the confidential informants who conducted the controlled purchases. Jarmon explored this information with the case agents, and argued to the jury that the confidential informants were biased and unreliable.

[15] As noted above, the video cameras worn by the CI captured Jarmon's face and other aspects of his meetings with the CI, but not all the actual exchanges of drugs and money. The government also presented the audio recordings of the transactions with Jarmon and the testimony of the agents who supervised the controlled purchases from Jarmon. This evidence was more than sufficient to support the verdicts.

2013); App. 161-62, Supp. App. 99-100 (Sept. 18, 2013); App. 162-63, 295-96, Supp. App. 101-02 (Sept. 19, 2013).[16] For example, in the two separate calls on September 7, 2013, Jarmon directed drug customers to seller R.C., telling him in the later call, "Yo, uhhh, [the customer] coming up. She got fifty, give her an extra one." App. 142-43; Supp. App. 83-86. R.C. identified Jarmon's voice on the calls and confirmed that Jarmon was sending customers up to the 18th floor of the building and directing R.C. to sell crack to them. App. 269-70, 288-90.

Jarmon contends that the evidence was insufficient because Jarmon did not explicitly mention crack in these conversations. Br. 49. He again ignores the other evidence in the record which permitted jurors to conclude that the conversations were about crack distribution. The government

---

[16]  For the first time on appeal, Jarmon suggests that Counts 24 and 25 should be dismissed because the time of the relevant intercepted call was mistakenly identified in the indictment as "approximately 4:41 pm," instead of "approximately 5:35 pm." Br. 48. His argument is unavailing. Where "'on or about" language is used in an indictment, the government is not required to prove the exact dates. *See Real v. Shannon*, 600 F.3d 302, 308 (3d Cir. 2010) (finding no variance where the indictment charged the crime to have been committed in December, but the crime may have occurred in November or January). "[A] variance in proof of a date is not material in the absence of some specific evidence of prejudice." *United States v. Schurr*, 775 F.2d 549, 558 (3d Cir. 1985)). Here, there was no variance in date, only time (54 minutes), and Jarmon has not explained how his defense was prejudiced or would have been different had the later time been specified, or why the jury would have reached a different result.

presented dozens of other intercepted calls in which Jarmon discussed drug trafficking activity using similar cryptic or vague language. The calls at issue occurred in the time frame of the conspiracy when R.C. was working for Jarmon, and referenced the area in the public housing complex where Jarmon's group sold crack. *See, e.g.*, Supp. App. 94-96 ("We got something popping on the 18th floor of this building"). As noted above, R.C.'s testimony also corroborated the conclusion that the calls related to potential drug sales.

This evidence was rather indisputable, particularly that recorded on video and audio. And viewing that evidence in the light most favorable to the government, a rational juror could readily infer that Jarmon arranged crack transactions in these conversations, and thus aided and abetted the possession of crack for the purpose of distributing it as charged in these counts. Jarmon's conviction on all counts should be affirmed.

## II. THE DISTRICT COURT DID NOT ERR IN DENYING CODEFENDANT STINSON'S MOTION TO SUPPRESS HIS PRISON PHONE CALLS

### Standard of Review

"This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

### Discussion

Jarmon contends that the district court erred by denying codefendant Stinson's motion to suppress his prison phone calls, which included a call with Jarmon in October 2012 while Stinson was incarcerated in a Philadelphia County prison.[17] Br. 50-58. This argument fails. Jarmon may not pursue a Fourth Amendment claim on Stinson's behalf, and presents no argument as to how his own Fourth Amendment rights were violated

---

[17] As noted above, in a call with Stinson on October 3, 2012, Stinson gave Jarmon permission to distribute crack inside the Blumberg complex. Stinson told Jarmon he could "make all the money off the building, right now." They discussed the specific floor on which Jarmon could sell crack (the 18th floor of the Hemberger building), a specific apartment to be used as a stash location, and a drug dealer to employ to sell the crack. App. 122, 125-26; Supp. App. 110-15.

because the government obtained Stinson's prison phone calls without obtaining a warrant.

Stinson was held in Philadelphia County prison facilities on several occasions prior to his indictment in this case. App. 7, 10-11. During investigation of this case, the government obtained recordings of Stinson's prison calls by means of administrative subpoenas. App. 7, 9. Before trial, Stinson moved to suppress the recordings, arguing that the government violated his Fourth Amendment rights by obtaining them without a search warrant. App. 6-8. Stinson relied upon *Carpenter v. United States*, 138 S. Ct. 2206 (2018), in which the Court held that the government must obtain a warrant for cell site location information that allows the government to track a person's location. Stinson argued that the government had to obtain a warrant for the recorded calls because he had a reasonable expectation of privacy in them. App. 6-9. Jarmon filed a general motion to join in the pretrial motions filed by his codefendants, which the court granted. App. 2, 5.

After an evidentiary hearing, the district court denied Stinson's motion. App. 10-11. The court found that inmates in the Philadelphia County prison system were aware that their calls were being recorded and monitored. The court credited the testimony of the county prison's

custodian of records that prisoners were notified in three ways that prison telephone calls are recorded and monitored:  in a handbook given to each prisoner upon arrival at the prison; by signs posted in the area of the telephones; and by an audio message played at the beginning of each telephone call informing both the prisoner and the other party on the line that the call is being recorded and monitored. App. 11.

The court held that because Stinson knew that his telephone calls would be recorded, he had no expectation of privacy in those calls. App. 11, citing *Lanza v. New York*, 370 U.S. 139, 143 (1962); *United States v. Shavers*, 693 F.3d 363, 389-90 (3d Cir. 2012) (no expectation of privacy where handbook and signage informed prisoner his calls are recorded), *vacated on other grounds*, 570 U.S. 913 (2013). Because Jarmon filed no written motion and merely joined in Stinson's motion, he never asserted in the district court that he himself had a reasonable expectation of privacy in the prison telephone calls. Accordingly, the district court did not address Jarmon's privacy interest in the recorded calls, or his "standing" to raise a privacy claim on behalf of Stinson.

In this appeal, Jarmon argues that district court erred by denying Stinson's motion to suppress the prison calls because Stinson had a Fourth Amendment privacy interest in his prison telephone calls, and these rights

were violated when the government obtained these calls without a warrant. Br. 50-58. He does not specifically assert that he himself had a reasonable expectation of privacy in the recorded call at issue, and that the government violated his rights by obtaining the call without a warrant.[18] It is well-settled that Fourth Amendment rights are personal rights that cannot be "vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978); *United States v. Myers*, 102 F.3d 227, 231 (6th Cir. 1996). Thus, Jarmon cannot pursue a Fourth Amendment claim on Stinson's behalf. Because Jarmon presents no claim that his own Fourth Amendment rights were violated, and he cannot assert a claim on Stinson's behalf, his argument on appeal fails to present a cognizable challenge to the court's denial of Stinson's motion, and may be denied on this basis alone.

Even if his argument is deemed to present a claim that he also had a reasonable expectation of privacy in the outgoing prison calls made by Stinson, this claim is unavailing, as the law does not recognize a privacy

---

[18]  Jarmon states, "If a pretrial detainee wants to communicate with anyone by phone they are forced to 'consent' to use the telephone system in the prison, otherwise they cannot contact the outside world. Based upon the holding in *Carpenter*, Stinson had a reasonable expectation of privacy in the recorded calls. As such, the government should have applied for and obtained a search warrant." Br. 53. He presents no argument as to his privacy interest in recorded prison calls when he was not the detainee at issue.

interest in such calls. "The [Fourth] Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable." *Oliver v. United States*, 466 U.S. 170, 177 (1984) (citations, quotation marks and brackets omitted). It is well established that neither a prisoner nor a person who receives a call from a prisoner has a reasonable expectation of privacy in telephone conversations between them. *See Shavers*, 693 F.3d at 389-90; *United States v. Van Poyck*, 77 F.3d 285, 290-91 (9th Cir. 1996) ("[N]o prisoner should expect privacy in his outbound telephone calls."); *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989) (finding unreasonable that a non-prisoner should expect telephone calls with an inmate in a high-security prison to be private); *United States v. Willoughby*, 860 F.2d 15, 22 (2d Cir. 1988) ("Given the institution's strong interest in preserving security, we conclude that the interception of calls from inmates to noninmates does not violate the privacy rights of the noninmates.")

This is particularly true where the parties are on notice that the calls will be monitored. *See, e.g., United States v. Novak*, 531 F.3d 99, 102 (1st Cir. 2008) (recognizing that there was no Fourth Amendment concern where prisoner was advised of phone monitoring and thus consented to

monitoring); *United States v. Balon*, 384 F.3d 38, 44 (2d Cir. 2004)

(same).

These decisions derive from the Supreme Court's decision in *Hudson v. Palmer*, "that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

The Court stated:

Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial, criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others....

*Id.* at 526-27. The Court recounted the numerous murders and other violent crimes that take place in a prison setting, and continued,

Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the

inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize.

*Id*. at 527. On this basis, the Court upheld the right of prison officials to conduct suspicionless searches of an inmate's cell and belongings. The same considerations plainly permit monitoring of inmate communications as officials deem necessary, without the need to show particularized suspicion.

Even if Jarmon had a reasonable expectation of privacy in calls from Stinson from prison, which he did not, the monitoring of that communication would not violate the Fourth Amendment because Stinson consented to the recording by using the prison phones that he knew were monitored. *See Novak*, 531 F.3d at 101 ("A telephone call can be monitored and recorded without violating the Fourth Amendment so long as one participant in the call consents to the monitoring.").

Jarmon argues that the body of law described above is no longer valid in light of *Carpenter,* which held that the government "must generally obtain a warrant supported by probable cause" before acquiring cell site location information (CSLI) for a period of seven days or more. 138 S. Ct. at 2221. In *Carpenter*, pursuant to court orders under 18 U.S.C. § 2703(d), the

government acquired wireless carrier cell-site records revealing the location of the defendant's cell phone whenever it made or received calls for a seven-day period. The Supreme Court reasoned that because the historical cell-site location information ostensibly provided an "all-encompassing record of [Carpenter's] whereabouts" over a seven-day period, Carpenter had a legitimate expectation of privacy in that information.

Jarmon argues that *Carpenter's* holding extends to recorded prison telephone calls, suggesting that a similar privacy interest exists in prisoners' phone communications. He is wrong. Inmates in Philadelphia County prisons are repeatedly warned that all of their outbound calls, except conversations with their attorneys, are subject to recording and monitoring. App. 10-11. Any subjective belief that their communications are private is therefore unreasonable. *Shavers*, 693 F.3d at 389-90. Indeed, the situation of a citizen at liberty whose cell phone may be tracked in public and private locations cannot conceivably be compared to that of an incarcerated individual whose conversations with outsiders are monitored in order to assure proper conduct and institutional security.

Jarmon identifies no case in which a court has held that *Carpenter* applies to prison phone calls. Instead, Jarmon portrays *Carpenter* as an example of the Court "expanding the expectation of privacy" afforded by the

Fourth Amendment in the digital age, Br. 53, opening the floodgates to

wider and wider applications of Fourth Amendment protection. His

interpretation of *Carpenter* is entirely unfounded. *Carpenter* is in fact a

very narrow decision. The Supreme Court emphasized the narrowness of its

decision:

> Our decision today is a narrow one. We do not express a view on
> matters not before us: real-time CSLI or "tower dumps" (a download
> of information on all the devices that connected to a particular cell
> site during a particular interval). We do not disturb the application of
> *Smith* and *Miller* or call into question conventional surveillance
> techniques and tools, such as security cameras. Nor do we address
> other business records that might incidentally reveal location
> information. Further, our opinion does not consider other collection
> techniques involving foreign affairs or national security. As Justice
> Frankfurter noted when considering new innovations in airplanes
> and radios, the Court must tread carefully in such cases, to ensure
> that we do not "embarrass the future." *Northwest Airlines, Inc. v.
> Minnesota*, 322 U.S. 292, 300 (1944).

*Carpenter*, 138 S. Ct. at 2220. *See also id.* at 2220 n.4 ("[W]e 'do not begin

to claim all the answers today,'…and therefore decide no more than the case

before us."). The *Carpenter* majority reminded the dissent that the subject

matter of the case differed greatly from the evidence to which the courts

were accustomed, stating that "CSLI is an entirely different species of

business record." *Id.* at 2222. For that reason, the Court expected that its

holding would rarely apply:

> This is certainly not to say that all orders compelling the production
> of documents will require a showing of probable cause. The

Government will be able to use subpoenas to acquire records in the overwhelming majority of investigations. We hold only that a warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party.

*Id.*

The *Carpenter* Court could hardly have been clearer. Its decision was intended to apply to the situation before the Court—the necessity of a warrant to obtain cell site location information for a period of seven days or more—and only to that situation. There is absolutely no basis for applying *Carpenter* to the familiar situation presented by this case. The facts of this case, as they pertain to Jarmon's codefendant's prison calls, are not novel, and neither is the law that governs those facts. The district court correctly denied the codefendant's motion to suppress the recordings of his prison telephone conversations.

## III. THE DISTRICT COURT DID NOT CLEARLY ERR BY APPLYING A FOUR-LEVEL LEADERSHIP ENHANCEMENT

### Standard of Review

In reviewing the district court's determination regarding a role in the offense adjustment, review is plenary if the purported error was one of legal interpretation. The district court's factual determination is reviewed for clear error. *United States v. Bierley*, 922 F.2d 1061, 1064 (3d Cir. 1990).

Under the clear error standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

### Discussion

Jarmon claims that that the district court erred in determining that he was a leader of the criminal activity and applying a four-level enhancement on this basis. Br. 38-39. Jarmon provides little argument, other than contending that the government failed to prove the charged

conspiracy or that Jarmon's drug trafficking operation involved five or more individuals or was otherwise "extensive." His claim is meritless.

Section 3B1.1 of the Guidelines provides for a four-level enhancement if the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1 (a). To qualify for this enhancement, the defendant need not have served in a leadership capacity as to all of the other participants in the criminal conspiracy. It is only necessary that defendant was the organizer or leader of "one or more other participants." U.S.S.G. § 3B1.1, app. note 2. The guidelines list seven factors for the sentencing court to consider in determining whether a defendant played a leadership role:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, app. note 4. See also *United States v. Helbling*, 209 F.3d 226, 243-44 (3d Cir. 2000).

In overruling Jarmon's objection to the leadership enhancement,[19] the district court found that there was "abundant evidence" that Jarmon

---

[19] As the court noted, Jarmon did not directly challenge the application of the enhancement but objected to all paragraphs in the

was the leader of the drug trafficking conspiracy charged in this case. App. 848. The court explained that the trial evidence established that Jarmon employed and supervised the sellers and lookouts, and that both R.C. and D.G. testified that Jarmon hired them to sell crack and continuously supplied them with crack. The court specifically noted that Jarmon "would advise sellers when a preferred customer approached, and directed the drug amount the customer would receive." App. 34-35.

The court's findings are fully supported by the record. R.C. and D.G. testified that Jarmon recruited and hired them, supplied them with bundles of crack cocaine, gave them authority to sell the drugs within the housing project, collected drug proceeds from them, and paid them for their shift work. App. 257-58, 373-77. D.G. also testified that Jarmon used violence to maintain control of the operation. App. 379-384. The intercepted calls also showed that Jarmon directed the activities of other sellers and lookouts in the drug trafficking conspiracy. For example, Jarmon told Taft Harris if, when, and how much to pay lookouts for their services. App. 178-81. The calls also showed that Jarmon purchased bulk quantities of drugs, *see, e.g.,* App. 149-50, 196-98, 204-05, 748-49, and levied taxes against sellers who

---

Presentence Report that described him as a leader of the conspiracy, which in effect challenged the leadership enhancement. App. 34.

failed to perform their duties, App. 157-60. That is exactly what an organizer and leader does.

Jarmon now asserts that the four-level enhancement was not applicable because the criminal activity was not "extensive." His argument is belied by the record. The evidence showed that the conspiracy involved five or more participants. In addition to Jarmon himself, the evidence showed that R.C., D.G., Raheen Butler, Michael Ferrell, Taft Harris, Stephen Dawkins, and Derek Fernandes were members of the conspiracy at various times. App. 260-61, 265-69, 271-74, 310-12. Moreover, even if the conspiracy involved fewer than five participants, it was "otherwise extensive" under the guidelines, given the volume of drug sales, the number of drug customers, the length of time that the group operated, and the way in which the group and its members monopolized and controlled an entire building, forcing residents to stay silent or face threats and violence if they "ratted" to police. *See Helbling*, 209 F.3d at 248 (considering the nature of the criminal scheme, among other factors, to evaluate whether it presented the "functional equivalent" of five participants).

In sum, the district court did not commit clear error in applying the four-level leadership enhancement.

## IV. THE DISTRICT COURT DID NOT CLEARLY ERR IN APPLYING THE DANGEROUS WEAPON ENHANCEMENT

### Standard of Review

The district court's factual finding that a dangerous weapon was possessed is reviewed for clear error. *See United States v. Napolitan*, 762 F.3d 297, 307 (3d Cir. 2014).

### Discussion

Jarmon argues the district court clearly erred in determining that he was subject to a two-level enhancement because he possessed a dangerous weapon during the commission of the offense. Br. 40. This argument fails.

Section 2D1.1 provides for a two-level increase if a dangerous weapon, like a firearm, was possessed. U.S.S.G. § 2D1.1(b)(1). The commentary to this Guideline explains that the enhancement "reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1, app. note 11. The commentary further explains that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.*

The government can show possession simply "by establishing that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *Napolitan*, 762 F.3d at 309. If the

government makes such a showing, the burden of production shifts to the

defendant to demonstrate that the connection between the weapon and the

drug offense was "clearly improbable." *Id.* (citation omitted).

At sentencing, the government introduced evidence that on

September 12, 2013, at approximately 1:44 a.m., law enforcement

intercepted a call in which Jarmon said that he had to acquire "another

pistol" after he had directed "Boo" (codefendant Damon Edwards) to "take

the pistols out of the house" because of police presence in the area. Jarmon

stated:

> G gotta try to get another pistol. I just let Boo take the pistols out the
> house, man, 'cause shit. I don't want that shit in the building with all
> them cops right there. I ain't tryin' to (UI) that shit, dog. Then, they
> comin' down. Housing, they on some other shit. They just keep
> searching everybody over on the building....
>
> I'm, man, I'm scared to even get in this car with this pistol, man (UI).
> I ain't drivin'. (UI) They see the (UI). They's gonna know something
> was up.

App. 848-49, 884.

Jarmon unambiguously stated that he possessed a "pistol" and that

he was afraid police might catch him with the firearm in his building or his

car. Jarmon did not use coded language and freely admitted on the call that

he possessed a firearm. During that time period, Jarmon and his co-

conspirators were selling crack in the Blumberg complex; indeed, that very

same day, Jarmon was directing drug customers to sellers on the 18th floor of the building to buy crack cocaine. App. 150-51; Supp. App. 94-96. Moreover, Jarmon's observations and counter-surveillance of police ("all those cops right there") was a modus operandi of the conspiracy. App. 139-40.

In arguing at the sentencing hearing that the evidence was insufficient, Jarmon contended that he never said on the call that he possessed a pistol, but only that "Boo" possessed a pistol. App. 850-51. The court disagreed with counsel's interpretation and found that the enhancement was applicable because the evidence showed that he and his codefendant both possessed guns in the course of the conspiracy. App. 35, 851.

Jarmon now contends that his firearm possession was not connected to the drug trafficking offense, and that he was simply trying to get rid of the gun. Br. 40. This argument is unpersuasive. Jarmon not only admitted on the call to having a gun but stated that he would need to get another gun if he had to get rid of the gun that he had. This evidence was sufficient to support the district court's conclusion that Jarmon and his codefendant possessed a dangerous weapon in the commission of the offense. The

district court did not clearly err by applying this enhancement, and its ruling should be affirmed.

## V. THE DISTRICT COURT DID NOT CLEARLY ERR IN APPLYING AN ENHANCEMENT FOR THE USE OF VIOLENCE AND THREATS OF VIOLENCE

### Standard of Review

The district court's determination that the defendant used violence and threatened to use violence in the commission of the offense is a factual finding that is reviewed for clear error.

### Discussion

Jarmon argues that the district court clearly erred in applying a two-level enhancement for the use of violence and threats of violence under U.S.S.G. § 2D1.1(b)(2), claiming the evidence presented in support of this enhancement was unreliable. Br. 41-42. This claim fails.

Section 2D1.1(b)(2) provides for a two-level enhancement if the defendant used violence, made a credible threat to use violence, or directed the use of violence, in the commission of the drug trafficking offense. The government presented evidence that Jarmon made multiple threats and committed acts of violence over the course of the conspiracy, including intercepted calls in which Jarmon threatened to use violence against others.

In one intercepted call, Jarmon threatened a female resident in the public housing community and directed the use of violence when he said,

"She don't understand how this sh*t go down around here....I'm gonna get her hurt....I'm getting six people to beat her the f*ck up tonight." App. 147-50; Supp. App. 91-93. In another, Jarmon threatened to "beat the sh*t out" of rivals who disrupted his drug trafficking business. App. 143-46; Supp. App. 87-90. In addition, co-conspirator seller D.G testified that Jarmon physically assaulted her in a dispute over drug proceeds. During the assault, Jarmon grabbed money out of D.G.'s pants pocket, ripping off the pocket, then Jarmon overpowered her and flung her across the room, cracking her head on a table. App. 379-84. The assault was corroborated by records of an emergency room visit, where D.G. was treated for lacerations on her left eyebrow and received stitches. App. 208-10, 384.

Based on this evidence, the district court found that the intercepted calls and testimony showed that Jarmon used violence and threats of violence throughout the course of the drug trafficking conspiracy. App. 33-34, 847. The court explicitly credited D.G.'s testimony, saying that she "testified credibly that [Jarmon] had violently assaulted her." App. 34.

Jarmon disagrees with the court's assessment, contending that D.G.'s testimony was not credible and the court erred in relying on it as support

for this enhancement.[20] Br. 41-42. Jarmon's argument ignores the clear error standard of review. Even assuming that the evidence supported an alternative conclusion, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *See Anderson*, 470 U.S. at 574. Here, D.G.'s account was corroborated by the emergency room records, and by other intercepted calls in which Jarmon made threats to harm other individuals. The district court's credibility determination was reasonable and supported by the record. The fact that Jarmon disagrees with the court's assessment does not establish error, and certainly not clear error.

---

[20] Jarmon repeats the arguments regarding D.G.'s credibility that he presented at trial, including the fact that D.G. told hospital personnel that her cousin had caused her injuries. Br. 41. D.G. admitted that she initially lied about the source of her injuries because she was scared. App. 384. The district court was able to evaluate D.G.'s credibility at trial, and did not clearly err by crediting D.G.'s account of the assault.

## VI. THE DISTRICT COURT DID NOT CLEARLY ERR IN DETERMINING THAT JARMON WAS RESPONSIBLE FOR AT LEAST 280 GRAMS OF CRACK UNDER THE GUIDELINES

### Standard of Review

The district court's determination regarding the quantity of drugs attributable to a defendant under the Guidelines is reviewed for clear error. *United States v. Yeung*, 241 F.3d 321, 322 (3d Cir. 2001).

In a case of "jointly undertaken criminal activity," a defendant's relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). A person convicted of conspiracy to distribute controlled substances "is accountable for all quantities of contraband with which he was directly involved and…all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.'" *United States v. Iglesias*, 535 F.3d 150, 160 (3d Cir. 2008), quoting U.S.S.G. § 1B1.3 app. note 2.

### Discussion

In an extension of his argument that the evidence failed to establish the he was involved in a single conspiracy to distribute at least 280 grams of crack as charged in Count 1, Jarmon contends that the district court clearly erred in finding that he was responsible for at least 280 grams for

purposes of the Sentencing Guidelines. Br. 42-44. Jarmon once again contends that that the government failed to prove that Jarmon and his codefendants participated in a single conspiracy, or that the crack sold by R.C. and D.G. was part of this conspiracy. Br. 43.

This argument fails. As explained above, the jury's finding that the conspiracy distributed at least 280 grams of crack and he was responsible for this amount was supported by substantial evidence. In determining the quantity for guideline purposes, the court only considered a few controlled buys of crack and the crack sold by R.C. and D.G., and even then used a very conservative estimate of R.C.'s sales for Jarmon, concluding that approximately 723 grams of crack were attributable to Jarmon. App. 36, 851-52, 894-95.[21] Jarmon does not challenge the specific quantity finding, but simply faults the court for holding him responsible for the crack distributed by R.C and D.G. As explained above, R.C.'s testimony regarding the quantity of crack that he sold for Jarmon was corroborated by the intercepted calls between R.C. and Jarmon, by calls in which Jarmon discussed selling up to four bundles per shift, App. 178-79, 742, and by D.G.'s testimony during which she describes a similar sales volume, App.

---

[21] This drug quantity did not include crack sold by Jarmon and others after R.C. was arrested, App. 281-82, nor did it not include crack regularly distributed by Jarmon's other sellers, App. 265-69, 310-12.

377-78. The evidence established that Jarmon was directing the distribution of crack by R.C., D.G., and other sellers in this time frame, and their crack sales were reasonably foreseeable to him. The record fully supports the district's court's conclusion that Jarmon was responsible for the distribution of more than 280 grams of crack as the jury found. The court's finding should be affirmed.

## VII. THE DISTRICT COURT DID NOT ERR IN IMPOSING CONCURENT TERMS OF IMPRISONMENT OF 360 MONTHS ON THE CONSPIRACY COUNT AND THE SUBSTANTIVE DISTRIBUTION COUNTS

### Standard of Review

This Court exercises plenary review of an interpretation of the Sentencing Guidelines, and reviews factual findings for clear error. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). The Court of Appeals reviews the final sentence for unreasonableness. *United States v. Booker*, 543 U.S. 220, 261 (2005). The burden rests on the party challenging the sentence to show unreasonableness, and this Court gives due deference to the district court's judgment. *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006).

### Discussion

Jarmon contends that the district court committed plain error in imposing the total term of imprisonment in this case. While his argument is somewhat difficult to decipher, it appears he contends that the court erred in determining that all counts grouped for purposes of determining his guideline range. Repeating his claim that the evidence failed to establish the existence of a single conspiracy and his conviction on this count cannot stand, he claims that his guideline range on the other counts should be

"drastically lower" based on the smaller quantities of crack involved in those counts. Br. 59-61. The district court committed no error in calculating the applicable guideline range or in imposing sentence on each count of conviction.

The Probation Office determined that the offenses were grouped pursuant to U.S.S.G. § 3D1.2(d) because the offense level was determined largely on the basis of the total quantity of the substance involved (crack). PSR ¶ 152. *See* U.S.S.G. § 3D1.2(d) (counts shall be grouped "[w]hen the offense level is largely determined on the basis of...the quantity of a substance involved," and directing that offenses under Sections 2D1.1 [drug trafficking] and 2D1.2 [drug offenses near a protected locations] shall be grouped). Jarmon did not object to this conclusion.

The district court agreed that the counts grouped and determined that Jarmon's guideline range was 360 months to life. App. 37, 40. After hearing argument on the appropriate sentence, the court determined that a term of imprisonment of 360 months was warranted. The court imposed that term of imprisonment on each count to the extent allowed by the statutory maximum for each offense: concurrent sentences of 360 months on the conspiracy count and the Section 860 counts (the protected location counts); and lesser concurrent sentences of 48 months on Count 2 (the

telephone count), and 240 months on Count 9 (distribution of crack).[22] Thus, the court complied with the directive in Section 5G1.2, which states that after determining the "total punishment," the court "shall impose that punishment on each such count," and that the sentences on such counts should run concurrently "to the extent allowed by the statutory maximum sentence." U.S.S.G. § 5G1.2, app. note 1; *United States v. Ward*, 626 F.3d 179, 184 (3d Cir. 2010).

Jarmon now claims for the first time that the court committed plain error by grouping all of the counts, arguing that the court should have separately determined the guideline range on the substantive counts based on the drug quantities involved in those counts, and he should have received a lower sentence on these counts. He ignores the directives for imposing sentence on multiple counts of conviction set forth in Section 5G1.2, and cites no other guideline provision or other authority that supports his position that the substantive counts should not have been grouped with the conspiracy count for purposes of determining the guideline range. Indeed, his argument appears to be premised on the assumption that his conviction on the conspiracy count cannot stand, and

---

[22] Count 2 carried a 48-month statutory maximum, Count 9 carried a 240-month statutory maximum, and the remaining counts of conviction all carried statutory maxima greater than 360 months. PSR ¶ 222.

without this count, his range on the substantive counts would be lower. Br. 60. While this contention is also incorrect, there is no reason to proceed further, as his conviction on the conspiracy count was supported by ample evidence.

To the extent that Jarmon challenges the substantive reasonableness of the sentence, that is unavailing. Jarmon led a long-term and harmful conspiracy to distribute drugs in a public housing facility. He was a career offender. And the sentence fell at the bottom of the advisory guideline range, and thus should be presumed reasonable. *Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (the "sentence was within the applicable Sentencing Guidelines range and thus is presumptively reasonable.").

In short, the court committed no error in imposing concurrent sentences of 360 months on the conspiracy count and the substantive distribution counts. Jarmon's sentence should be affirmed.

## CONCLUSION

For the reasons stated above, the government respectfully requests

that the judgment of the district court be affirmed.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126


*/s Jerome M. Maiatico*
JEROME M. MAIATICO
Assistant United States Attorney
Pa. Bar No. 210073


United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8258

## CERTIFICATION

1. The undersigned certifies that this brief contains 12,932 words, exclusive of the table of contents, table of authorities, signature block, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.


*/s Jerome M. Maiatico*
JEROME M. MAIATICO
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

> Maureen Coggins, Esquire
> 509 Swede Street
> Norristown, PA  19404

*/s Jerome M. Maiatico*
JEROME M. MAIATICO
Assistant United States Attorney

DATED:  May 3, 2021.